| | |
|---|---|
| **TONY DEWITT**<br>2526 Harford Road, Apt. 1A<br>Baltimore, Maryland 21218<br><br>　　*Plaintiff*<br><br>v.<br><br>**WILLIAM RITZ**, Police Officer,<br>in his individual and official capacity,<br>Baltimore City Police Department<br>601 East Fayette Street<br>Baltimore, Maryland 21202<br><br>　　*Serve on:*<br>　　Daniel Beck, Chief Legal Counsel<br>　　242 West 29th Street<br>　　Baltimore, Maryland 21211<br><br>and<br><br>**GREGORY MACGILLIVARY,**<br>Police Officer, in his individual<br>and official capacity,<br>Baltimore City Police Department<br>601 East Fayette Street<br>Baltimore, Maryland 21202<br><br>　　*Serve on:*<br>　　Daniel Beck, Chief Legal Counsel<br>　　242 West 29th Street<br>　　Baltimore, Maryland 21211<br><br>and<br><br>**GARNELL GREEN,** Police Officer,<br>in his individual and official capacity,<br>Baltimore City Police Department<br>601 East Fayette Street<br>Baltimore, Maryland 21202<br><br>　　*Serve on:*<br>　　Daniel Beck, Chief Legal Counsel<br>　　242 West 29th Street<br>　　Baltimore, Maryland 21211 | \*　IN THE UNITED STATES<br><br>\*　DISTRICT COURT FOR<br><br>\*　THE DISTRICT OF MARYLAND,<br><br>\*　BALTIMORE DIVISION<br><br>\*<br><br>\*　*JURY TRIAL DEMANDED*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\*<br><br>\* |

|  |  |
|---|---|
| and | * |
|  | * |
| **KEVIN TURNER,** Police Officer, | |
| in his individual and official capacity, | * |
| Baltimore City Police Department | |
| 601 East Fayette Street | * |
| Baltimore, Maryland 21202 | |
|  | * |
| *Serve on:* | |
| Daniel Beck, Chief Legal Counsel | * |
| 242 West 29th Street | |
| Baltimore, Maryland 21211 | * |
|  | * |
| and | |
|  | * |
| **MARK VENEY,** Police Officer, | |
| in his individual and official capacity, | * |
| Baltimore City Police Department | |
| 601 East Fayette Street | * |
| Baltimore, Maryland 21202 | |
|  | * |
| *Serve on:* | |
| Daniel Beck, Chief Legal Counsel | * |
| 242 West 29th Street | |
| Baltimore, Maryland 21211 | * |
|  | * |
| and | |
|  | * |
| **MICHAEL GLENN,** Police Officer, | |
| in his individual and official capacity, | * |
| Baltimore City Police Department | |
| 601 East Fayette Street | * |
| Baltimore, Maryland 21202 | |
|  | * |
| *Serve on:* | |
| Daniel Beck, Chief Legal Counsel | * |
| 242 West 29th Street | |
| Baltimore, Maryland 21211 | * |
|  | * |
| and | |
|  | * |
| **CHRIS JONES,** Police Officer, | |
| in his individual and official capacity, | * |
| Baltimore City Police Department | |
| 601 East Fayette Street | * |

|  |  |
|---|---|
| Baltimore, Maryland 21202 | * |
| *Serve on:*<br>Daniel Beck, Chief Legal Counsel<br>242 West 29th Street<br>Baltimore, Maryland 21211 | *<br><br>* |
| and | * |
| **CHARLES JONES**, Police Officer,<br>in his individual and official capacity,<br>Baltimore City Police Department<br>601 East Fayette Street<br>Baltimore, Maryland 21202 | *<br><br>*<br><br>* |
| *Serve on:*<br>Daniel Beck, Chief Legal Counsel<br>242 West 29th Street<br>Baltimore, Maryland 21211 | *<br><br>* |
| *Defendants* | *   Case Number:_____ |
|  | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **COMPLAINT**

## INTRODUCTION & NATURE OF THE ACTION

1. This action arises from one of the most shameful patterns of police misconduct in Baltimore City's history, which is being brought by the Plaintiff, Tony Dewitt, an innocent man, who was falsely arrested and maliciously prosecuted for a cold-blooded murder and an attempted murder that the Baltimore City Police Department (*hereinafter,* the "Police Department") knew from the outset that he did not commit. There was clearly negligence involved – or at least a symphony of bumbling – and a deliberate conspiracy by which the events were laid at Mr. Dewitt's doorstep. There is even the strong suggestion that the Police Department knew the identity of the cold-blooded murderer and instead of concentrating their efforts on arresting the cold-blooded murderer, they manufactured inculpatory evidence against Mr. Dewitt to satisfy their own purposes.

2. This should not come as a surprise to the residents of Baltimore City. Similarly, following the hugely successful podcast *Serial,* hosted by Sarah Koening, which investigated the Police Department's investigation of the 1999 murder of Hae Lee, no one across the nation should be surprised to learn of Mr. Dewitt's unfortunate fate as much of the police misconduct in Mr. Dewitt's case was committed by the same police officers that were responsible for the investigation into Hae Lee's murder and the malicious prosecution of Adnan Syed. In fact, while Mr. Dewitt was serving over a decade in prison, he became friends a Mr. Syed. It was no coincidence that both Mr. Dewitt and Mr. Syed were serving protracted sentences in the same prison.

3. In this case, Sherene Moore was fatally gunned down on her sixteenth birthday and Maurice Booker was gunned down and survived after a gunman blindly fired multiple shots from around a corner at a number of people congregated on and around a nearby porch. There was only one person that the Defendants identified as an eyewitness to the shootings, Maurice Booker. However, prior to making an alleged identification of Mr. Dewitt in a second interview, Maurice Booker stated in a first interview that he did not know the identity of the shooter and that he had merely seen the shooter's arm that was extended around a corner. He was then told by the Defendants that Mr. Dewitt shot him and in no uncertain terms that the adult members of his family would be incarcerated and that the children would be put in foster care if he did not fabricate an identification of Mr. Dewitt. Likewise, Maurice Booker's sister, Tasha Booker, was

threatened that if she did not fabricate corroborating evidence bolstering Maurice Booker's phony identification of Mr. Dewitt, that that she would be falsely prosecuted on unrelated charges. And, Shamecca Bryant, Mr. Dewitt's friend that he had been out with till well after the shooting was threatened that if she did not cooperate with the Defendants she would go to prison for thirty three years.

4. Where the Defendants did not possess any eyewitness testimony inculpating Mr. Dewitt as the shooter that was not the product of their coercive threats, they did possess numerous exculpatory statements that Mr. Dewitt was not the shooter. One example was the statement of Shannon Lewis, who was present when a man by the name of Mwambe Epps took credit for the shooting. Another example was Tyrell Curtis, an eyewitness, who identified George Gaines as the shooter. As well, Damion Young made a statement to the Defendants that George Gaines was the shooter.

5. Based on the coerced testimony manufactured by the Defendants, Mr. Dewitt was convicted of first degree murder, second degree murder, use of a handgun in the committing of a crime, and wearing or carrying a handgun. However, after Mr. Dewitt's Motion for Post-Conviction Relief was granted, on October 16, 2015, a *nolle prosequi* was entered on all counts. And after well over a decade, he was released from prison.

## PARTIES

I. **THE PLAINTIFF**

6. At all times herein pertinent, the Plaintiff, Tony Dewitt, is and was a resident of the State of Maryland and a citizen of the United States of America. He currently resides in the City of Baltimore and at all times herein pertinent resided in the City of Baltimore.

II. **THE DEFENDANTS**

7. That at all times herein pertinent, the Defendant, William Ritz, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official

policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Ritz acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Ritz is being sued in his individual capacity.

8. That at all times herein pertinent, the Defendant, Gregory MacGillivary, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant MacGillivary acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant MacGillivary is being sued in his individual capacity.

9. That at all times herein pertinent, the Defendant, Garnell Green, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Green acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Green is being sued in his individual capacity.

10. That at all times herein pertinent, the Defendant, Kevin Turner, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official

policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Turner acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Turner is being sued in his individual capacity.

11. That at all times herein pertinent, the Defendant, Mark Veney,, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Veney acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Veney is being sued in his individual capacity.

12. That at all times herein pertinent, the Defendant, Michael Glenn, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Glenn acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Glenn is being sued in his individual and official capacity.

13.. That at all times herein pertinent, the Defendant, Chris Jones, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and

control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Jones acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Jones is being sued in his individual capacity.

14. That at all times herein pertinent, the Defendant, Charles Jones, was a police officer of the Baltimore City Police Department, and was acting in such a capacity as an agent, servant, and employee of the Baltimore City Police Department, and was acting under the direction and control of the Baltimore City Police Department, and pursuant to either official policy, or the custom, practice, and usage of the Baltimore City Police Department. Additionally, at all times referred to herein, Defendant Jones acted under the color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Maryland, the City of Baltimore, the Baltimore City Police Department, and pursuant to his authority as a police officer of the Baltimore City Police Department. Defendant Jones is being sued in his individual capacity.

## JURISDICTION AND VENUE

15. This action arises under the Constitution to the United States; 42 U.S.C. § 1983; and 42 U.S.C. § 1988(b).

16. This Court has original jurisdiction over Mr. Dewitt's federal law claims, including claims arising under the Constitution of the United States of America, pursuant to 28 U.S.C. § 1943 and 28 U.S.C. § 1331.

17. Under 28 U.S.C. § 1391(b)(1) and (2), venue is appropriate in the United States District Court, Baltimore Division, because the Baltimore Division is (1) a judicial district where at least one Defendant resides and all Defendants reside in the State of Maryland, and (2) it is the judicial district in which all the events and omissions giving rise to Ms. Whetstone's Complaint occurred.

## *ALLEGATIONS COMMON TO PLAINTIFF'S CLAIMS*

18. At 2:30 a.m. on July 5, 2002, Sherene Moore and Maurice Booker were shot while on the porch of a vacant residence in the 1700 block of Montpelier Street in Baltimore City. Ms. Moore, who had just celebrated her sixteenth birthday, died from a single gunshot wound to her chest. Maurice Booker, who was eighteen, sustained a gunshot wound to his arm and chest.

19. Shavon Stanley, who was seventeen years old, described Ms. Moore as her "best friend." She testified that July 4 was Ms. Moore's birthday, and, on that date, they went to the Inner Harbor with another friend. At about 8:00 p.m., they returned home to Montpelier Street, and then went down the street to "Marty's" house, i.e., Maurice Booker, at 1702 Montpelier Street, where they remained until the early morning hours of July 5, 2002.

20. A group had gathered in front of, on the steps to, and on the porches of the residences at 1700 and 1702 Montperier Street, which included Maurice Booker, Ms. Moore, Ms. Stanley, and others. Some of the individuals were drinking alcohol and smoking marijuana.

21. At about 2:15 a.m., while Ms. Stanley was standing next to Ms. Moore and talking to Maurice Booker, she heard six or seven shots coming from her right. According to Stanley, upon hearing gunshots, everyone ran; she ran onto the porch at 1700 Montpelier Street and laid down. Ms. Moore also ran up on the porch, but Ms. Stanley saw that she had blood on her back. In the statement she gave to police that night, and at trial, Ms. Stanley claimed that she did not see who fired the shots.

22. At around 2:00 a.m., Maurice Booker was on the porch steps of his Montpelier Street home, "chilling" and drinking with a "bunch of people," when "[s]omebody stuck their arm around the corner [on Polk Avenue] and shot me." He ran from the scene, through an alley off Montpelier Street, and toward Harford Road. An ambulance on Homestead Street transported him to the hospital. Homicide detectives responded to the hospital, but Maurice Booker declined to speak with them. We shall return to Maurice Booker, *infra*.

23. Baltimore City Police Officer Charles Jones responded to a call for a shooting on Montpelier Street, a one-way street. He found Ms. Moore fatally injured on a porch. Officer Jones cordoned off an area "from the upper part of PoIk Avenue, around the 1700 block of Montpelier Street, up several houses within the 1700 block of Montpelier Street." He was acutely aware that Mr. Dewitt was never at the crime scene.

24. Maurice Booker's sister, Tasha Booker, was twenty years old at the time of the incident. She had been inside the Booker residence at 1702 Montpelier Street when she heard "more than three" gunshots. It is undisputed that she did not see the shooting. Afterwards, she went outside and saw "the girl" (i.e., Ms. Moore) laying on the "vacant porch."

25. On the date of the shooting, Tasha Booker spoke with the police at the hospital. Later on that date, while at the Homicide Unit, she gave a taped statement to Detective Gregory MacGillivary. Tasha Booker provided another taped statement on July 30, 2002.

26. Tasha Booker testified that, on the afternoon of July 30, 2002, Detective MacGillivary and Detective Ritz came to her house and lied about their identities to gain entry. She stated that she told the officers that she was not outside at the time of the shooting, and "did not see" who did the shooting. According to her, the officers said that if she "didn't go with them and talk to them, they was going to lock me, have me arrested…" Further, she claimed that the officers told her that they already "knew who did the shooting" and that she "might as well just go ahead and talk because they could hold me for know[ing] it and not speaking." Detective McGillivary and Detective Ritz told Tasha Booker that if she wanted to avoid being arrested, she had to fabricate a statement that she saw Mr. Dewitt driving around Montpelier Street after the shooting and that he eventually exited his motor vehicle and displayed a handgun. As well, she was required to fabricate a photo identification of Mr. Dewitt as the guy she was to claim exited the motor vehicle with a handgun. She complied but then recanted.

27. Shamecca Bryant owned the blue four-door Ford Taurus station wagon that had been seen traveling on Montpelier Street on the date in question. Ms. Bryant, who was twenty four years of age at the time, presented as an alibi for Mr. Dewitt. She stated that, on July 5, 2002, she was with Mr. Dewitt from around midnight (i.e.; before the shooting) until she dropped him off on Montpelier Street at around 3:30 or 4:00 a.m. (i.e., after the shooting). Ms. Bryant

explained that she had known Mr. Dewitt for ten years and they were sexual partners in July of 2002.

28. According to Ms. Bryant, on July 5, 2002, she met Mr. Dewitt between midnight and 1:00 a.m. on Harford Road, and then they drove around. They got some drinks and some marijuana, drove around a while longer, went to the Inner Harbor, where they walked around, then drove to a parking lot, where they had sex.

29. Ms. Bryant dropped Mr. Dewitt off on Montpelier Street between 3:00 a.m. and 4:00 a.m. Ms. Bryant recalled during her trial testimony that she began to drive away, but then returned because she wanted Mr. Dewitt to pay for half the gas, since she was not working at that time. She did not see Mr. Dewitt so she came back around the block again and then noticed that she had driven through some tape at the intersection of Montpelier, Polk, and Disquith. She added that she had been speeding. Ms. Bryant stated that she saw a police officer, who first told her to stop, but then told her to keep going. Ms. Bryant did not attempt to speak to the officer because she had been drinking; instead she drove home.

30. In August 2002, Ms. Bryant gave an oral statement to the police. She testified that Detective MacGillivary had threatened her with incarceration for thirty three years. Moreover, Ms. Bryant stated that someone spoke to her in the elevator at the police station and asked her how she was doing. When she responded that she was fine, the individual replied, "[N]o, you're not." She was then put in a room by herself for approximately one hour. Although she was not handcuffed, Ms. Bryant claimed she was not free to leave.

31. Maurice Booker shot Marquis Brown in June 2002, eight days before Maurice Booker was shot. In connection with that offense, on September 25, 2002, the Warrant Apprehension Task Force arrested Maurice Booker at his residence at 1762 Montpelier Street.

32. Maurice Booker and Cornell Booker were transported to the Eastern District where Detective Kevin Turner interviewed Maurice Booker. He testified that Detective Turner spoke to him about the attempted murder charge, as well as the shooting in which he was a victim. According to Maurice Booker, Detective Turner told him that Mr. Dewitt was the one

who shot him, and threatened to "lock up" Maurice Booker's mother and older sister and place his younger sister and niece in foster care if he did not identify Mr. Dewitt as the shooter. Moreover, Detective Turner promised Maurice Booker that, if he identified Mr. Dewitt as the shooter, the detective would "let [Cornell] go...and he wasn't going to lock my mother and my sister up." Because Maurice Booker had seen his mother and sister at the police station, he believed that Detective Turner had brought them there.

33. Further, Detective Turner showed Maurice Booker a photo array, while Cornell Booker was in the room. The array was first presented to Maurice Booker face down and, when he turned it over, Detective Turner stated: "[T]hat's him right here. Just sign your name on the top." Maurice Booker placed his signature on top of Mr. Dewitt's photograph because the detective directed him to do so, and in order to secure his family's release. On the back of the array, Maurice Booker wrote after being prompted: "[H]e shot me."

34. Maurice Booker was later transported to the Homicide Unit, where he was interviewed about the underlying matter by Detective MacGillivary. Maurice Booker claimed that he told Detective MacGillivary about Detective Turner's promise to release his mother, sisters, and niece. Maurice Booker gave a taped statement and viewed another photo array, again identifying Mr. Dewitt. He also again wrote on the back of the array: "He shot me."

35. Regarding the taped statement that he provided, Maurice Booker stated that he had seen an armed man in the alley when he fled after he was shot, but explained at trial that it was a lie, and he merely said what Detectives Turner and MacGillivary told him to say. Moreover, Maurice Booker stated at trial that Detectives MacGillivary and Turner had also instructed him to say that a light-skinned man had stuck his arm around the corner and started shooting. Further, he claimed that he was instructed to state that a man had run up the alley and was trying to shoot him, but the gun jammed.

36. Maurice Booker's statement reflects that when asked if any promises had been made to him: "That dude that bring me down here and say he was going to let my brother and them go." Detective MacGillivary did not ask Maurice Booker any follow up questions concerning this promise.

37.	In his trial testimony for the defense, Maurice Booker denied that he saw Mr. Dewitt on July 5, 2002, denied that Mr. Dewitt shot him, and denied that Mr. Dewitt had a gun. When asked why he lied about these matters, Maurice Booker stated: "Because of Detective Turner, he said he was going to lock my mother and my sister, my niece put in a foster care and my little sister Brittany."

38.	According to Detective Turner, it was Sergeant Chris Jones who made the decision to transport Maurice Booker's family to the police station. When the family arrived, they were not under arrest. However, Maurice Booker was unaware that his family members were not under arrest.

39.	According to Detective MacGillivary, Maurice Booker arrived at the Homicide Unit at 3:15 p.m., and he was interviewed jointly by Sergeant Gamell Greene, and MacGillivary.

40.	Tasha Booker's interview on July 30, 2002, was conducted by Detectives MacGillivary and Ritz, and began at 5:25 p.m. The interview was tape recorded, and concluded at 6:10 p.m. During that interview, Detective MacGillivary showed Tasha Booker a photographic array, from which she identified Mr. Dewitt. When Tasha Booker's statement was completed, she was transported to her home.

41.	Larry Mitchell, a.k.a. "Brother," was nineteen years old at the time of trial. Testifying for the defense, he recalled that, on the night in question, he was sitting on the porch at 1702 Montpelier Street and estimated that there were eight people outside the house. Three individuals were also on the porch at 1700 Montpelier Street, which was vacant. At approximately 2:30 a.m Mr. Mitchell heard gunshots, which came from around a brick wall at the comer at Polk Avenue. Although Mr. Mitchell did not see anyone fire the shots, he "saw an arm" belonging to "[a] light-skinned guy" that came "around the comer shooting and everybody run…" Again, Mr. Dewitt is described as having dark skin.

## *CAUSE OF ACTION*
**Violation and Conspiracy to Violate Fourth and Fourteenth Amendment Rights under 42 U.S.C. § 1983 – Malicious Prosecution**
**WILLIAM RITZ, GREGORY MACGILLIVARY, GARNELL GREEN, KEVIN TURNER, MARK VENEY, MICHAEL GREEN, CHRIS JONES, CHARLES JONES**
*In their individual capacities*

42. Each of the paragraphs of this Complaint is incorporated by Mr. Dewitt as if restated fully herein.

43. The Defendants in this cause of action are "persons," as that term is used in the text of 42 U.S.C. § 1983.

44. The Defendants in this cause of action conspired by entering into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of initiating and continuing criminal prosecutions against Mr. Dewitt and the Defendants in this cause of action did in fact, under the color of law, initiate and continue criminal prosecutions against Mr. Dewitt without probable cause, justification, and/or belief that he was guilty.

45. The Defendants in this cause of action commenced and continued the criminal proceedings against Mr. Dewitt without any belief that he was guilty of the crimes for which he was charged or that they had any reasonable right to charge the charges he was charged with against him. Additionally, the criminal prosecutions against Mr Dewitt were instituted for a purpose other than bringing Mr. Dewitt to justice or securing the conviction of a guilty person.

46. There was no probable cause for the criminal prosecution the Defendants in this cause of action were responsible for initiating and continuing against Mr. Dewitt and all the charges levied against Mr. Dewitt were terminated in his favor.

47. The Defendants in this cause of action acted intentionally, with actual malice and ill will, and without legal justification, knowingly, willfully, and wantonly evidencing a complete and utter disregard for the truth in instituting legal proceedings against Mr. Dewitt and evidenced a reckless and callous disregard for, and deliberate indifference to Mr. Dewitt's constitutional rights.

48. The Defendants in this cause of action were motivated in the pursuit of criminal charges against Mr. Dewitt, not by a belief that the charges had any factual or legal merit or that probable cause for their existence existed, but for improper, illegal, and unconstitutional purposes.

49. The conduct of the Defendants in this cause of action as aforescribed caused Mr.

Dewitt to suffer deprivations to his liberty as his liberty relates to the concept of seizure and violated Mr. Dewitt's right to be free of unreasonable and unlawful seizure, secured by the Fourth and Fourteenth Amendments to the United States Constitution.

### *CLAIMS, DAMAGES, AND JURY DAMAGES*

50. The actions of the Defendants have deprived Mr. Dewitt of his civil rights under federal law, including the Fourth and Fourteenth Amendments to the United States Constitution.

51. The unlawful and reckless acts of the Defendants constituted violations of Mr. Dewitt's rights under the Constitution of the United States of America, including any innominate tort theory encompassed by the facts pleaded herein.

52. The unlawful and reckless actions of the Defendants caused Mr. Dewitt severe emotional distress, humiliation, and embarrassment, pain and suffering, and other damages including, without limitation, damages for lost wages, for which Mr. Dewitt is entitled to monetary relief.

53. All acts committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, with actual malice, wantonly, and/or recklessly and said acts meet all of the standards for the imposition of punitive damages.

54. As a direct and proximate result of these acts, Mr Dewitt suffered damages including, among others, the following: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; humiliation; indignities and severe embarrassment; degradation; and injury to his reputation.

**WHEREFORE**, the Plaintiff prays as follows:

A. That the Court will award compensatory damages to the Plaintiff and against the Defendants, jointly and/or severally, in an amount in excess of One Hundred Thousand Dollars ($100,000.00), which exceeds any and all jurisdictional requirements of this Court that may exis;

B. That the Court award punitive damages to the Plaintiff, and against the Defendants, jointly and/or severally, that will deter such conduct by the Defendants and others in the future;

C. For a trial by jury;

D. For interest on said judgment, recovery of the Plaintiff's costs, including any and all allowable attorney's fees; and

E. For any and all other relief to which the Plaintiff may be entitled.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, LLC**

/s/

By: _____
Charles H. Edwards IV
Federal Bar No.: 29977
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
Phone: (410) 547-8568
Fax: (410) 547-0036
charles.edwards@robinhoodlawyers.com
*Counsel for the Plaintiff*

**DEMAND FOR JURY TRIAL**

The Plaintiff demands a jury trial on all issues and causes of action asserted in the foregoing Complaint.

/s/

_____

Charles H. Edwards IV