# EXHIBIT

# A

| | | |
|---|---|---|
| **TONY DEWITT** | * | **IN THE** |
| **Petitioner** | * | **CIRCUIT COURT** |
| **v.** | * | **FOR** |
| **STATE OF MARYLAND** | * | **BALTIMORE CITY** |
| **Respondent** | * | **Case Nos.: 103006015-16** |
| | | **PC No.: 11165** |

*   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION

Tony DeWitt, Petitioner, filed a Petition for Post Conviction Relief pursuant to the Post Conviction Procedure Act, Md. Code Ann., Crim. Proc. § 7-101, *et. seq.* Petitioner filed the Petition on December 5, 2013. Respondent filed a Motion to Dismiss/Response on December 9, 2013, and filed a Memorandum in Support of on August 15, 2014. Petitioner filed an Amended Post Conviction Petition on June 13, 2014, and filed another Amended Post Conviction Petition on July 25, 2014. A post conviction hearing was held on July 15, 2015[1] and continued until August 6, 2015.[2] The State of Maryland was represented by Cynthia Banks, Esq., and the Petitioner was represented by Roland Brown, Esq. In his Petition and at the post conviction hearing, Petitioner asserts the following grounds for relief:

1.  The prosecutor violated Petitioner's rights under the 4th and 14th Amendments and the Due Process Clause when she allowed the Detective to submit perjured statements to the grand jury to obtain an indictment;

---

[1] At the post conviction hearing on July 15, 2015, the Petitioner orally waived several allegations. In his Petition for Post Conviction Relief, Petitioner waived the sections titled II.A; II.C; VII; VIII; X.A.II; X.A.III; X.E.; X.H. Petitioner also orally waived the allegations in both Amended Petitions. Additionally, Petitioner orally requested a continuance, at the end of the hearing, to investigate alleged coercive tactics used by the police when interviewing witnesses. The Respondent objected. The Court denied Petitioner's request for a continuance.

[2] The hearing was continued until August 6th for the Court to hear testimony from trial counsel.

2.  The prosecutor erred when she made several inflammatory remarks, misstatements of evidence and law to the jury in closing arguments;

    a.    The prosecutor acted as the judge by misquoting first and second degree murder to the jury;

    b.    The prosecutor during closing arguments made several assertions of opinion and personal knowledge stating Detective Turner, Detective MacGillivary and State's witness Allen Rice wouldn't "lie";

3.  The prosecutor denied Petitioner a fair trial by allowing the Detectives to testify falsely at Petitioner's trial, which violated Petitioner's due process rights and his rights under Article 21 of the Maryland Declaration of Rights;

4.  The prosecutor knowingly used false testimony of Maurice Booker and failed to disclose exculpatory evidence at Petitioner's trial;

    a.    The prosecutor knew before trial that perjury and coercion took place to obtain Maurice Booker's pretrial statement;

    b.    Petitioner obtained information through the Maryland Public Information Act about a witness named Shannon Lewis who gave a statement to the detectives that she witnessed another suspect by the name of Mwambe Epps saying that he committed the crime;

    c.    Petitioner obtained information through the Maryland Public Information Act about a potential witness, Tyrell Curtis who gave an exculpatory statement to detectives that was never disclosed to the defendant or his counsel;

5. The detectives in Petitioner's trial made several errors which violate Petitioner's due process rights and his 4th Amendment protection, in the warrant clause, by giving false statements to obtain a warrant and a grand jury indictment;

    a.    The arrest warrant is invalid because the detective in the Petitioner's trial gave false statements to the magistrate to obtain the warrant;

    b.    The detectives violated Petitioner's due process and 4th Amendment rights by giving perjured statements to the grand jury to obtain the indictment;

6. The trial court committed plain error when the jury was improperly instructed [and] when the trial court erroneously gave limited instructions for [attempted] second degree murder and second degree murder, which violated Petitioner's due process rights;

    a.    First, the trial court failed to instruct the jury on "specific intent" for attempted murder which would make the instruction improper because it was not fully given;

    b.    Second, the trial court failed to instruct the jury on "mitigating circumstances" and justified killing for second degree murder without giving a full instruction, which makes the instruction confusing and erroneously given;

7. The trial court erred in refusing to [give an] alibi instruction when the evidence presented at trial was sufficient to generate an [alibi defense];

8. Trial counsel and appellate counsel were ineffective by committing multiple serious attorney errors, each of which individually and all of which cumulatively caused Petitioner's due process rights under the 14th Amendment and his rights under Article 21 of the Maryland Declaration of Rights to be violated;

a.   Trial counsel was ineffective for failing to object when the prosecutor acted as the judge during closing arguments by misquoting first and second degree murder instructions and making several inflammatory remarks in vouching for witnesses;

    i.   The prosecutor acted as the judge while misquoting first and second degree murder instructions to the jury which had a tendency to mislead the jury;

    ii.   During closing arguments, trial counsel never objected when the prosecutor made several assertions of opinion and personal knowledge for several of the State's witnesses, stating that her witnesses wouldn't "lie" or make promises, which should be considered improper vouching;

b.   Trial counsel was ineffective for failing to challenge Petitioner's arrest warrant, which was obtained by threats, promises and coerced testimony that led to a grand jury indictment;

c.   Trial counsel was ineffective for failing to investigate Maurice and Cornell Booker's statements before going to trial, knowing he needed more time to investigate, but [ still proceeded to trial];

d.   Trial counsel was ineffective for not asking for a mistrial when the prosecutor violated the prosecutorial vouching rule, making herself a witness in Petitioner's trial;

e.   Trial counsel was ineffective for failing to request a jury instruction for [attempted] second degree murder, second degree murder, and failing to

object to the trial court giving erroneous limited instructions to the jury on the elements of second degree murder and [attempted] second degree murder;

    i. Trial counsel was ineffective for failing to object and not asking the trial court to give a full instruction for [attempted] second degree murder, which made the instruction limited and erroneous;

    ii. Trial counsel failed to object or request a full instruction to the jury on second degree murder, which made the instruction limited and erroneous;

f.     Appellate counsel was ineffective for failing to raise on direct appeal that the trial judge abused his discretion by allowing coerced, perjured testimony into evidence, and appellate attorney never argued that the induced threats, promises and coerced statements falsely accused Petitioner of being the assailant;

    i. Appellate counsel was ineffective for failing to raise on appeal that the trial judge abused his discretion by allowing the prosecutor to admit prejudicial, coerced statements to the jury;

    ii. Appellate counsel was ineffective for failing to raise on appeal that the induced threats, promises and coerced statements [of Maurice and Tarsha Booker were based on improper police conduct and should not have been introduced as evidence in Petitioner's trial];

g.     Trial counsel was ineffective for failing to investigate exculpatory evidence of witness statements, failing to summons police and failing to

question the police officer who interviewed the witness and wrote the report about the conversation of another assailant being accused of the crime in this case;

h.   Appellate counsel was ineffective for failing to raise on appeal the trial court's violation of Petitioner's 6th Amendment right to a speedy trial;

i.   Trial counsel was ineffective for failing to request [an alibi] instruction and not objecting to the trial court's failure to [give the instruction].

For the reasons stated in allegation 8(g),[3] post conviction relief is **GRANTED** as a matter of law.

## I.   PROCEDURAL HISTORY AND STATEMENT OF FACTS

In March of 2003, Petitioner was charged with committing a series of crimes, including first degree murder; second degree murder; attempted first degree murder; attempted second degree murder; first degree assault; second degree assault; and handgun violations.   On November 24, 2003, Petitioner was found guilty of the following:

Under Case Number 103006015:

**First Degree Murder** of Sherene Moore:  term of life;

**Second Degree Murder** of Sherene Moore:  merged with the conviction for first degree murder;

**Use of a Handgun in a Crime of Violence**:  term of 20 years to be served consecutively;

**Wearing/Carrying/Transporting a Handgun**:  merged with the conviction for use of a handgun in a crime of violence.

Under Case Number 103006016:

**Attempted First Degree Murder** of Maurice Booker:  term of life suspend all but 30 years, concurrent to the conviction for first degree murder;

---

[3] As to the allegation concerning Tyrell Curtis the Petition is granted.

**Attempted Second Degree Murder** of Maurice Booker:   merged with the conviction for attempted first degree murder;

**First Degree Assault**: merged with the attempted murder convictions;

**Second Degree Assault**: merged with the attempted murder convictions;

**Use of a Handgun in a crime of Violence**:  merged;

**Wearing/Carrying/Transporting a Handgun**: merged.

Without correction, this Court adopts the same statement of facts drawn and quoted directly from the Court of Special Appeals unpublished opinion:

At 2:30 a.m. on July 5, 2002, Sherene Moore and Maurice Booker were shot while on the porch of a vacant residence in the 1700 block of Montpelier Street in Baltimore City.   Ms. Moore, who had just celebrated her sixteenth birthday, died from a single gunshot wound to her chest.  Booker, who was eighteen, sustained a gunshot wound to his arm and chest.

Shavon Stanley, who was seventeen years of age at the time of trial, described Moore as her "best friend."  She testified that July 4 was Moore's birthday, and, on that date, they went to the Inner Harbor with another friend named Lakia.  At about 8:00 p.m., they returned home to Montpelier Street, and then went down the street to "Marty's" house, i.e., Maurice Booker, at 1702 Montpelier Street, where they remained until the early morning hours of July 5, 2002.

Stanley recalled that a group had gathered in front of, on the steps to, and on the porches of the residences at 1700 and 1702 Montpelier, which included Booker, Moore, Stanley, Wright, and others.   Some of the individuals were drinking alcohol and smoking marijuana.

At about 2:15 a.m., while Ms. Stanley was standing next to Ms. Moore and talking to "Daddy" (i.e., Wright) and Maurice, she heard six or seven shots coming from her right.  According to Stanley, upon hearing gunshots, everyone ran; she ran onto the porch at 1700 Montpelier Street and laid down.  Moore also ran up on the porch, but Stanley saw that she had blood on her back.  In the statement she gave to police that night, and at trial, Ms. Stanley claimed that she did not see who fired the shots.

Booker testified[4] that, at around 2:00 a.m., he was on the porch steps of his Montpelier Street home, "chilling" and drinking with a "bunch of people," when "[s]omebody stuck their arm around the corner [on Polk Avenue] and shot me." He ran from the scene, through an alley off Montpelier Street, and toward Harford Road.   An ambulance on Homestead Street transported him to the hospital.

---

[4] Maurice Booker testified for the State and was recalled as a defense witness.  In our factual summary, we have included evidence adduced from both the State's case and the defense's case.

Homicide detectives responded to the hospital, but Booker declined to speak with them. We shall return to Booker's testimony, *infra*.

Baltimore City Police Officer Charles Jones responded to a call for a shooting on Montpelier Street, a one-way street. He found Ms. Moore fatally injured on a porch. Jones cordoned off an area "from the upper part of Polk Avenue, around the 1700 block of Montpelier, up several houses within the 1700 block of Montpelier."

Officer Jones recalled that while he and Evidence Technician John Frinch were still at the scene "two vehicles . . . sped through the crime scene on various occasions coming from the 1700 block of Montpelier from Harford Road, and from Polk Avenue which intersects into Montpelier." Within a span of five to seven minutes, the vehicles traveled through the area three times. Jones noted that both vehicles had four doors, the lead car was silver, bearing a tag number of JLL 098, and the second car, which followed right behind the first car, was a "reddish-burgundy" color, bearing the tag number KMT 576. Each vehicle was operated by an African-American male, according to Jones, but Jones was unable to determine if there were any passengers in the vehicles.

Frinch testified as an expert in crime lab evaluation and techniques. He, too, saw "[t]wo cars came racing through the intersection." He added that the cars were traveling "[v]ery fast," with the second car following "[c]losely" behind the first. Because the cars drove by once or twice more, Frinch wrote down a description of the cars and their tag numbers and gave the information to Officer Jones.[5]

Maurice Booker's sister, Tasha Booker,[6] was twenty years old at the time of the incident. She had been inside the Booker residence at 1702 Montpelier Street when she heard "more than three" gunshots. It is undisputed that she did not see the shooting. Afterwards, she went outside and saw "the girl" (i.e., Moore) laying on the "vacant porch."

Tasha recalled that, after the shooting, she saw two cars driving "fast" down Montpelier Street, two to three times; the lead car was a blue Taurus and the other was a "burgundy car." Tasha identified the owner of the Taurus as "Mika," later identified as Shamecca Bryant. The burgundy car was owned by someone Tasha knew as "Daddy" (i.e., Wright). Tasha also saw appellant, whom she knew as "T.O.", in the front passenger seat of the Taurus, but was unable to see whether someone was in the vehicle with Wright. According to Tasha, at one point the cars stopped on Montpelier Street and appellant "got out and ran," but Tasha did

---

[5] In a search of the area, the police recovered two shell casings from the corner of Polk Avenue and Montpelier Street. Mark Tackas, who testified as an expert in firearms examination, explained that semiautomatic firearms eject the cartridge casings after the projectile is fired. In contrast, stated Tackas, a revolver retains the fired cartridge casings within its cylinder. No fingerprints were recovered from the casings. A spent round, which Evidence Technician John Frinch described as "a smashed bullet," was recovered from the window of a car parked in front of 1706 Montpelier Street. Ballistics analysis determined that the casings were fired from the same weapon. However, the caliber of the smashed bullet could not be determined due to its damaged condition.

[6] To avoid confusion between Tasha Booker, Maurice Booker, and Cornell Booker, we shall sometimes refer to them by their first name. Our occasional reference to "Booker" refers only to Maurice. In the record, Tasha's name is sometimes spelled as Tarsha.

not see where he went. Notably, when asked if appellant had anything in his possession, Tasha responded: "I didn't see nothing."

Tasha testified that she had known appellant for "two or three" years.[7] Although Tasha saw appellant on Montpelier Street after the shooting, she stated that she did not know the time.

On the date of the shooting, Tasha spoke with the police at the hospital. Later on that date, while at the Homicide Unit, she gave a taped statement to Detective Gregory MacGillivary.[8] Tasha provided another taped statement on July 30, 2002.

At trial, Tasha denied that she told the detective that she had seen appellant in possession of a gun when he exited the car on Montpelier Street, stating: "I didn't tell him that." When pressed, she persisted: "I said I didn't say none of that." When her taped statement of July 5, 2002, was played for the jury, Tasha denied that it was her voice on the tape.[9] Later, she stated: "I didn't give them no statement."

In Tasha' taped statement of July 5, 2002, she indicated that, after the shooting, she saw Mika driving the Taurus, with T.O. in the passenger seat. The tape continued: "They stopped in the middle of the block. . . . Tio jumped out with a gun, a black long gun, ran to the alley. . . . . 'Daddy' followed them. And then Tio came back through our block again. Tio got back in the car." According to the statement, T.O. "kept running through the street" until he got back into the car. Tasha described the gun as a black automatic, "either .44 or .45."[10]

As to the statement of July 30, 2002, Tasha did not recall providing that statement to the police. She also denied that the voice on the tape was hers.

In that statement, which was played for the jury, Tasha reiterated that she had been inside her residence at the time of the shooting and did not see who shot her brother or Moore. He noted that her brother had been "beefing" with someone named Paris Moore.[11] She indicated that, after the shooting, Bryant and appellant "kept riding . . . down the block" on Montpelier Street in Bryant's blue Taurus, with Wright's "red" car following the Taurus. She recalled that she saw the cars "soon as the . . . ambulance . . . pulled off with [Moore] . . . that's when um the blue station wagon coming rolling down the street, speeding through . . . like a couple of times." Moreover, Tasha indicated that, the third time that the cars came through, the cars "stopped in the middle of the block where there's like a little alley" and "Teo jumped out with a gun, a black long gun" and he "ran through the alley." She added that "Meeka kept on going" and "Daddy follow them." She did not see appellant, whom she described as having dark brown skin, chasing anyone. But, when Bryant came back through the block, "Teo got back in the car and Daddy was still following them . . . ." She claimed that "Daddy kept on" saying to the police "there go the boy, there go the boy right there."

---

[7] In her pretrial statement, Tasha indicated that she had known appellant for five years as of 2002.

[8] In the record, the detective's surname is sometimes incorrectly spelled "McGillivary."

[9] Previously, Tasha had acknowledged that her statement of July 5, 2002 was taped.

[10] We have relied on the trial transcript for the content of Tasha's statement of July 5, 2002.

[11] The record indicates that Paris's last name is Moore, although Tasha did not mention the last name.

Tasha also viewed a photographic array. She identified appellant as the person who jumped out of the car.

On cross-examination, Tasha testified that, on the afternoon of July 30, 2002, Detective MacGillivary and another officer came to her house and lied about their identities to gain entry. Tasha stated that she told the officers that she was not outside at the time of the shooting, and "did not see" who did the shooting. According to Tasha, the officers said that if she "didn't go with them and talk to them, they was going to lock me, have me arrested . . . ." Further, she claimed that the officers told her that they already "knew who did the shooting" and that she "might as well just go ahead and talk because they could not hold me for know[ing] it and not speaking."

In addition, Tasha stated that, at the relevant time, Maurice was involved in a dispute with someone named Paris concerning motorcycles. She claimed that she told Detective MacGillivary on July 5, 2002, that she had been informed by her cousin, Crystal Gitting, that Gitting had seen someone named Paris shooting at Maurice. Tasha recounted, after the shooting of Moore and Maurice, Paris and three others came to the hospital in a burgundy car, pulled up to her, and started laughing. She rain into the hospital because she was afraid. According to Tasha, the burgundy car she saw drive through Montpelier Street was the same car she saw Paris in at the hospital.

Shamecca Bryant owned the blue four-door Ford Taurus station wagon, tag number JLL 098, which had been seen traveling on Montpelier Street on the date in question.[12] Bryant, who was twenty-four years of age at the time of trial, presented alibi testimony. She testified that, on July 5, 2002, she was with appellant from around midnight (i.e., before the shooting) until she dropped him off on Montpelier Street at around 3:30 or 4:00 a.m. (i.e., after the shooting). Bryant explained that she had known appellant for ten years and they were sexual partners in July of 2002.

According to Bryant, on July 5, 2002, she met appellant between midnight and 1:00 a.m. on Harford Road, and then they drove around. They got some drinks and some marijuana, drove around a while longer, went to the Inner Harbor, where they walked around, then drove to a parking lot, where they had sex. Bryant stated that she had not seen a car following them. In addition, she claimed that she had done all the driving.

Bryant testified that she dropped appellant off on Montpelier Street between 3:00 a.m. and 4:00 a.m. Bryant recalled that she began to drive away, but then returned because she wanted appellant to pay for half the gas, since she was not working at that time. She did not see appellant so she came back around the block again and then noticed that she had driven through some tape at the intersection of Montpelier, Polk, and Aisquith. She added that she had been speeding. Bryant stated that she saw a police officer, who first told her to stop, but then told her to keep going. Bryant did not attempt to speak to the officer because she had been drinking; instead she drove home.

---

[12] Bryant was recalled as a defense witness. In our factual summary, we have included portions of her testimony from both the State's case and the defense case.

In August 2002, Bryant gave an oral statement to the police. She testified that Detective MacGillivary had threatened her with incarceration. Moreover, Bryant stated that someone spoke to her in the elevator at the police station and asked her how she was doing. When she responded that she was fine, the individual replied, "[N]o, you're not." She was then put in a room by herself for approximately one hour. Although she was not handcuffed, Bryant claimed she was not free to leave.

Bryant also testified that she told Detective MacGillivary that, on the morning in question, she had picked appellant up at 3:30 a.m. on Montpelier Street. Rather, she stated that she had dropped appellant off at about that time. Although Bryant agreed that she had informed Detective MacGillivary that she had driven through Montpelier Street two or three times, she denied stating that appellant was in her vehicle or that a burgundy car followed them. Further, Bryant denied telling the detective that, on her third pass through Montpeleir Street, she stopped her car, appellant got out and ran through the alleyway toward Homestead, and that she later met appellant at Harford Road and 25th Street.

As noted, Maurice shot Marquis Brown in June 2002, eight days before Maurice was shot. In connection with that offense, on September 25, 2002, the Warrant Apprehension Task Force arrested Maurice at his residence at 1702 Montpelier Street. Maurice's brother, Cornell Booker, was also arrested, because police found him "bagging up weed."[13] Maurice's mother, two sisters, and niece were present at the home.

Maurice and Cornell were transported to the Eastern District, where Detective Kevin Turner interviewed Maurice. Maurice testified that Detective Turner spoke to him about the attempted murder charge, as well as the shooting in which he was a victim. According to Maurice, Turner told him that appellant was the one who shot him, and threatened to "lock up" Maurice's Mother and older sister and place his younger sister and niece in foster care if he did not identify appellant as the shooter. Moreover, Maurice claimed that Detective Turner promised him that, if he identified appellant as the shooter, the detective would "let [Cornell] go, drop his charges, and he wasn't going to lock my mother and my sister up." Maurice explained that because he had seen his mother and sister at the police station, he believed that Detective Turner had brought them there.

Further, Maurice testified that Detective Turner showed him a photo array, while Cornell was in the room. Maurice recalled that the array was first presented to him face down and, when he turned it over, Detective Turner stated: "[T]hat's him right here. Just sign your name on the top." Maurice testified that he placed his signature on top of appellant's photograph because the detective directed him to do so, and in order to secure his brother's release. On the back of the array, Maurice wrote: "[H]e shot me."

Maurice was later transported to the Homicide Unit, where he was interviewed about the underlying matter by Detective MacGillivary. Maurice claimed that he told Detective MacGillivary about Detective Turner's promise to release his mother, sisters, and niece. Maurice recalled that he gave a taped

---

[13] Cornell Booker was convicted of the marijuana charge and sentence to eighteen months' incarceration. As noted, at the time of trial in this case, Maurice was serving ten years for the attempted murder of Brown.

statement and viewed another photo array, again identifying appellant. He also again wrote on the back of the array: "He shot me."

Regarding the taped statement that he provided, Maurice conceded that he stated that he had seen an armed man in the alley when he fled after he was shot, but explained that it was a lie, and he merely said what Detectives Turner and MacGillivary told him to say. Moreover, Maurice stated that Detectives MacGillivary and Turner had also instructed him to say that a light-skinned man had stuck his arm around the corner and started shooting. Further, he claimed that he was instructed to state that a man had run up the alley and was trying to shoot him, but the gun jammed.

Maurice's taped statement was then played for the jury. In that statement, Maurice stated that he was on the porch when he heard gunshots and felt his "arm being numb . . . ." When Maurice first heard the shots, he turned and did not see anyone, and "ran up the street." He stated that he had "seen an arm sticking around the corner" at Polk Avenue, "just seen an arm sticking around the corner and that's when I ran and I seen him in the alley." Maurice recalled that, after he was shot, he saw "T.O. in the alley," who "was still trying to shoot the gun." Maurice believed the weapon was an automatic. According to Maurice, the gun jammed, appellant was unable to shoot the weapon, and Maurice ran away. He added that he did not know why appellant would want to shoot him.

Maurice made a photographic identification of appellant as the one who shot him and Moore. He explained his selection, stating: "Because I seen him in the alley. He was running up [the alley] with a gun."

In his statement, Maurice also indicated that, while he was at the hospital for treatment of his gunshot wound, he learned that George Gaines had just been shot and killed. Maurice stated that Gaines would "hang" with appellant and described Gaines as appellant's "home boy." When Detective MacGillivary asked if Gaines was killed in retaliation for Maurice's shooting and Moore's death, Maurice responded, "Probably."

Maurice then stated that no one had forced him to give the statement and that he had not been mistreated. However, when asked if any promises had been made to him, Maurice stated: "That dude that bring me down here and say he was going to let my brother and them go." Detective MacGillivary did not ask Maurice any follow up questions concerning this alleged promise.

On cross-examination, Maurice acknowledged that his attempted murder conviction arose from his shooting of Brown on June 26, 2002. According to Maurice, Brown was friends with an individual named Paris. On June 26, Maurice was "beefing" with Brown and Paris because he (Maurice) had taken Paris's dirt bike. He confirmed that, on July 5, 2002, Paris had "a reason to beef" with him. Maurice also denied that appellant had anything to do with the June 26 shooting of Brown.

Further, Maurice reiterated that he did not see who shot him, and that he only saw an "arm stick around the corner," which was that of "a light-skinned dude"; appellant described Mr. DeWitt as dark skinned.[14] Maurice also denied that he saw appellant in the alley attempting to clear a gun. He maintained that he

---

[14] Tasha also described appellant as dark skinned.

had included that information in his taped statement because that was what Detective Turner told him to say.

In his testimony for the defense, Maurice denied that he saw appellant on July 5, 2002, denied that appellant shot him, and denied that appellant had a gun. When asked why he lied about these matters, Maurice stated: "Because of Detective Turner, he said he was going to lock my mother and my sister, my niece put in a foster care and my little sister Brittany."

Detective Turner testified that, at about 11:00 a.m. on September 25, 2002, after Maurice and Cornell Booker had been arrested, he went to the Booker residence to execute a search warrant. Maurice's mother, sister, and another family member were present. Later, after 2:00 p.m., patrol officers transported members of Maurice's family to the Eastern District in an effort to determine if they had any information concerning the marijuana recovered from the residence, and to see if they had any knowledge of the shooting of Brown. According to Detective Turner, it was Sergeant Jones who made the decision to transport Maurice's family to the police station. When the family arrived, they were not under arrest.

Turner recalled that Maurice and Booker were transported to the police station and placed in different cells, located as far apart from each other as possible. Detective Turner first conducted "a pre-interview" with Cornell and then, at about 12:15 p.m., he spoke with Maurice. Maurice was advised of his rights and agreed to answer questions without an attorney. According to Detective Turner, they spoke only for two to three minutes about the shootings at issue here, in which Maurice was a victim. The detective claimed that he did not ask Maurice about any suspects or if he knew who had shot him, nor did he ask about appellant, because he did not know who appellant was at that time. The detective added that because he did not have a suspect in the shooting, he did not show Maurice a photo array.

According to Turner, Maurice never saw his family at the police station. Moreover, Detective Turner denied that he made any promises or threats in regard to Maurice's family. At approximately 3:00 p.m., Maurice was transported to the Homicide Unit at Central District.

Detective MacGillivary investigated the shootings of Moore and Maurice Booker. He testified that, initially, Paris Moore had been a suspect, but eventually appellant was developed as a suspect. The detective had been unable to speak with Maurice concerning the shootings, however, until Maurice was arrested on the charge of attempted murder of Brown.

According to Detective MacGillivary, Maurice arrived at the Homicide Unit at 3:15 p.m., and he was interviewed jointly by Sergeant Garnell Greene and MacGillivary. The detective explained that, during a "pre-interview," he tries to ascertain what an individual has to say and they then move to a taped interview. Detective MacGillivary claimed that, during the pre-interview of Maurice, he did not tell Maurice what to say. Moreover, he claimed that Maurice spoke with him voluntarily; neither he nor Greene made any promises or threats to Maurice.

As noted, Maurice's taped statement was played for the jury. It began at 4:25 p.m. Following the taped statement, Maurice was shown a photographic array, from which he identified appellant as the person who shot him.

Over defense objection, the state was permitted to impeach Bryant through Detective MacGillivary. He testified about his interview of Bryant on August 12, 2002. Detective William Ritz and Assistant State's Attorney Cheryl Atkins, in whose office the interview took place, were also present.[15]

MacGillivary acknowledged that he advised Bryant that, "if she had any knowledge of a homicide prior, during, or after, that she could be charged with an accessory, during, or after the fact." When asked to explain what he meant, the detective stated: "If she was instrumental in the death of this young lady and the shooting of Maurice Booker prior, if she was instrumental during, or instrumental in after that she could be charged with this case." He also told Bryant that she could be charged with murder. The detective then informed Bryant "[t]hat she needed to tell me what happened." According to the detective, Bryant was not under arrest, did not want to be involved in the case, and was willing to tell the detectives and the prosecutor what had happened.

During the interview, Bryant advised that, at approximately 3:45 a.m. July 5, 2002, she went to Montpelier Street, where she met some friends and learned of the shooting. At 4:00 a.m., appellant got into her car and they drove somewhere and had sex. As they drove, she noticed a car following them. Eventually, Bryant drove down the 1700 block of Montpelier Street, stopped the car, and appellant got out and ran down an alleyway.

Detective MacGillivary also testified that, on July 5 and July 30, 2002, he interviewed Tasha Booker. Regarding Tasha's interview on July 30, 2002, he recounted that he had responded to 1702 Montpelier Street in an attempt to locate Maurice. Maurice was not there, but he asked Tasha to accompany him to the police station to discuss the shooting. Tasha was transported in his vehicle, but she was not under arrest.

Tasha's interview on July 30, 2002 was conducted by Detectives MacGillivary and Ritz, and began at 5:25 p.m. The interview was tape recorded, and concluded at 6:10 p.m. During that interview, Detective MacGillivary showed Tasha a photographic array, from which she identified appellant. When Tasha's statement was completed, she was transported to her home. MacGillivary denied that any promises or threats were made to Tasha in order to obtain her statement.

Detective MacGillivary interviewed appellant on December 12, 2002, at approximately 11:00 a.m., in the presence of Sergeant Greene and Detective Melissa Anderson. Appellant, who was then twenty-three years old, was in custody. According to Detective MacGillivary, appellant was first advised of his rights and agreed to make a statement without an attorney. Appellant signed the advice of rights form at 11:10 a.m. At 11:15 a.m., Detective MacGillivary began a "pre-interview[.]" At 12:05 p.m., the taped interview began.

---

[15] The interview took place in the prosecutor's office because Bryant was at the courthouse after being subpoenaed to appear before the grand jury. Detective MacGillivary explained that the interview was not recorded because a tape recorder was not available.

Appellant's taped statement was played for the jury.[16]  In that statement, appellant claimed that he did not commit the shooting, did not have a gun in his possession, did not know what happened on July 5, 2002, and did not know Moore. He also denied getting out of a car in the 1700 block of Montpelier Street on that date, or running up the alley with a gun. But he acknowledge that he knew Maurice "from the neighborhood[.]"

According to DeWitt, a disagreement had arisen between Gaines and Wright over drug money. He explained that he and Gaines sold "Ready Rock" in yellow-topped vials, and Maurice and Wright sold Ready Rock in different colored vials. Although they were all selling the same substance, appellant claimed that he and Gaines were making more money than Maurice and Wright, which upset the latter two. As a result, approximately one week prior to the shooting on Montpelier Street, an altercation arose between Gaines and Wright. Appellant stated that he was not present, but that Gaines later informed him that he had fought with Wright. According to appellant, Gaines indicated that he had won the fight, but claimed that Wright threatened to kill Gaines.  In a conversation that took place a few days after the fight, Gaines said that he needed to kill Wright before Wright killed him.

Regarding July 4, 2002, appellant recounted that he had gone to the Inner Harbor with Gaines to see the fireworks and to meet girls. After the fireworks, they walked around the Inner Harbor, ate, then returned to Harford Road around midnight. Appellant and Gaines went their separate ways. Later, as appellant was standing on the corner by his house, he saw Bryant driving down Harford Road in a blue wagon.

Appellant stated that it was around midnight when he met up with Bryant. He got into the passenger seat of her car and the two drove around; no one else was in the car.  Appellant recalled that they drove down Harford Road, Montpelier Street, and Asquith Street to a gas station. They then obtained "some blunts" and "some weed" and drove around smoking. Then, they stopped at a bar, purchased alcohol, and drove around some more. Eventually, they stopped along Kirk Avenue and had sex. Afterward, at around 3:30 a.m. or 4:00 a.m. Bryant dropped appellant off on Harford Road and told him that she was going home. He claimed that they did not drive on Montpelier Street. He also denied that he had been in a car that was chased by Wright. When he got home, he saw the police and flashing lights one block away, but did not go to see what had happened.

Further, appellant indicated that he knew "Little Marty" (i.e., Maurice) had been shot on Montpelier Street, but he did not know why. Appellant thought his "rap buddy," Gaines, with whom he was "real tight," had shot Maurice. He added that Marty was not supposed to get shot. Instead, said appellant, Wright was supposed to get shot, because Gaines had to get Wright before Wright got him. Appellant explained: "There was beef and so words had been said, and it's either I'm going to get you or you're going [to] get me first. That's how it goes."

As noted, Gaines was killed a few hours after Moore and Maurice were shot.  Appellant believed that the two shooting incidents were related.  He

---

[16] Before trial, appellant moved to suppress his statement; the motion was denied.  On appeal, appellant does not claim that the trial court erred in its ruling.

explained that "George [Gaines] was trying to shoot one of them" because of the fight. Appellant also acknowledged that he was shot in August of 2002. Initially, he stated that this shooting was not related to the incident in question. He reiterated that the fight in issue concerned drug territory and drug money: Wright and Maurice were upset that Gaines and appellant were making more money, and Gaines was killed and taken out of the picture. Appellant added that Wright killed Gaines over "jealousy" and "what happened that night." Appellant then confirmed that he was shot in August because "the drug battle was still going on."

When Detective MacGillivary indicated that the bullet that killed Gaines was meant for DeWitt, appellant responded: "He probably had one meant for me and him." When asked why Wright and Maurice would want to kill him, appellant responded:

Why? Jealousy, jealousy. Me and him [Gaines] hustling together and him shooting him, and knowing that I'm going to know who shot him. So to get rid of me is either to send me to jail or kill me, that's how it goes. That's what he's trying to do now.

At the conclusion of his statement, appellant indicated that he had not been threatened and that he had been treated fairly.

Larry Mitchell, a.k.a. "Brother," was nineteen years old at the time of trial. Testifying for the defense, he recalled that, on the night in question, he was sitting on the porch at 1702 Montpelier Street, and estimated that there were eight people outside the house. Three individuals were also on the porch at 1700 Montpelier Street, which was vacant. At approximately 2:30 a.m., Mitchell heard gunshots, which came from around a brick wall at the corner at Polk Avenue. Although Mitchell did not see anyone fire the shots, he "saw an arm" belonging to "[a] light-skinned guy" that came "around the corner shooting and everybody run. . . ."

*Tony DeWitt v. State of Maryland*, No. 2493, slip op. at 3-23 (Court of Special Appeals of Maryland February 22, 2007).

On December 11, 2003, Petitioner's Motion for New Trial was denied. On January 14, 2004, the Honorable Alfred Nance sentenced Petitioner to Life suspend all but 50 years, followed by five years of probation. On January 14, 2004 Petitioner filed a notice of appeal to the Court of Special Appeals. On February 22, 2007, Petitioner's direct appeal was denied by the Court of Special Appeals in an unreported opinion written by the Honorable Ellen L. Hollander.

16

## II.   STANDARD OF REVIEW

Pursuant to Md. Code Ann., Crim. Proc. § 7-102(a), a petitioner may, in the circuit court for the county in which his conviction took place, institute a proceeding to set aside or correct a judgment or sentence, provided that the alleged error has not been previously and finally litigated or waived in the proceedings resulting in the conviction, or in any proceeding that petitioner has undertaken to secure relief from the conviction. Md. Code Ann., Crim. Proc. § 7-102(a).

Petitioner has the burden of proof in a post conviction proceeding. *State v. Hardy*, 2 Md. App. 150, 156-57 (1967).   [the] petitioner must prove facts to establish his allegations. *Cirincione v. State*, 119 Md. App. 471, 504, *cert. denied*, 350 Md. 275 (1998).   Maryland appellate courts have not defined the petitioner's burden except to say that it is "heavy." *Harris v. State*, 303 Md. 685, 697 (1985).   The hearing judge is the fact finder in a post conviction proceeding. *See Farrell v. Warden*, 241 Md. 46, 49 (1965).  It is incumbent on the hearing judge to make findings of fact upon all contentions raised by the petitioner. *Conley v. Warden*, 10 Md. App. 251, 252 (1970).

## III.   DISCUSSION

To establish a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) the attorney's performance was deficient, and (2) the deficient performance prejudiced the defense. *Harris v. State*, 303 Md. 685, 697-99 (1985).  Judicial review of counsel's performance "must be highly deferential." *State v. Thomas*, 325 Md. 160, 171-72 (1992). The Supreme Court stated in *Strickland v. Washington*, 466 U.S. 668 (1984) that:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the

deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from the breakdown of the adversary process that renders the result unreliable. *Id.* at 687.

With these principles in mind, this Court turns to Petitioner's specific allegations.

1. **The Prosecutor Violated Petitioner's Rights Under the 4th and 14th Amendments [and the] Due Process Clause [by allowing] the Detective to Submit Perjured Statements to the Grant Jury to Obtain an Indictment**

Petitioner alleges that his rights under the 4th and 14th Amendments were violated when the prosecutor presented perjured testimony to the grand jury in order to obtain an indictment. Petitioner argues that Detective Gregory MacGillivary testified before the grand jury about the statement of witness/victim Maurice Booker that he knew to be a lie. In support of this contention, Petitioner cites the following excerpt from the trial:

MS. BANKS:  The conversation you had with Detective Turner was about what?

MAURICE BOOKER:  About the charge that I'm locked up for.  When he started talking [to] me [about] who shot me and he was going to let my mother and all them go, so I lied and told that them T.O. shot me.

MS. BANKS:  That's what you told Detective...

MAURICE BOOKER: After he showed... yeah; and we was talking and he was like here [is] the picture, and all this.  And he was like, we going to lock your mother and them up if you don't tell us who shot you or whatever.  So he was like, tell us T.O. shot you and we going to let your mother and them go.  They said they was going to lock my mother and them up.  My mother, my sister, they was going to put my niece in a foster care and they was going to put my little sister inside a foster care, too.  And they was like, just tell us T.O. did it; so I said all right.  I lied and told them that T.O. did it.

(TR, 11/19/2003, at P-195-196).

Respondent asserts that, regardless of whether Maurice Booker's pretrial statement was truthful or not, Booker does not say that he lied until he testifies at trial. The most that occurs is that, when asked, Booker states that he was promised that his family would be let go if he talked. Booker never actually says that he lied prior to the trial. Respondent maintains that any subsequent recantations by witnesses of an initial statement merely changes the nature of the statement to that of a prior inconsistent statement, which is admissible as substantive evidence pursuant to Md. Rule 5-802.1.

Additionally, Respondent argues that witness credibility cannot be challenged in a post conviction proceeding. In support of this argument, Respondent cites *Gray v. State*, 158 Md. App. 635, 648 (2004), which states that credibility issues are not ordinarily reviewable in post conviction proceedings. Respondent further cites *Walls v. Warden, Md. Penitentiary*, 242 Md. 401 (1966), which states that "an allegation of a conviction based on false testimony . . . goes to the credibility of the witnesses and so to the sufficiency of the evidence, a matter not reviewable on post conviction."

Respondent further argues that the Supreme Court has stated in *Kaley v. U.S.*, 134 S. Ct. 1090, 1097 (2014) that a challenge to the reliability or competency of the evidence supporting a grand jury's finding of probable cause will not be heard. In *Kaley*, the defendants believed they were constitutionally entitled to a judicial redetermination of the grand jury's conclusion that probable cause supported a criminal prosecution. The *Kaley* court opined:

> This Court has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime. See, *e.g.,* *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956). "[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,' " we have explained, "conclusively determines the existence of probable cause" to believe the defendant perpetrated the offense alleged. *Gerstein v. Pugh,* 420 U.S. 103, 117, n. 19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Ex parte United States,* 287 U.S. 241, 250, 53 S.Ct. 129, 77 L.Ed. 283 (1932)). And

"conclusively" has meant, case in and case out, just that. We have found no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Costello,* 350 U.S., at 362–363, 76 S.Ct. 406 (quoting *United States v. Reed,* 27 F.Cas. 727, 738 (No. 16,134) (C.C.N.D.N.Y.1852) (Nelson, J.)). *Kaley* at 1097.

Accordingly, this allegation is not appropriate for post conviction review. Therefore, this

Court finds that Petitioner's allegation lacks merit and is denied as a matter of law.

### 2. The Prosecutor Erred When She Made Several Inflammatory Remarks, Misstatements of Evidence and Law to the Jury in Closing Arguments

#### a. The Prosecutor Acted as the Judge by Misquoting First and Second Degree Murder to the Jury

Petitioner asserts that the prosecutor misquoted the law for first and second degree

murder to the jury, and that these improper remarks had a tendency to mislead the jury.

Petitioner points to the following excerpt of the prosecutor's closing argument:

MS. BANKS:  The next charge, second degree murder.  Second degree murder is some kind of lesser (inaudible) than the first degree which means if you find the person, the Defendant guilty of second degree murder, you didn't (inaudible) first degree murder.  Second degree murder requires that the conduct of the Defendant (inaudible)…

Well, the Defendant's firing that gun on to that porch, pow, Sherene's dead.  So you know that.  And that the Defendant engaged in deadly conduct, either with the intent to kill or the intent to inflict serious bodily injury.  When you fire a gun, what are you intending to do?  You intend to inflict serious bodily injury or to kill someone.  That's the whole purpose of a handgun.

Then the next charge, first degree murder.  First degree murder is second degree murder plus two, two other factors.  In order to convict the Defendant of first degree murder, the State must prove that the Defendant (inaudible) caused the death [and] it was willful, deliberate, and premeditated.  Premeditated, (inaudible) planned it, thought about it.  If I move from here to here and I decide to walk over here, I'm thinking about it.  That's premeditation.  It could take two seconds or it could take a year.  The plan, that's not important.  How you plan the act is not the issue.  The issue is, did you think about it or you did it.  That's premeditation.

> Willful and deliberate, you intended to do it. When the Defendant came around that corner with that gun in his hand and started firing, hiding his body, he intended to fire up and kill someone on that porch, no doubt about it. That's willful and deliberate. (Inaudible) show you willful and deliberate. When he's in the alleyway with [Booker] and pulled that trigger yet again. He knows what he's doing. It's willful, deliberate and premeditated. So he sees [Booker]. Fortunately for [Booker], that gun did not fire anymore, but it fired enough to kill [Moore].

(TR, 11/24/2003, at P-78-80).

Petitioner asserts that these remarks misled the jury because the instructions conflicted with those given by the judge. Petitioner contends that the result of the case could have been different had the prosecutor not made these remarks and confused the jury as to what standard of the law they should follow. Petitioner relies on the case of *Rheubottom v. State*, 99 Md.App. 335 (1994). In *Rheubottom*, the prosecutor made gross misstatements of the law about reasonable doubt, during closing arguments, specifically, the prosecutor argued that in order for jurors to find reasonable doubt they would "need to articulate and be able to write down on a piece of paper why and what your doubt is ... and if you can't do that, specifically there's no reasonable doubt." *Id.* at 341. The defense objected to this statement and the trial court overruled the objection. The Court of Special Appeals found that this was clearly error, because the trial judge failed to take any corrective action, failed to sustain the objection, and failed to admonish the jurors to disregard that remark. *Id.* at 342-343.

Respondent contends that the prosecutor's closing argument did not invite the jury to disregard the Court's instructions, nor did the comments vary in material respect from the Court's instructions. Respondent cites *Taylor v. Koppel*, 2010 U.S. Dist. LEXIS 49232 (2010) for the contention that for statements in closing argument to be deemed improper they must have so infected the trial with unfairness as to make the resulting conviction a denial of due process.

21

In *Taylor*, the prosecutor made statements trying to expound on the definition of reasonable doubt, and noted that "the instruction on what a reasonable doubt is also unhelpful. These are written by committees of people." The United States District Court for the District of Maryland was not convinced that this statement, or defense counsel's failure to object to this statement warranted the granting of a new trial, and specifically distinguished the case from *Rheubottom*. The Court opined that:

> First, the prosecutor in this case said nothing as shocking as "unless you can write down an articulable reason on a piece of paper you do not have reasonable doubt." Secondly, the trial judge not only gave the proper jury instruction, but also instructed the jury, that his instructions, and not counsel's arguments, were binding on them. Further, the trial judge sent the instructions to the jury in writing, so that if they had any questions as to the definition of reasonable doubt, it was available to them. Third, even if we assume without deciding that the prosecutor's argument was improper, the Court of Special Appeals has stated "that just because a prosecutor makes an improper jury argument this does not necessarily constitute reversible error." [*Rheubottom*, 99 Md.App.] at 341, 637 A.2d 501.
>
> It is disconcerting that the prosecutor told the jury that the Court's reasonable doubt instruction was "unhelpful." However, the jury was properly instructed by the Court, and was told that the Court's instructions were binding. There is not a substantial probability that the jury would have decided differently had trial counsel objected and had that objection been sustained. *Id.*

Respondent further asserts that the prosecutor used poster boards which mirrored the Court's instructions given for first and second degree murder; and, that the Court's instructions on first and second degree murder followed the Maryland Pattern Jury Instructions nearly verbatim. Respondent contends that nothing said during closing arguments by the prosecutor suggested that the Court's instructions should be disregarded, and that the prosecutor was simply using laymen's terms to help explain the law.

The record reflects that, the Court instructed the jury that opening and closing statements are not evidence. (TR. 11/24/2003, P-19). Before closing arguments, the Court repeated this instruction to the jury. The Court explained to the jury that closing arguments are not evidence

and are only intended to assist them during deliberations. (TR 11/24/2003, P-40). Defense counsel repeated this fact during closing as well, reminding jurors that closing arguments are not evidence, and that anything the prosecutor or he says during closing arguments is not evidence. (TR 11/24/2003, P-70).

Moreover, the record reveals that the prosecutor merely applied the law to the evidence presented at the trial. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### b. The Prosecutor Made Several Assertions of Opinion and Personal Knowledge [By] Stating [that] [Witnesses] Detective Turner, Detective M[a]cGillivary and Allen Rice Wouldn't "Lie"

Petitioner argues that the prosecutor improperly vouched for its witnesses, depriving him of a fair trial. Petitioner points to several statements made by the prosecutor during closing arguments:

> MS. BANKS: Maurice Booker said, well, police promises me this, police promised [to let my brother go]. Turner, Detective Turner, I didn't show him an array. If I did, it would have been [in] ECU. There was not one array produced. No array was shown [to] him by Detective Turner. I didn't take a statement from him about the murder. It's not my job. If he did, why did he take him down to Detective MacGillivary if he already had [a] statement. What do you need two for? It didn't happen. He didn't do that. I didn't promise him anything. He didn't do it.

(TR, 11/24/2003, at P-49).

> MS. BANKS: Maurice Booker's not the type of guy who would remember a story in that much detail, when an officer just told him that a couple hours before what do you think he'll remember all that detail and replay it back to another detective that somebody told him that? It didn't happen that way.

(TR, 11/24/2003, at P-49-50).

> MS. BANKS: And then what does Allen say? He came home and went to bed at 5:00 and I got up and George was in the house. Allen

doesn't lie and tell you I'm absolutely sure George was in the house at 10:30 to 5:00[17].

Petitioner relies on *Sivells v. State*, 196 Md. App. 254 (2010) for the contention that the prosecutor in his case engaged in improper vouching. In *Sivells*, the prosecutor argued to the jury that police officers were testifying truthfully because they would risk losing their pensions and their jobs if they gave false testimony. *Id.*

Respondent asserts that the above excerpts cited by Petitioner are simply referencing the actual testimony of the witnesses. As to the first excerpt cited by Petitioner, Respondent points to the Detective Turner's trial testimony to explain the prosecutor's remarks during closing arguments:

MS. BANKS:  And so when Detective MacGillivary spoke to Mr. Booker, were you present?

DETECTIVE TURNER: No, ma'am.

MS. BANKS: If a photo array had been shown to Mr. Booker, what would happen to that photo array?

DETECTIVE TURNER:  It would have…

MS. BANKS:  If you had shown him a photo array?

DETECTIVE TURNER:  If I had shown him a photo array, he would have signed it.  I would have witnessed it as well as Detective Wells, and it would have been submitted to Evidence Control Unit to be [presented] during the course of the trial.

MS. BANKS:  And did you do that?

DETECTIVE TURNER:  No ma'am, we did not.

MS. BANKS:  Why not?

DETECTIVE TURNER: I didn't have any photographs to show him.  He was a suspect in my case.

---

[17] The transcript provided by Petitioner is incomplete and does not contain this excerpt cited by Petitioner in his Petition for Post Conviction Relief.

> MS. BANKS: Is it the policy of the Baltimore City Police Department to make deals?

DETECTIVE TURNER: No, ma'am, I did not.

> MS. BANKS: Did you make any promises or deals to Mr. Cornell Booker and Mr. Maurice Booker?

DETECTIVE TURNER: No, ma'am, I did not.

(TR, 11/20/2003, at P-54-55).

As to the second excerpt cited by Petitioner, Respondent points to the Maurice Booker's trial testimony to explain that the prosecutor was merely commenting on the veracity of Booker's testimony:

> MS. BANKS: You told Detective Turner that you – or, I'm sorry; Detective McGillivary that you ran after you were shot and you ran through the cut, and you saw the Defendant standing in the alley with a gun trying to un-jam it; is that true?

MAURICE BOOKER: No, it ain't true. That's what he told me to say.

MS. BANKS: That's what who… that

MAURICE BOOKER: Turner. Detective – Detective Turner

> MS. BANKS: Detective Turner told you to say that you saw the Defendant standing in the alley trying to un-jam a gun?

MAURICE BOOKER: Yeah.

(TR, 11/19/2003, at P-272).

As to the third excerpt cited by Petitioner, Respondent relies on Allen Rice's trial testimony to explain that the prosecutor was merely saying to the jury that Rice could have given a more definitive statement of alibi, but did not:

> MS. BANKS: Now, you indicated you are a light sleeper so how did (unintelligible) if the doors were to open while you are sleeping, would you hear them?

ALAN RICE: Yes.

MS. BANKS: How would you hear them, sir?

ALAN RICE: Because most any door makes squeak or [make] a cracking sound when they open or close.

MS. BANKS: The doors at your home, those doors, they make squeaking or cracking sounds?

ALAN RICE: Yes.

MS. BANKS: Were they soft or loud?

ALAN RICE: I say medium. Mediocre. It's not loud or it's not soft.

MS. BANKS: As you... after you went to bed and before you woke up, to the best of your knowledge, sir, did those doors open or close at any time?

ALAN RICE: I think the doors [were] close[d].

MS. BANKS: And the following morning, you said you and Mr. Gaines got up to go to work; is that correct?

ALAN RICE: Yes.

MS. BANKS: And what time did you leave the house?

ALAN RICE: About 5:15, 5:20.

MS. BANKS: How long Mr. Gaines live [sic] how long did Mr. Gaines live with you, sir?

ALAN RICE: Well, I guess he was back at my mother's house for about a year.

MS. BANKS: Okay. And based on the time that you have lived with Mr. Gaines, how long would it take him to get dressed and all that, get himself together.

ALAN RICE: Well, it don't [,] it all depends on what Mr. Gaines was getting dressed for.

MS. BANKS:  Okay.  Let me rephrase the question.  You got up at what time, sir?

ALAN RICE:  Five.

MS. BANKS:  When you got up, was Mr. Gaines already up or was he still sleeping?

ALAN RICE:  He was up.

MS. BANKS:  And was he dressing [?] what was he doing when you saw him?

ALAN RICE:  He was getting ready so we could leave.

(TR, 11/20/2003, at P-93-94).

In support of the argument that a prosecutor is permitted to argue that a witness is being truthful based on the trial testimony Respondent relies on *Warren v. State*, 205 Md. App. 93, 134 (2012).  Under the test in *Warren*, Respondent argues that all of the comments were within the proper scope of closing argument, and were based upon the evidence and natural allowable inferences.

Further Respondent asserts that "The rule against vouching does not preclude a prosecutor from addressing the credibility of witnesses in its closing argument." *Sivells v. State*, 196 Md. App. 254, 278 (2010). In *Sivells*, the prosecutor argued to the jury that the police officers were testifying truthfully because they would risk losing their pensions and their jobs if they gave false testimony.  *Id.*  "Where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness is based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching." *Id.* (quoting *Spain v. State*, 386 Md. 155 (2005)).  In *Spain*, the prosecutor argued that the State's police witness had a motive to give truthful testimony because lying would expose him to perjury.

Unlike the prosecutor in *Sivells and Spain,* the prosecutor during closing arguments did not say that the witnesses had a motive to testify truthfully or that they would risk losing their jobs if they committed perjury. At no time did the prosecutor make assertions of personal opinion or knowledge of the witnesses' credibility. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### 3. The Prosecutor Denied Petitioner a Fair Trial [by allowing] the Detectives to Testify Falsely at Petitioner's Trial, Which Violated Petitioner's Due Process Rights and His Rights Under Article 21 of the Maryland Declaration of Rights

Petitioner argues that he was denied a fair trial because the prosecutor presented perjured testimony before the jury, i.e., Detective Turner's testimony. Petitioner contends that Detective Turner's testimony that he had never seen or heard of Petitioner was not true. The following dialogue occurred between trial counsel and Detective Turner at the trial:

> MR. LACORTE:  Now Detective Turner, you know the Defendant Tony DeWitt?
>
> DETECTIVE TURNER: No.
>
> MR. LACORTE: And in September of 2002 did you act in connection with an arrest of Mr. DeWitt?
>
> DETECTIVE TURNER: No Sir I did not.
>
> MR. LACORTE:  Did you know that he was in Central Booking?
>
> DETECTIVE TURNER: No I [didn't] know.
>
> MR. LACORTE:  Your testimony is that you had no knowledge of who Tony DeWitt was on September 25, 2002?
>
> DETECTIVE TURNER: No sir.
>
> MR. LACORTE: How did the word come to you that Detective MacGillivary of Homicide wanted to interrogate Maurice Booker?
>
> DETECTIVE TURNER: We had talked prior during the course of the shooting, there were several shootings that were connected

involving the Eastern and North Eastern District.  So we would always have conversation about shootings that occurred and the homicide[s].

MR. LACORTE: Okay, so [when] you say "we" you mean you and Detective MacGillivary?

DETECTIVE TURNER: And other detectives, yes.

MR. LACORTE: So you said you had talked before September 25th?

DETECTIVE TURNER: Yes.

MR. LACORTE: About the shooting in the Northeast District.

DETECTIVE TURNER: Shootings and homicides in the Eastern and Northeast.

MR. LACORTE: And Detective MacGillivary had told you, had he not that Maurice Booker was a person of interest in connection with homicide that occurred in the Northeast District?

DETECTIVE TURNER: That I had knowledge of myself of that [sic].

MR. LACORTE: On July 5, 2002?

DETECTIVE TURNER: Sometimes around that time.

MR. LACORTE: And it's your testimony today that as of September 25th you had no knowledge that Tony DeWitt was a person of interest in connection with this case?

DETECTIVE TURNER: No I did not.

MR. LACORTE:  Is that your testimony today?

DETECTIVE TURNER: Yes it is[18].

In support of this argument Petitioner relies on the trial testimony of Detective MacGillivary. The following dialogue occurred between trial counsel and Detective MacGillivary at the trial:

---

[18] The transcript provided by Petitioner is incomplete and does not contain this excerpt cited by Petitioner in his Petition for Post Conviction Relief.

MR. LACORTE: Would it be fair to say that you spoke to Detective
Kevin Turner on several occasions about your interest [sic] prior to
September 25th, 2002?

DETECTIVE MACGILLIVARY: Yes.

MR. LACORTE: Prior to September 25th, 2002, would it be fair to say
that you spoke with Detective Turner on several occasions about
your interest in Maurice Booker?

DETECTIVE MACGILLIVARY: Yes.

MR. LACORTE:  And were you specific about what you were interested
in?

DETECTIVE MACGILLIVARY: He's a victim of a shooting related to
this homicide.

MR. LACORTE: No, prior to September 25th, 2002, had you developed
Tony DeWitt as a suspect?

DETECTIVE MACGILLIVARY: Yes.

MR. LACORTE: And had you shared that information with Detective
Turner?

DETECTIVE MACGILLIVARY: I'm sure I would have, absolutely.

MR. LACORTE: Prior to all of this?

DETECTIVE MACGILLIVARY: Absolutely.

MR. LACORTE: No doubt in your mind?

DETECTIVE MACGILLIVARY: No doubt in my mind.

MR. LACORTE: So Detective Turner knew full well, you believe knew
full well when Maurice Booker was in his custody that Tony
DeWitt was a potential suspect?

DETECTIVE MACGILLIVARY: In my matter?

MR. LACORTE: Yes.

DETECTIVE MACGILLIVARY: Yes[19].

Petitioner cites the Supreme Court case of *Mooney v. Holohan*, 294 U.S. 103 (1935) for the proposition that a conviction obtained through testimony known by the state to be false is a violation of a defendant's due process rights. The Court reasoned that "such a contrivance by a [prosecutor] to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Id.* at 112.

Respondent asserts that Maryland courts have consistently held that witness credibility is an issue of sufficiency of the evidence and not subject to post conviction review. *Walls v. Warden, Md. Penitentiary*, 242 Md. 401 (1966).

Petitioner's reliance on the trial testimony of Detectives Turner and MacGillivary in support of this argument is insufficient to prove that the prosecutor knew before the trial that Detective Turner's testimony would be untrue. Furthermore, witness credibility is an issue to be decided by the trier of fact and is not appropriate for post conviction review. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

**4. The Prosecutor Knowingly Used False Testimony of Maurice Booker and Failed to Disclose Exculpatory Evidence at Petitioner's Trial**

**a. The Prosecutor Knew Before Trial That Perjury and Coercion Took Place to Obtain Maurice Booker's Pretrial Statement**

Petitioner asserts that the prosecutor knowingly admitted into evidence perjured, coerced statements at the trial. Petitioner contends that Maurice Booker informed Detective MacGillivary, during the taping of his pre-trial statement, that Detective Turner promised him that he would let his brother, Cornell Booker go if he named Petitioner as the shooter. The following colloquy occurred at trial:

---

[19] The transcript provided by Petitioner is incomplete and does not contain this excerpt cited by Petitioner in his Petition for Post Conviction Relief.

DETECTIVE MACGILLIVARY: "Anybody make any promises to you?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "What's that?"

MAURICE BOOKER: "That dude that [brought] me down here say he was going to let my brother and them go."

DETECTIVE MACGILLIVARY: "And who's your brother?"

MAURICE BOOKER: "Cornell Booker"

DETECTIVE MACGILLIVARY: "And what happened with Cornell Booker?"

MAURICE BOOKER: "That dude found some weed he was in there bagging up some weed or something."

DETECTIVE MACGILLIVARY: "He was bagging up some weed?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "Okay, anything else?"

MAURICE BOOKER: "That's it."

DETECTIVE MACGILLIVARY: "Sergeant?"

SERGEANT GREENE: "No other questions."

DETECTIVE MACGILLIVARY: "Okay. It is the 25th of September. It is approximately 10 minutes of 5:00. This interview is concluded. Nothing to follow[20]."

(TR, 11/19/2003, P-253).

Petitioner argues that these statements show that Maurice Booker was clearly coerced into making incriminating remarks about the Petitioner. Petitioner also refers to Maurice Booker's testimony where he states that he lied during pretrial interviews:[21]

---

[20] The excerpt cited by Petitioner is from the recorded taped statement of Maurice Booker.

MS. BANKS: The conversation you had with Detective Turner was about what?

MAURICE BOOKER: About the charge that I'm locked up for. When he started talking about telling [him] who shot me and he was going to let my mother and all them go, so I lied and told them that T.O. shot me.

MS. BANKS: That's what you told Detective...

MAURICE BOOKER: After he showed...yeah; and we was talking and he was like here go the picture, and all this. And he was like, we going to lock your mother and them up if you don't tell us who shot you or whatever. So he was like, tell us T.O. shot you and we going to let your mother and them go. They said they was going to lock my mother and them up. My mother, my sister, they was going to put my niece in a foster care and they was going to put my little sister inside a foster care, too. And they was like, just tell us T.O. did it; so I said all right. I lied and I told them that T.O. did it.

MS. BANKS: Okay. Now, when you told Detective Turner and the light-skinned detective that T.O... who's T.O., first of all?

MAURICE BOOKER: Huh?

MS. BANKS: Who is T.O.?

MAURICE BOOKER:  Tony DeWitt.

MS. BANKS: Is that person present today?

MAURICE BOOKER: Yes, he is.

(TR, 11/19/2003, P-195-196).

Petitioner relies on *Napue v. Illinois*, 360 U.S. 264, 269 (1959) for the proposition that the "State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." Petitioner further cites *Giglio v. United States*, 450 U.S. 150 (1972) for the contention that a promise made to a witness is attributable to the prosecutor regardless of

---

[21] At the post conviction hearing Petitioner called Maurice Booker as a witness. Booker testified that after his statement to the police he told the detectives he lied. Booker further testified that after his trial testimony he informed the prosecutor that his pre-trial statement was a lie.

whether it is disclosed or not. "Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Id.* at 154

Respondent argues that issues of witness credibility are for the trier of fact to decide, not for the post conviction court.

The record reflects that Booker at the trial recanted the pre-trial statement wherein he implicates Petitioner as the shooter. Whether Booker's pre-trial statement or his trial testimony were credible was an issue to be decided by the jury. Additionally, the verdict reveals that the jury did not believe Booker's trial testimony.   Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

    **b.  Petitioner Obtained Information Through the Maryland Public Information Act About a Witness Named Shannon Lewis Who Gave a Statement to the Detectives That She Witnessed Another Suspect By the Name of Mwambe Epps Saying that He Committed the Crime**

Petitioner argues that the prosecutor knew before trial that Shannon Lewis informed the police that she heard Mwambe Epps saying he did the shooting; and, that the prosecutor failed to disclose this information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).   Petitioner contends that had this information been available to him before trial that the result would have been different.

Respondent argues that Petitioner is mistaken.   Respondent points to the prosecutor's Supplemental Disclosure dated April 7, 2003, which was provided to trial counsel, regarding Lewis and her reference to Mwambe Epps. *Respondent's Exhibit 2*.   In addition, Respondent asserts that trial counsel did engage in investigation of what Ms. Lewis said regarding Mwambe Epps (*Respondent's Exhibit 3a-c*) and that Petitioner therefore cannot show any discovery violation regarding Lewis.

The exhibit demonstrates that this information was mailed to trial counsel on April 7,

2003. Additionally, *Respondent's Exhibit 3(a)* entitled Defense Acknowledgement of Review of

State's file shows that Petitioner's trial counsel reviewed the prosecutor's file on June 17, 2003

wherein the name of the officer that interviewed Lewis was disclosed. Accordingly, there was

no *Brady* violation by the prosecution. Therefore, this Court finds that Petitioner's allegation

lacks merit and must be denied as a matter of law.

### c. Petitioner Obtained Information Through the Maryland Public Information Act About a Witness Named Tyrell Curtis Who Gave an Exculpatory Statement to Detectives That Was Never Disclosed to the Defendant or His Counsel

Petitioner asserts that the prosecutor committed a *Brady* violation by failing to disclose

the statement of Tyrell Curtis to him or trial counsel. Petitioner argues that the prosecutor was

aware of Tyrell Curtis, an eyewitness, who identified George Gaines as the shooter. Petitioner

contends that he was not aware of Curtis's statement until he received it through the Maryland

Public Information Act. Petitioner concludes that having this information would have changed

the outcome of the trial. At the post conviction hearing Petitioner entered into evidence Exhibit

1, the interview of Tyrell Curtis by Detective Mark Veney. The interview was conducted on

December 10th, 2002. Detective Veney writes that he responded to the 1700 block of Monteplier

Street to assist another officer on a call pertaining to a potential eyewitness to this case, Tyrell

Curtis. After being transported to Northeast District and Homicide Curtis told Detective Veney

that he witnessed George Gaines come around the corner shooting at everybody who [was]

sitting on the porch [in] the 1700 block of Montpelier Street. Curtis, also, told Detective Veney

that Petitioner had nothing to do with the shooting.

At the post conviction hearing, Petitioner testified that in 2011 he received Detective Veney's interview of Tyrell Curtis on December 10th, 2002 through the Maryland Public Information Act, and the information came from the prosecutor's file.

Respondent argues that in order to establish a violation under *Brady*, Petitioner must show "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense, either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness, and (3) that the suppressed evidence is material." *Id* at 87.

Respondent maintains that trial counsel's awareness of Curtis as a witness was known at a minimum from the review of the prosecutor's file in full, which occurred on June 17, 2003. *Respondent's Exhibit 3a.* In that review, counsel viewed the prosecutor's entire file, to include detective's notes and progress reports. *Respondent's Exhibit 3b*, dated June 18, 2003, shows that [trial] counsel was aware of Curtis and was seeking to locate him, as [trial] counsel requested a current address for Curtis because he could not locate him in jail. In addition, [trial] counsel was advised by the prosecutor in State's Supplemental Discovery dated July 14, 2003 (*Respondent's Exhibit 4*) of Curtis' statement, that he heard over 20 gunshots, [and] ran with Maurice Booker into the "cut." Additionally, Curtis identified the shooter as a black male, not too tall, and kind of thick.

Respondent further avows that the alleged undisclosed information was not material to the defense. In citing *United States v. Agurs*, 427 U.S. 97 (1976), Respondent asserts that the standard for materiality is whether there is a substantial possibility that, had evidence been disclosed to the defense, the result of the proceeding would have been different. Respondent argues that prior to trial several persons were mentioned as alternative suspects, George Gaines,

Mwambe Epps, and Paris Moore. Further, Respondent contends that trial counsel made a strategic choice to proceed with the theory that Paris Moore was the shooter, a reasonable and viable theory because it was proven[22] that Maurice Booker was "beefing" with Paris Moore and had shot Moore's friend, Marquis Brown, one week earlier.

Respondent's Exhibits 3a-c show that the prosecutor disclosed the above December 10th interview of Curtis by Detective Veney on three different occasions. Trial counsel's request for Curtis' address evidenced in Exhibit 3b suggest that when reviewing the prosecutor's file trial counsel saw the December 10th interview of Tyrell Curtis by Detective Veney. Additionally, the fact that the Petitioner's Exhibit 1 was in the prosecutor's file in 2011 seems to suggest that it was there on July 17, 2003 when trial counsel reviewed the prosecutor's file during open file discovery. Accordingly, there was no *Brady* violation by the prosecutor. Therefore, this Court finds that Petitioner's allegation is without merit and must be denied as a matter of law.

**5. The Detectives in Petitioner's Trial Made Several Errors Which Violated Petitioner's Due Process [Rights] and His 4th Amendment Protection by Giving False Statements to Obtain a Warrant and a Grand Jury Indictment**

**a. The Arrest Warrant Was Invalid Because the Detective Gave False Statements to the Magistrate to Obtain the Warrant**

Petitioner asserts that the arrest warrant was invalid because the detectives used false statements obtained from Maurice Booker in order to obtain the warrant. Petitioner relies on *Franks v. Delaware*, 438 U.S. 164, 182 (1978), which states that "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." Petitioner argues that the detectives misled the magistrate in this case with false statements obtained from Maurice Booker. Petitioner points to the same excerpts cited in subsection 4(a):

---

[22] Maurice Booker had pled guilty to that shooting and was serving a 10 year sentence.

DETECTIVE MACGILLIVARY: "Anybody make any promises to you?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "What's that?"

MAURICE BOOKER: "That dude that [brought] me down here say he was going to let my brother and them go."

DETECTIVE MACGILLIVARY: "And who's your brother?"

MAURICE BOOKER: "Cornell Booker"

DETECTIVE MACGILLIVARY: "And what happened with Cornell Booker?"

MAURICE BOOKER: "That dude found some weed he was in there bagging up some weed or something."

DETECTIVE MACGILLIVARY: "He was bagging up some weed?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "Okay, anything else?"

MAURICE BOOKER: "That's it."

DETECTIVE MACGILLIVARY: "Sergeant?"

SERGEANT GREENE: "No other questions."

DETECTIVE MACGILLIVARY: "Okay.  It is the 25th of September.  It is approximately 10 minutes of 5:00.  This interview is concluded.  Nothing to follow[23]."

(TR, 11/19/2003, P-253).

MS. BANKS: The conversation you had with Detective Turner was about what?

MAURICE BOOKER: About the charge that I'm locked up for.  When he started talking about telling me who shot me and he was going to let my mother and all them go, so I lied and told them that T.O. shot me.

---

[23] The excerpt cited by Petitioner is from the audio recording of Maurice Booker's statement played at trial.

MS. BANKS: That's what you told Detective…

MAURICE BOOKER: After he showed…yeah; and we was talking and he was like here go the picture, and all this. And he was like, we going to lock your mother and them up if you don't tell us who shot you or whatever. So he was like, tell us T.O. shot you and we going to let your mother and them go. They said they was going to lock my mother and them up. My mother, my sister, they was going to put my niece in a foster care and they was going to put my little sister inside a foster care, too. And they was like, just tell us T.O. did it; so I said all right. I lied and I told them that T.O. did it.

MS. BANKS: Okay. Now, when you told Detective Turner and the light-skinned detective that T.O… who's T.O., first of all?

MAURICE BOOKER: Huh?

MS. BANKS: Who is T.O.?

MAURICE BOOKER: Tony DeWitt.

MS. BANKS: Is that person present today?

MAURICE BOOKER: Yes, he is.

(TR, 11/19/2003, P-195-196).

Respondent cites *Colkley v. U.S.*, 899 F.2d 297, 300 (1990) for the proposition that, in order to even consider a *Franks* violation, the defense must make a substantial preliminary showing that the affiant intended to mislead the magistrate. To meet this requirement, "Petitioner needs to show more than mere omission in the weak sense that it was done, but that it was the product of 'deliberate falsehood or of reckless disregard for the truth.' *Id.* at 301.

As Respondent correctly asserts the Petitioner has the burden to make a substantial preliminary showing of wrongdoing by the affiant in the application for the warrant. Petitioner's argument in support of this allegation fails to show that the affiant of the warrant intended to mislead the magistrate. Additionally, it is not the magistrate's function to weigh the credibility of a witness's statement. As stated earlier, credibility of witnesses is the express duty of the trier

of fact. Therefore, this Court finds Petitioner's allegation is without merit and must be denied as a matter of law.

### b. The Detectives Violated Petitioner's Due Process [Rights] and 4th Amendment Rights By Giving Perjured Statements to the Grand Jury to Obtain the Indictment

Petitioner makes the same argument as subsection 5(a) as he does with respect to the grand jury indictment.  Petitioner argues that the grand jury indictment was obtained based on coerced and falsified testimony of Booker.  Petitioner points to Detective MacGillivary's testimony before the grand jury on January 6, 2003:

PROSECUTOR SHERYL D.H. ATKINS:  Okay Detective MacGillivary, were you the primary investigator in the shooting of Shawn [Sherene] Moore and Maurice Booker?

DETECTIVE MACGILLIVARY: I was.

MS. ATKINS: Okay and on July 5th did you respond to the 1700 block of Montpelier St. for a shooting of two individuals.

DETECTIVE MACGILLIVARY: I did.

MS. ATKINS: And once you arrived in that area what did you find?

DETECTIVE MACGILLIVARY: I found an ambo on the scene in the 1700 block of Homestead Street which is one street north of Montpelier St. with the surviving victim Maurice Booker suffering from a gun shot wound to the back.  He was ultimately transported to Johns Hopkins hospital where he was treated for that wound.  A young man an eighteen year old was found on the porch of 1700 Montpelier St.  He had actually been taken from the scene by medics and transported to Hopkins also he suffered a gun shot wound to his back, a through and through wound and he succumbed to the wound inflicted and he died that evening.

MS. ATKINS: And did you have an accusation to investigate exactly what happened as far as this homicide and attempted homicide.

DETECTIVE MACGILLIVARY: Yes, we actually interviewed numerous witnesses who were on the scene at the time ultimately we interviewed the surviving victim who indicated to us that an

individual by the name of Tony DeWitt had shot him and we took a taped statement and also showed him a group of six photographs that we had from our B of I files and he identified Tony DeWitt as the person who did shoot he and the victim Shawn [Sherene] Moore.

(Grand Jury Minutes, 01/07/2003, P-2-3[24]).

Petitioner argues that Detective MacGillivary failed to inform the grand jury of the promises or threats that were used to obtain Maurice Booker's pretrial statement. Petitioner asserts that if the grand jury was aware of the promises, threats, inducements and suggestive identification made by Detective MacGillivary and Turner to Booker there may not have been indicted.

Respondent asserts that, as a general rule, one may not inquire into the sufficiency or competency of evidence presented to a grand jury. *Kaley v. U.S.*, 134 S. Ct. 1090 (2014). *See also, Lykins v. State*, 288 Md. 71 (1980) (holding that it is well settled law that the competency of testimony before the grand jury will not be inquired into by the courts). Respondent further contends that any issue of whether grand jury testimony of a State's witness was coerced, and therefore presumably untrue, is a question for the jury. *Wilson v. State*, 261 Md. 551, 557 (1971).

For the reasons stated under Petitioner's allegation (1) this allegation is not proper for post conviction review. Therefore, this Court finds that Petitioner's allegation is without merit and must be denied as a matter of law.

6. **The Trial Court Committed Plain Error When the Jury was Improperly Instructed When the Trial Court Erroneously Gave Limited Instructions for [Attempted] Second Degree Murder and Second Degree Murder, Which Violated Petitioner's Due Process Rights**

---

[24] The excerpt from the Grand Jury Minutes is cited in Petitioner's Petition for Post Conviction Relief but was not supplied to the Court. This Court notes that in Paragraph six Detective MacGillivary testified to the grand jury that an 18 year old male was killed. This testimony by Detective MacGillivary is contrary to the facts in this case.

**a. The Trial Court Failed to Instruct the Jury on "Specific Intent" for Attempted Second Degree Murder Which Would Make the Instruction Improper Because it Was Not Fully Given**

Petitioner asserts that the trial court gave an erroneous instruction for attempted second degree murder, specifically in failing to define for the jury what "specific intent" means. Petitioner argues that this failure makes the instruction erroneous and limited, and therefore his due process rights were violated because the jury was confused by the partial instruction. In support of this contention, Petitioner cites *State v. Jenkins*, 307 Md. 501, 510 (1986), which states that "the critical element of assault with intent to murder, as the plain statutory language demonstrates, is an "intent to murder." In the instant case, the Court gave the following instruction for attempted second degree murder:

> THE COURT: In order to convict the Defendant, Tony DeWitt, of second degree murder, the State must prove that the conduct of the Defendant, Tony DeWitt, caused the death of Sherene Moore, and (2) that the Defendant, Tony DeWitt, engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result, that is for second degree.

(TR, 11/24/2003, at P-30).

> THE COURT: You're instructed that attempted murder, second degree murder, is a substantial step beyond the mere preparation toward the commission of murder in the second degree as we just discussed. In order to convict the Defendant, Tony DeWitt, of attempted murder in the second degree, the State must prove that the defendant, Tony DeWitt, took a substantial step beyond mere preparation toward the commission of murder in the second degree, and that the Defendant, Tony DeWitt, had the apparent ability at the time to commit the crime of murder in the second degree.

(TR, 11/24/2003, at P-34).

Petitioner asserts that the Court neglected to read the last element of attempted second degree murder, specifically that the defendant actually intended to kill the victim. Petitioner

contends that [the] jury was not instructed to determine whether or not the State had proved either his 'specific intent' or the absence of any affirmative defenses [and therefore there is a] possibility that the trial's result would have been different had the jury not been confused and properly instructed.

Respondent concedes that the trial court gave the MPJI 4:17:13 instruction for attempted second degree murder with the last line missing ("that the defendant actually intended to kill"). Respondent argues that the flawed instruction in this case actually made it easier for the jury to convict Petitioner of attempted second degree murder instead of attempted first degree murder. Notwithstanding this fact, the jury still found the defendant guilty of first degree attempted murder, which requires a finding of willfulness, premeditation and deliberate intent to kill.

The record reflects that the trial court did omit to read the last part of the attempted second degree murder instruction. However, since the attempted second murder conviction was merged with the attempted first degree murder conviction the Petitioner has failed to show how he was prejudiced. Therefore, this Court finds that Petitioner's allegation is without merit and must be denied as a matter of law.

### b. The Trial Court Failed to Instruct the Jury on "Mitigating Circumstances" and Justified Killing for Second Degree Murder Without Giving a Full Instruction, Which Makes the Instruction Confusing and Erroneously Given

Petitioner alleges that the trial court committed plain error when it failed to instruct the jury fully on second degree murder. The Court gave the following instruction for second degree murder:

> THE COURT: Madame Forelady, ladies and gentlemen of the jury, you are instructed that second degree murder is different from first degree murder. You're instructed that second degree murder is the killing of another person either with the intent to kill or the intent to inflict such serious bodily harm upon that victim that death would be the likely result. Second degree murder does not require

premeditation or deliberation.  In order to convict the Defendant, Tony DeWitt, of second degree murder, the State must prove that the conduct of the Defendant, Tony DeWitt, caused the death of Sherene Moore, and (2) that the Defendant, Tony DeWitt, engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result, that is for second degree.

(TR, 11/24/2003, at P-29-30).

Petitioner argues that the trial court committed plain error by leaving out parts of the instruction, specifically that the killing was not "justified" and that there were no mitigating circumstances.  Petitioner asserts that this erroneous and limited instruction violated his due process rights. Petitioner relies on *Thornton v. State*, 397 Md. 704 (2007), in which the trial judge mistakenly modified the specific intent requirement of second degree murder, thereby unconstitutionally shifting the burden of proof to the defendant.

Respondent asserts that the trial court gave the instruction requested by trial counsel (MPJI 4:17); and, that counsel strategically withdrew his initial request for MPJI 4:17.8 (Depraved Heart Murder), and proceeded with MPJI 4:17 (First Degree Premeditated Murder and Second Degree Specific Intent Murder (No Justification or Mitigation Generated).  Trial counsel made the choice to seek full acquittal, to argue mitigation would have been to concede/imply that Petitioner was the shooter.

The record reflects that the judge gave the instruction requested by the Petitioner's trial counsel.  Even if the court did omit "Mitigating Circumstances" and "Justified Killing" for second degree murder Petitioner has failed to show how he was prejudiced. The conviction for second degree murder was merged with the conviction for first degree murder. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### 7. The Trial Court Erred in Refusing to Give an Alibi Instruction When the Evidence Presented at Trial was Sufficient to Generate [The] Instruction

Petitioner asserts that the trial court, when instructing the jury, committed error by not giving an alibi instruction. Petitioner cites *Smith v. State*, 302 Md. 175 (1985) for the proposition that it is reversible error for a trial court to refuse to give an alibi instruction when an alibi is generated by the evidence. Petitioner contends that the testimony of Shamecca Bryant generated an alibi defense. The following colloquy occurs when the trial counsel calls Shamecca Bryant as a witness:

> MR. LACTORE: Now, do you remember what time you saw Mr. DeWitt on the morning of July 5?
>
> MS. BRYANT: Yes.
>
> MR. LACORTE: What time.
>
> MS. BRYANT: I'm not sure of the exact time, but I know it was between the hours of 12:00 and 1:00 a.m.
>
> MR. LACORTE: And where did you see him?
>
> MS. BRYANT: On Harford Road.
>
> MR. LACORTE: Had you called [and] spoken to him, or by the telephone, [sic] did you make arrangements to meet?
>
> MS. BRYANT: No, um-um.
>
> MR. LACORTE: You just saw him standing there?
>
> MS. BRYANT: Right.
>
> MR. LACORTE: Did you know him?
>
> MS. BRYANT: Yes.
>
> MR. LACORTE: How long had you known him?
>
> MS. BRYANT: For about 10 years.
>
> MR. LACORTE: And did you pick him up?

MS. BRYANT: Um-hum

MR. LACORTE: And where did you go?

MS. BRYANT: We went to get some drinks and some weed.  And [were] riding around drinking, smoking, and then we went down to the harbor.

MR. LACORTE: Did you see fireworks?

MS. BRYANT: No.

MR. LACORTE: What time was it that you were at the Harbor?

MS. BRYANT: I'm not exactly sure when we got to the Harbor, but I think we left the Harbor about 2:00.

MR. LACORTE: And where did you go?

MS. BRYANT: We went to by the City School [sic].

MR. LACORTE: Now, you testified earlier about driving through some crime scene tape, do you remember that?

MS. BRYANT: Right.

MR. LACROTE: Was that before you went to City or after?

MS. BRYANT: After.

MR. LACORTE: So do you know what time that was about that you rode through the crime scene tape?

MS. BRYANT: Somewhere in the hours of between 3:00 and 4:00.

MR. LACORTE: And when you rode through the crime scene tape what happened?

MS. BRYANT: When I rode through the crime scene tape it was an officer telling me to stop.

MR. LACORTE: Let me stop you for a minute.  Do you remember who the officer was?

MS. BRYANT: No.

MR. LACORTE: Was he in uniform?

MS. BRYANT: Yes.

MR. LACORTE: He told you to stop and then what happened?

MS. BRYANT: Then I proceeded to stop and he told me to keep going.

MR. LACORTE: Was Mr. DeWitt in your car at that point?

MS. BRYANT: No.

MR. LACORTE: Where was he?

MS. BRYANT: I had dropped him off further up the street I would say maybe two or three minutes ago.

MR. LACORTE:  Before the officer stopped you [,] you dropped off Mr. DeWitt?

MS. BRYANT: Um-hum.

MR. LACORTE: Where did you drop him off?

MS. BRYANT: On Montpelier.

MR. LACORTE: Where on Montpelier?

MS. BRYANT: About midways the block.

MR. LACORTE: All right.  Now, what time was it that he got out of your car?

MS. BRYANT: Between the hours of 3:00 and 4:00, I don't know the exact time.

MR. LACORTE: Did he get back in your car that night?

MS. BRYANT: No.

(TR 11/23/2003, P-217-219).

Petitioner contends that Bryant's testimony clearly demonstrates that they were together when the crime was committed, and that her testimony was more than sufficient for an alibi instruction to be given to the jury.

Respondent contends that trial counsel's decision to forego an alibi defense was a reasonable strategy, given the inconsistent statements of Ms. Bryant. Respondent argues that Petitioner was not prejudiced by this, because the jury was fully aware of all of Bryant's statements regarding the location of Petitioner at the time of the murder and dismissed them as incredible.

The record reflects that alibi was not a theory of the defense's case. On the first day of the trial, the following colloquy occurred:

THE COURT: Is alibi an issue here.

MR LACORTE: No Your Honor.

(TR 11/18/2003, P-174).

Nevertheless, at the post conviction hearing Petitioner argued that trial counsel would not have called Ms. Bryant as a defense witness if she was not an alibi witness. There is nothing in the testimony of Ms. Bryant that remotely suggests that Petitioner was with her at the time of the shooting, thus making her an alibi witness. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

8. **Trial Counsel[25] and Appellate Counsel Were Ineffective By Committing Multiple Serious Attorney Errors, Each of Which Individually and All of Which Cumulatively Caused Petitioner's Due Process Rights Under the 14th Amendment and Article 21 of the Maryland Declaration of Rights to Be Violated**

---

[25] At trial, the Petitioner was represented by Jerome LaCorte, Esquire, (hereafter referenced to as "trial counsel"). Trial counsel was not called as a witness by the Petitioner or the Respondent at the post conviction hearing. Trial counsel was called as a witness by the Court.

### a. Trial Counsel Was Ineffective For Failing to Object When the Prosecutor Acted as the Judge During Closing Arguments By Misquoting The First and Second Degree Murder Instructions and Making Several Inflammatory Remarks in Vouching for Witnesses

#### i. The Prosecutor Acted As the Judge While Misquoting First and Second Degree Murder Instructions to the Jury Which Had a Tendency to Mislead the Jury

Petitioner asserts that the prosecutor misquoted the law for first and second degree murder during its closing argument, and that trial counsel's failure to object to these misstatements deemed his performance ineffective. Petitioner argues that if counsel would have objected, the trial judge could have ruled on it and the issue would have been preserved for appeal. Petitioner contends that he was prejudiced by counsel failing to object, because it allowed the jury to listen to the prosecutor's interpretation of the law instead of the Court's.

Respondent points to its previous argument concerning the prosecutor's description for first and second degree murder during closing argument; that the prosecutor's comments regarding the law were not inappropriate (Subsection 6). Additionally, Respondent argues that frequently experienced trial lawyers often refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsels on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality, or even highlight that which counsel does not want to highlight in the jury's mind. *Catala v. State*, 168 Md. App. 438 (2006).

As stated under Petitioner's allegation 2 the prosecutor is permitted by law to apply the law to the evidence in the case. There was no reason for trial counsel to object. Trial counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### ii. During Closing Argument, Trial Counsel Never Objected When the Prosecutor Made Several Assertions of Opinion and Personal Knowledge for Several of the State's Witnesses, Stating That Her Witnesses Wouldn't "Lie" or Make Promises, Which Should Be Considered Improper Vouching

Petitioner asserts that trial counsel was ineffective for failing to object during closing arguments when the prosecutor engaged in improper vouching for its witnesses. Petitioner argues that for the reasons stated in subsection 2(b) alleging error by the prosecutor, trial counsel was ineffective for failing to object to any of these errors. Petitioner contends that, under *Strickland* trial counsel was deficient and that he was prejudiced by counsel's deficient performance.

Respondent contends that the prosecutor was not vouching for its witnesses. Rather, the prosecutor was using witness testimony to emphasize whether the witnesses were testifying truthfully.

For the reasons stated in Petitioner's allegation 2(b) trial counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### b. Trial Counsel Was Ineffective For Failing to Challenge Petitioner's Arrest Warrant, Which Was Obtained by Threats, Promises and Coerced Testimony That Led to a Grand Jury Indictment

Petitioner asserts that trial counsel was ineffective for failing to challenge his arrest warrant at a preliminary hearing. Petitioner argues that Detectives Turner and MacGillivary went in front of the magistrate with false, misleading evidence which led to an arrest warrant and a grand jury indictment. Petitioner cites *Franks v. Delaware*, 438 U.S. 154 (1978) for the argument that defendants have a right to challenge the truthfulness of a warrant. Petitioner contends that trial attorney was deficient by failing to challenge the arrest warrant and failing to

ask for a preliminary hearing so Petitioner could challenge the truthfulness of the warrant. Petitioner concludes that had trial counsel challenged the arrest warrant and had a preliminary hearing, the charges would have been dismissed.

Respondent contends that in order for the court to even consider a *Franks* violation that the defense must make a preliminary showing that the affiant intended to mislead the magistrate by omission. *Id.* at 300.

Petitioner has the burden to demonstrate that the probable cause statement written by the affiant of the warrant for his arrest was the product of deliberate falsehood or of reckless disregard for the truth. Petitioner merely contends that the statement of Booker was coerced. Again, this argument goes to the weight of the evidence and is not in the province of the magistrate. Additionally, this Court has already addressed Petitioner's allegation concerning the grand jury under Petitioner's allegation 1. Trial counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegations lack merit and must be denied as a matter of law.

### c. Trial Counsel Was Ineffective for Failing to Investigate Maurice and Cornell Booker's Statements Before Going to Trial, Knowing He Needed More Time to Investigate, But Instead Still [Proceeded] to Trial

Petitioner asserts that trial counsel was ineffective for failing to investigate the pretrial statements of Maurice and Cornell Booker. Petitioner cites several examples as to how trial counsel was deficient. Petitioner claims that trial counsel admitted he went to trial knowing he needed more time to prepare. The following dialogue occurred between trial counsel and the Court:

MR. LACORTE: Your Honor, I would just point out that Maurice Booker acknowledged during his testimony that he had been made promises by a detective that he would in fact dismiss charges against his brother. Maurice Booker gave two statements, Your Honor. I had asked the State to give me those

statements.  We went to Discovery Court; Discovery Court denied my access to them. At some point later…

THE COURT: Weren't you given access to those things?

MR. LACORTE: Your Honor, the State filed supplemental discovery in August.  I did not ever receive a copy of that for some reason.

THE COURT: Did you receive access to the information during and before use of it in the trial?

MR. LACORTE: I received access, Your Honor, immediately before trial started to that [sic].

THE COURT: Isn't that what you're supposed to have?

MR. LACORTE: Well, Your Honor…

THE COURT: Isn't that what the rule is?

MR. LACORTE: Your Honor, I believe that evidence was exculpatory because it indicated that Mr. Booker had been made promises in exchange for his testimony.

THE COURT:   Did you need additional time after receiving this statement?

MR. LACORTE: Well, Your Honor, I would have been able to do more investigation if I had more time, obviously.

THE COURT: Didn't the Court make those statements available to you and make sure that you had them before going forward with your trial use [sic]?

MR. LACORTE: I had them immediately before trial, Your Honor.

THE COURT: And I'm confused.

MR. LACORTE: Well, Your Honor, if…

THE COURT: What action did you take after receiving them that indicated that you needed additional time?

MR. LACORTE: Trial began I think November 20[,] November 20th. [a]ccording to the State I should have had those statements in August.  I didn't have them.

THE COURT: Well let's just assume that you received it just before trial
as argued.  What actions did you take before the trial to indicate
you needed additional time?

MR. LACORTE: Well, Your Honor, I don't know that I asked for
additional time at that point.

THE COURT: I don't recall you doing so as well.

(TR 01/14/2004, P-6-8).

Petitioner asserts that trial counsel was not prepared to proceed to trial because trial

counsel admitted he did not have enough time to investigate Maurice Booker's pretrial statement.

Further, Petitioner alleges that trial counsel did not do enough to investigate statements of

Booker's brother Cornell Booker in preparation for trial. The following colloquy occurred

between trial counsel and the Court.

MR. LACORTE: Just to let the Court know, last week [I] was in a trial
with Judge Heard, it was a battered spouse case, when I received a
letter from Mr. DeWitt.  Apparently my client communicated with
Mr. Cornell Booker and Mr. Cornell Booker does have some
information that I think would be useful at this trial.

THE COURT: Have you spoken to this witness?

MR. LACORTE: I have not sir.

THE COURT: How are you going to tell me what your client believes to
be a potential witness, that the person has found out to be an actual
witness [sic] if[you] have [not] driven there yourself to speak to
him?

MR. LACORTE: My client has communicated with him, Your Honor.

THE COURT: And it's Cornell Booker?

MR. LACORTE: Yes sir.

(TR 11/18/2003, P-14).

Petitioner argues that trial counsel was ineffective for failing to go and interview Cornell Booker, and failing to call Cornell Booker as a witness. Petitioner contends trial counsel's performance was deficient and that he was prejudiced by this performance, because if trial counsel had spent more time investigating these issues then there is a good chance that the outcome of the trial would have been different.

Respondent asserts that Exhibit 3a-c show trial counsel's diligence in the investigation of Cornell Booker. Respondent notes that trial counsel even filed a motion to compel in order to obtain a copy of Maurice Booker's recorded statement, and that that statement was provided to the defense on two separate occasions, on August 29, 2003 and November 14, 2003. *Respondent's Exhibit 5a-b.* In addition, Maurice Booker was called as a defense witness.

With regards to Cornell Booker, Respondent argues that trial counsel advised the court that he had not had a chance to speak with Cornell Booker and requested a continuance. That continuance was denied; but, Cornell Booker was produced for counsel to interview. Respondent asserts that Cornell Booker was interviewed by trial counsel and that a strategic choice was made not to call Cornell Booker as a witness. Respondent points to the following excerpt:

THE COURT: Excuse me. Is it [Cornell] that you...

MR. LACORTE: It is Your Honor. The Defense does not, after all, intend to call Cornell Booker. And I thank the Court for its travail in obtaining his presence.

(TR 11/21/2003, P-195-196).

As to Cornell Booker, the record reveals that the court made him available to trial counsel during the trial. After speaking with Cornell Booker trial counsel did not call him as a witness. One can only conclude that trial counsel did not find whatever Cornell Booker had to say

relevant or helpful to the defense. Furthermore, Petitioner in his Petition never asserts what Cornell Booker would have testified to if called as a witness. The burden is on the Petitioner to demonstrate that trial counsel's performance was deficient and that he was prejudiced by trial counsel's decision not to call Cornell Booker as a witness. Here the Petitioner has not demonstrated either.

Turning now to Maurice Booker, trial counsel before trial had the taped statement of Booker's interview with the police. This is demonstrated by the fact that trial counsel did a pretrial motion, although unsuccessfully, to suppress Booker's pre-trial statement. The dialogue between trial counsel and the judge, in the record, is concerning the transcribed statement. The general rule concerning a transcribed statement of a witness in this jurisdiction in 2002/2003 was that the prosecutor was not required to give the transcribed statement to the defense until the witness testified. Trial counsel's performance was not deficient as to the investigation of Maurice and Cornell Booker. Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### d. Trial Counsel Was Ineffective for Not Asking for a Mistrial When the Prosecutor Violated the Prosecutorial Vouching Rule, Making Herself a Witness in Petitioner's Trial

Petitioner asserts that trial counsel was ineffective for allowing the prosecutor to make herself a witness in the trial. Petitioner points to the following colloquy:

MS. BANKS: When you spoke with me [,] Detective MacGillivary was there, is that right?  The white dude.

MAURICE BOOKER: Yeah.

MS. BANKS: And when you talked to me you told me that it was a white detective that made the promise to you.

MAURICE BOOKER: Who?  No [I] didn't.

(Bench Conference begins – 12:32:45) (All Counsel and the Defendant approach the bench where the following [occurred].

THE COURT: I apologize for the interruption.  I just caution you that (inaudible) make yourself a witness.

MS. BANKS: Well, Detective MacGillivary... I understand Your Honor.

THE COURT: Thank you very much.

MS. BANKS: Thank you.

THE COURT: I just caution you you're going to make yourself a witness.

(TR 11/18/2003, P-100).

Respondent asserts this questioning occurred during the motions hearing and was admonished by the trial court. Moreover, the prosecutor didn't pursue this line of questioning before the jury.

Trial counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegations lack merit and must be denied as a matter of law.

<blockquote>

e. **Trial Counsel Was Ineffective for Failing to Request a Jury Instruction for [Attempted] Second Degree Murder, Second Degree Murder, and Failing to Object to the Trial Court Giving Erroneous Limited Instructions to the Jury on the Elements of Second Degree Murder and [Attempted] Second Degree Murder**

i. **Trial Counsel was Ineffective for Failing to Object and Not Asking the Trial Court to Give a Full Instruction for [Attempted] Second Degree Murder, Which Made the Instruction Limited and Erroneous**

</blockquote>

Petitioner argues that trial counsel's failure to request the full jury instruction for attempted second degree murder and failure to object to the limited instruction that was given rendered him ineffective.  Petitioner equates his case to *Testerman v. State*, 170 Md. App. 324 (2006).  In *Testerman*, trial counsel failed to make a motion for judgment of acquittal.  The court found that trial counsel would have prevailed, and that there was no legitimate trial strategy to

not pursue this issue.  Petitioner contends that there was no legitimate trial strategy to not seek the full jury instruction.  Petitioner asserts that the result of his trial would have been different had trial counsel objected and sought the full instruction.

Respondent cites *Dorsey v. State*, 278 Md. 221 (1976) in contrast to Petitioner's argument.  In *Dorsey*, the court found that a defective jury instruction concerning the elements necessary to reduce murder to manslaughter was not enough to overcome the jury's verdict of first degree murder.  Despite the flawed instruction, the court reasoned that the verdict "negated the existence of mitigating circumstances by proof, beyond a reasonable doubt, that the homicidal act was unlawful, the result of a cool calm state constituting first-degree murder." *Id.* at 645.  Respondent further argues that the flawed instruction in this case actually made it easier for the jury to convict Petitioner of attempted second degree murder instead of attempted first degree murder, and yet the jury still found all the elements of attempted first degree murder, thus negating any error.

The Court has already addressed this issue under Petitioner's allegation 6(a).  For the reasons already stated trial counsel's performance was not deficient.  Therefore, this Court finds that Petitioner's allegation lacks merit and must be denied as a matter of law.

### ii.   Trial Counsel Failed to Object or Request a Full Instruction to the Jury on Second Degree Murder, Which Made the Instruction Limited and Erroneous

Petitioner asserts that trial counsel's failure to object and request the full jury instruction on second degree murder rendered him ineffective.  Petitioner argues that the trial court did not give the full instruction for second degree murder. Petitioner contends that he was prejudiced by trial counsel's not objecting.

Respondent asserts that the trial court gave the instructions requested, that of MPJI 4:17; and, that trial counsel strategically withdrew his request for MPJI 4:17-8 (Depraved Heart Murder).

For the reasons already stated under Petitioner's allegation 6(b), trial counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegation must be denied as a matter of law.

    f.    **Appellate Counsel Was Ineffective[26] For Failing to Raise on Direct Appeal That the Trial Judge Abused His Discretion By Allowing Coerced, Perjured Testimony Into Evidence, and Appellate Counsel Never Argued that the Induced Threats, Promises and Coerced Statements Falsely Accused Petitioner of Being the Assailant**

        i.    **Appellate Counsel Was Ineffective for Failing to Raise on Appeal that the Trial Judge Abused His Discretion By Allowing the Prosecutor to Admit Prejudicial, Coerced Statements to the Jury**

        ii.    **Appellate Counsel Was Ineffective for Failing to Raise on Appeal that the Induced Threats, Promises and Coerced Statements Which Fatally Accused Petitioner of Being the Assailant Were Based on Improper Police Conduct, That Being the Admission of Maurice Booker and Tarsha Booker's Pretrial Statements**

        iii.    **Appellate Counsel was Ineffective For Failing to Raise on Appeal the Trial Court's Violation of Petitioner's 6th Amendment Right to a Speedy Trial[27]**

First, Petitioner asserts that appellate counsel was ineffective for failing to raise on appeal the argument that the trial court abused its discretion by allowing prejudicial, coerced statements of Booker to be heard by the jury. Petitioner asserts that Booker's testimony shows that he gave a coerced statement based on promises and threats, and that this statement was allowed to be put before the jury. Petitioner's trial attorney moved to have that statement [suppressed], but the motion was denied. Petitioner argues that this preserved issue would have had a [strong]

---

[26] The Court has grouped each of Petitioner's allegations concerning ineffective assistance of appellate counsel under subsection 8(f).

[27] This allegation is listed as 8(h) on page 6 of the Memorandum Opinion.

[probability] of resulting in a reversal, and [therefore he was prejudiced] by appellate counsel's assistance was ineffective.

Secondly, Petitioner asserts that appellate counsel was ineffective for failing to raise on appeal that the pretrial statements of Maurice and Tarsha Booker were the products of police misconduct. Petitioner argues that detectives made a promise to Maurice Booker by telling him that if he said Petitioner was involved in the crime that they would let his family go for the drugs recovered from their house. Petitioner cites *Hillard v. State*, 286 Md. 145 (1979) for the proposition that the burden is on the government to show affirmatively that an inculpatory statement was freely and voluntarily made and not the product of a promise or threat. Petitioner contends that had appellate counsel raised this issue on appeal that the case could have been reversed and remanded for a new trial.

Respondent asserts that these issues were finally litigated by the Court of Special Appeals in an unreported opinion dated February 22, 2007. The Court of Special Appeals reviewed the circumstances of the recorded statement of Maurice Booker and held that "[E]ven assuming appellant had challenged the pre-trial statements of Tasha and Maurice, and further assuming that the alleged misconduct of the police actually occurred, we are satisfied, based on our review of the transcripts and the case law that such police conduct was hardly, 'so opprobrious' as to require the exclusion of the statements at appellant's trial . . . Therefore, under the circumstances of this case, the court below correctly permitted defense to elicit the witness' version of events, with the jury as the ultimate arbiter of the voluntariness and reliability of the witnesses' statements." *Tony DeWitt v. State of Maryland*, No. 2493, slip op. at 70 (Court of Special Appeals of Maryland February 22, 2007).

Finally, Petitioner further asserts that appellate counsel rendered ineffective assistance of counsel by not raising on appeal that his Speedy Trial Rights were violated. Petitioner argues that he was charged on December 10, 2002 and a motion for a speedy trial was filed on March 22, 2003.  The trial was postponed three times without Petitioner having waived his rights to a speedy trial. Petitioner also argues that a Motion to Dismiss for violation of his speedy trial rights was filed, and that the motion was heard and denied on February 7, 2003.  Petitioner contends that he informed appellate counsel on two occasions that he wanted to raise the speedy trial issue on appeal.

Respondent cites *Dorsey v. State*, 349 Md. 688, 701 (1998), stating that in the event that a defendant cannot be brought to trial within 180 days, the county administrative judge or his designee must make a finding of good cause justifying the postponement of the trial date beyond the prescribed time limit.  The critical order by the administrative judge is the order having the effect of extending the trial date beyond 180 days. *State v. Frazier*, 298 Md. 422, 428 (1984). Respondent argues that when moving a trial to a date beyond the 180 day deadline there are two components: 1) there must be good cause for not commencing the trial on the assigned date and 2) there must be good cause for the extent of the delay. *Brown v. State*, 355 Md. 89, 98 (1999) (citing *Frazier* at 448).  The determination of good cause is entrusted to the sound discretion of the administrative judge or the judge's designee. *Id* at 450.  Respondent further argues that "when the 'good cause' question concerns the need for a postponement, as opposed to the length of the delay until the new trial date, th[e] 'clear abuse of discretion' standard of review necessarily relates to what is before the administrative judge or his designee at the time the postponement is ordered." *Morgan v. State*, 299 Md. 480, 488 (1984). "The question is not whether a trial judge or an appellate court," in light of the facts discovered after the

postponement has been ordered, "might, in the exercise of hindsight, believe that there had not been good cause for postponing the trial." *Id.*

Additionally, Respondent asserts that the July 23rd postponement put the case beyond 180 days. The prosecutor asked for a postponement because Technician John Frinch was unavailable on July 23, 2003. *Respondent's Exhibit 7a.* Respondent contends that the prosecutor made every effort to resolve the issue, and even informed the Court that it would forego the testimony of Frinch if necessary. No earlier, mutually acceptable trial dates could be agreed upon, and the administrative judge found good cause for the postponement and the trial was set for October 6, 2003. On October 6, there were no courts available. The case was rescheduled for November 14, 2003, again no courts were available, and the case was placed on the "move docket."[28]

The burden remains with the Petitioner to demonstrate prejudice at the appellate level by showing that, had the issue been raised on appeal, the appeal would have likely been successful. *State v Gross, 134* Md. App. *528 (2000).* Not every conceivable issue, even non-frivolous ones, must be raised on appeal. It is only required that appellate counsel's choice of issues for appeal did not fall below an objective standard of reasonableness. *Id.* at 562. Significant issues which could have been raised should be compared to issues that were raised, and only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome. *Id.* at 562. This is because the strategic selection of which appellate issues to raise and which to ignore is one entrusted to the strategic judgment of appellate counsel. *Id.* at 556 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Furthermore, a failure to consult with the defendant about an appeal is not necessary unreasonable, and therefore deficient. *Id.* at 558.

Petitioner raised six questions for review on appeal: (1) did the trial court err in refusing to redact other crimes evidence from [Dewitt's] statement to the police; (2) did the trial court err

---

[28] Three days later Petitioner's case was sent to trial before the Honorable Alfred Nance.

in not suppressing Maurice and Tarsha Booker's identifications of [appellant] as they were the product of promises and threats; (3) did the trial court err in allowing impermissible impeachment evidence; (4) was the evidence sufficient to support [appellant's] conviction; (5) did the trial court err in its instructions to the jury; (6) did the trial court improperly exceed its role as neutral arbitrator and become an arm of the prosecution.

Petitioner has not demonstrated that the issues he contends should have been raised on appeal are stronger than the ones presented and that they would be successful. As already stated whether Maurice and Tarsha Booker's statements were coerced was for the jury to decide. The trial judge properly allowed Maurice and Tarsha Booker's statements to be put before the trier of fact. Moreover this issue was addressed by the appellate court and the court found no error. As to the speedy trial issue, Exhibits 7(a) and (b) entered into evidence by Respondent at the post conviction hearing reveal that the administrative judge found good cause for the postponements. Appellate counsel's performance was not deficient. Therefore, this Court finds that Petitioner's allegations are without merit and must be denied as a matter of law.

### g. Trial Counsel Was Ineffective for Failing to Investigate Exculpatory Evidence of Witness Statements, Failing to Summons Police and Failing to Question the Police Officer Who Interviewed the Witness and Wrote the Report About the Conversation of Another Assailant Being Accused of the Crime

Petitioner argues that trial counsel was ineffective for failing to adequately prepare for trial; not retaining an investigator to interview witnesses; not examining other statements from police reports; and, not thoroughly investigating facts surrounding the charges and possible defenses. Petitioner asserts that a witness by the name of Shannon Lewis identified Mwamba Epps as the assailant, and that counsel failed to investigate this potentially exculpatory evidence.

Petitioner contends that had trial counsel investigated the case further that there may have been new material to present at trial that would have raised reasonable doubt in the minds of jurors.

Respondent's Exhibit 3(a) reveals that Lewis made a statement to the police about the shootings and murders regarding complaint numbers 02-133[sic] and 02H0131. Complaint number 02H0131 is the complaint number assigned to Petitioner's case. Respondent's Exhibit 3(a) reads that Lewis heard "Mwanba" Epps saying that he committed the shooting and the murder. Lewis further says that the intended victim got away and that a female got caught in the crossfire. This information was disclosed to trial counsel when he did an open file discovery review of the prosecutor's file on June 17, 2003. On June 18, 2003, trial counsel sent a letter to the prosecutor requesting access to the investigative file on Epps. On June 19, 2003, the prosecutor responded, in writing, that she had reviewed the detective's notes regarding the interview with Lewis and that Lewis only spoke about Epps' involvement in the shooting of George Gaines. Further, the prosecutor wrote that trial counsel was privy to her conversation with Detective MacGillivary and that Detective MacGillivary did not interview Lewis in connection with this case. However, Exhibit 3(a) demonstrates that Lewis did give information about facts pertinent to this case, i.e., the intended victim getting away and a female getting shot. Nonetheless, her statement that she heard Epps saying that he did the shooting is unclear as to which shooting Epps was speaking about. Therefore, even if trial counsel's performance was inadequate by not attempting to get a judge to compel the prosecutor to disclose Epps' file, Petitioner has not demonstrated how this information would have changed the outcome of his trial.

At the post conviction hearing, held on July 15th, 2015, Petitioner orally supplemented his Petition, without objection, and asserted that trial counsel's performance was also deficient for

not thoroughly investigating the statement of Tyrell Curtis on December 10th, 2002 to Detective Veney.[29] At the hearing, Petitioner called Curtis as a witness. Curtis acknowledged that he was interviewed by Detective Veney in 2002; and, that he told the Detective Veney that George Gaines was the shooter.  Curtis testified that when the shooting occurred he was sitting on the porch in the 1700 block of Montpelier with Maurice Booker and others; and that he and Booker ran around the corner. Curtis further testified that he and Booker were friends; attended the same school; would see each other every day; and, that it was a 3 to 5 minute walk between their homes.

On cross examination, the Respondent entered into evidence a taped statement of Curtis taken by Detective Purtell in April, 2003, Respondent's Exhibit #1A, wherein Curtis only gives a description of the shooter. Upon questioning by Respondent, Curtis did recall being interviewed again by the police in 2003, but did not recall the substance of the interview. The 2003 taped statement was played in open court in an effort to refresh Curtis' memory, to no avail.

At the close of the post conviction hearing, Petitioner argued that trial counsel's performance was deficient if trial counsel was aware of Curtis' December 10th, 2002 statement to Detective Veney; and, failed to call Curtis as a defense witness at the trial. Petitioner maintained that trial counsel had a duty to bring Curtis to trial. Petitioner further argued that Curtis' April, 2003 statement did not negate his December, 2002 statement; and therefore, trial counsel had a duty to investigate Curtis as a potential witness. Petitioner maintained that it doesn't matter that Curtis in his April, 2003 statement does not name Gaines as the shooter. Petitioner argued that what matters is that Curtis did not say Petitioner was the assailant. Petitioner contended that because nobody knows what the truth is, Curtis should have been put before the jury to let the jury decide what is true.

---

[29] As stated in section 4(c), Petitioner obtained this evidence from the Maryland Public Information Act in 2011.

Additionally, Petitioner asserted that Curtis and Booker were both eyewitnesses to the shooting and had Curtis testified at Petitioner's trial his testimony would have corroborated Booker's testimony because both Curtis and Booker said that Petitioner was not the shooter. In sum, Petitioner argued that but for the deficient performance of counsel the outcome of Petitioner's trial would have been different.

In response to Petitioner's arguments, the Respondent argued that trial counsel's performance was reasonable under the totality of the evidence. Respondent argued that the record demonstrates that trial counsel's trial strategy was that Paris Moore was the shooter. In support of this argument, Respondent pointed to trial counsel's opening/closing arguments and counsel's cross examination of Detective MacGillivary.

Respondent asserted that the record reflects that during opening statements, trial counsel tells the jury that the evidence would show that there may have been someone else that wanted to shoot Maurice Booker and tragically took the life of Sherene Moore. He tells the jury that they may hear testimony about an individual by the name of Paris that [Booker] had a beef with over a motor scooter.

Next, Respondent maintained that the record reveals that, on cross examination, trial counsel questioned Detective MacGillivary about Tarsha Booker telling him that she believed that Paris Moore shot her brother, Maurice Booker. Detective MacGillivary testified that Tarsha Booker believed that Moore shot her brother because someone told her that Moore was beefing with him.

Finally, Respondent argued that the record demonstrates that, during closing arguments, trial counsel argued to the jury that they had heard testimony from Maurice Booker that he was

beefing with Paris Moore. Further, trial counsel reiterated for the jury that Booker told them that he was charged with the murder of Marquis Brown on June 26th.

In sum, Respondent asserted that trial counsel's strategy that Moore was the shooter was a legitimate and viable strategy, available to counsel at the time, because Paris Moore had gotten into a confrontation with Maurice Booker and Booker had shot Moore's friend, Marquis Brown, two weeks prior.

As to the December 10th statement of Tyrell Curtis wherein he tells the police that Gaines was the shooter; Respondent argued that there was no reasonable probability that this information would have had any effect on the outcome of the trial. Respondent argued that first, Curtis would have had to be produced to testify at the trial. Respondent contended that trial counsel did his due diligence to produce Curtis by enlisting the assistance of an investigator to locate him, to no avail. Further, Respondent argued that even if Curtis had been produced his testimony would not have changed the outcome of the trial because he gave two conflicting statements to the police. Specifically, there was the statement in December, 2002 wherein Curtis says that George Gaines was the shooter; and, then there was the statement in April, 2003 wherein he does not say Gaines was the shooter; he just says the shooter was a black male, not too tall, and thick in build.

Respondent, also, argued that the testimony of Curtis would not have altered the outcome of the trial because the prosecutor had already ruled out the possibility of Gaines being the shooter through the testimony of Allen Rice. At the trial, Allen Rice testified that he and Gaines lived together and that at the time of the shooting Gaines was home. Finally, Respondent contends that Maurice Booker, Tarsha Booker and Shamecca Bryant all placed Petitioner at the scene of the shooting.

The Court now turns to trial counsel's testimony at the post conviction hearing regarding Tyrell Curtis. Trial counsel testified that he was not aware of Curtis until after he reviewed the prosecutor's file on June 17, 2003. Trial counsel acknowledged that the following day he wrote a letter to the prosecutor requesting Curtis' address. However, trial counsel could not recall specifically why he made the request for Curtis' address.

The Court attempted to refresh trial counsel's memory by showing him Petitioner's Exhibit 1, the December 10th interview of Curtis by Detective Veney, wherein Curtis told Detective Veney that George Gaines was the shooter and that Petitioner had nothing to do with it. Nonetheless, trial counsel continuously testified that he never saw Petitioner's Exhibit 1 in the prosecutor's file on June 17th, 2003. Trial counsel testified that there must have been something else in the prosecutor's file that prompted him to request Curtis' address. Trial counsel testified that he had investigator Feldman assisting him with interviewing potential witnesses. Counsel testified that he *believed* that Feldman attempted to find Curtis, to no avail. (*emphasis added*). However, trial counsel was unable to produce any note/reports from the investigator detailing what efforts were made to locate Curtis. This Court is troubled by this testimony and finds it incredible that an investigator would not have provided counsel with a written report concerning his/her findings.

Notwithstanding trial counsel testifying that he had enlisted the assistance of investigator Feldman to locate Curtis, trial counsel testified that if he had seen Petitioner's Exhibit 1 in the prosecutor's file he would have had a lot more to say about it, such as asking the prosecutor for a copy of it; and, if the prosecutor did not provide a copy, he would have filed a Motion to Compel. Trial counsel admitted that Curtis would have been an important witness.

On cross examination, Respondent asked trial counsel if he was aware that other witnesses had stated that George Gaines was the shooter; specifically, that Damion Young had said that Gaines was the shooter. Trial counsel had no memory of this information ever being disclosed to him. Respondent attempted to refresh trial counsel's memory with Respondent's Exhibit 2 wherein Damion Young says that George Gaines is the shooter. Trial counsel still could not recollect this fact but acknowledged that the Exhibit indicates that the information was disclosed to him on April 7, 2003.

Additionally, Respondent asked counsel if his presenting evidence and arguing to the jury that Paris Moore was possibly the shooter was trial his strategy. Trial counsel did not acknowledge that any mention of Paris Moore by him during the trial was part of any trial strategy.[30]

As to Respondent's Exhibit 1A, the 2003 taped statement of Tyrell Curtis, trial counsel, also, testified that he was not aware of this statement before trial; but, Petitioner testified that both he and trial counsel were aware of it. In his 2003 statement, Curtis tells the police that he was right next to the girl that got shot and that when the shooting began he ran into the alley with Booker. In this statement Curtis doesn't say the shooter is Gaines; but, he does give a description that the shooter was a black male, not that tall and kind of thick.

In *Strickland v. Washington*, the court held that [t]o obtain relief due to ineffective assistance of counsel, a criminal defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's performance gives rise to a reasonable probability that, if counsel had performed adequately, the result of the proceeding would have been different. *Supra*. The Court established a two-part test for an ineffective assistance of counsel claim: 1) counsel's performance fell below an objective standard of reasonableness, and

---

[30] This was the extent of trial counsel's testimony at the post conviction hearing on August 6, 2015.

2) that counsel's performance gives rise to a reasonable probability that, if counsel had performed adequately, the result would have been different. *Id.*

The *Strickland* Court recognized that [c]ounsel must have "wide latitude" to make "reasonable tactical decisions..." Judges who evaluate ineffective assistance claims should, in turn, be highly deferential to counsel's decisions and avoid scrutinizing them in hindsight. *Id.* Counsel does, however, have a duty to make "reasonable investigations, or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Strategic decisions made in light of a reasonable investigation and compared to plausible options are virtually unchallengeable. By contrast, strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments justify the curtailment of counsel's investigation. *Id.* Counsel's errors must prejudice the defendant's ability to receive a fair trial. *Id.*

Further, the Court reasoned that [s]ince the goal is to ensure that the defendant had a fair trial, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* [The] defendant must show that counsel's errors prevented the jury from forming a reasonable doubt as to his guilt. *Id.*

Applying the two part test for an ineffective assistance of counsel claim to this case the Court finds for the following reasons that trial counsel's performance fell below an objective standard of reasonableness: First, trial counsel was privy to an *eyewitness*, Curtis, who told the police that he was right next to the girl that got shot and that Petitioner was not the shooter. (*emphasis added*). This information was available to trial counsel in the December 10th, 2002 statement and the 2003 statement of Tyrell Curtis. Secondly, in Curtis' April, 2003 statement he gives a description of the shooter as being a black male, not too tall, with a thick build which

matches the height and weight of George Gaines as shown in Petitioner's Exhibit 2.[31] Thirdly, Curtis in his April, 2003 statement says that before the shooting he was on the porch in the 1700 block of Montpelier with Booker and when the shots were fired he and Booker ran into the alley. Additionally, Curtis testified at the post conviction hearing that at the time of the shooting he and Booker were friends and that they lived only 3 to 5 minutes from each other. Booker was a defense witness and trial counsel never asked him if he knew how to locate Curtis.  Finally, trial counsel knew that Gaines was shot and killed 4 hours after the shooting in this case arguably in retaliation for the shooting in this case.

As to whether counsel's performance gives rise to a reasonable probability that, if counsel had performed adequately the result would have been different, this Court finds that the Petitioner has proven by a preponderance of the evidence that had trial counsel adequately investigated Curtis as a witness there is a reasonable probability that the outcome of his case would have been different.  If Curtis, an eyewitness, had been developed by trial counsel as a potential witness the jury would have heard that he was standing right next to the deceased, Sherene Moore and the surviving victim Booker when the shots were fired and that he identified Gaines as the shooter. The Court rejects Respondent's argument that the issue of whether Gaines was the shooter was ruled out through the testimony of Allen Rice.  Curtis' testimony would have put Gaines at the scene and the jury would have heard *eyewitness* testimony in contrast to Rice's testimony. The jury would have had to decide which testimony it believed. Further, the jury would have heard that Gaines was killed four hours after the shooting in this case and could have inferred that Gaines was killed in retaliation.

The Court also rejects Respondent's contention that Curtis' 2003 statement is contrary to the statement he made on December 10th, 2002 because Curtis does not name Gaines as the

---

[31] Petitioner's Exhibit 2, a booking photo of George Gaines describes him as being 5 feet 8 inches tall and 240 lbs.

shooter.   Curtis in his 2003 statement clearly provides a description of the assailant that arguably fits the description of Gaines as demonstrated by Petitioner's Exhibit 2.  Additionally, Respondent argued that the testimony of Curtis would not have altered the outcome of the trial because Booker, Tarsha Booker and Shamecca Bryant all placed Petitioner at the scene of the shooting.  The Court rejects this line of reasoning too.  A person's presence at the time and place of a crime, without more is not enough to prove that the person committed the crime...MPJI-Cr 3:25.

Pursuant to the holding in *Strickland* trial counsel has a duty to make "reasonable" investigations, or to make a reasonable decision that makes particular investigations unnecessary. *Supra.* Curtis' December 10th, 2002 statement clearly was exculpatory evidence. Curtis' December 10th, 2002 statement was received by Petitioner in 2011 in consequence of him filing a Maryland Public Information Act. The information came from the prosecutor's file. One could deduce that if the information was in the prosecutor's file in 2011 it was there when trial counsel reviewed the prosecutor's file in 2003. Thus, trial counsel's performance fell below an objective standard of reasonableness; and, there is a reasonable probability that, if counsel had performed adequately, the result of Petitioner's trial would have been different.

### h.   Trial Counsel Was Ineffective for Failing to Request Instructions on Alibi or Objecting to the Trial Court's Failure to Instruct the Jury on Alibi[32]

Petitioner asserts that trial counsel was ineffective for failing to request an alibi instruction, when Shamecca Bryant's testimony placed him away from the scene of the crime at the time of the shooting.  In citing *Smith v. State*, 302 Md. 175 (1985), the Petitioner asserts that where the evidence in a criminal case generates the issue of alibi and the defendant requests an alibi instruction, he is entitled to such an instruction being read.

---

[32] This allegation is listed as 8(i) on page 6 of the Memorandum Opinion.

Respondent asserts that trial counsel's decision to forego an alibi instruction was a reasonable strategic choice, given the inconsistent statements of Shamecca Bryant.

For the reasons stated under Petitioner's allegation 7 trial counsel's performance was not deficient. Therefore, this Court finds Petitioner's allegation lacks merit and must be denied as a matter of law.

## IV. CONCLUSION

Upon review of the Petition for Post Conviction Relief, Respondent's Response/Motion to Dismiss/Memorandum, and following a hearing where testimony by the Petitioner, witnesses and argument from all counsel was heard, the Petition for Post Conviction Relief, as to allegation 8(g), is **GRANTED** as a matter of law.

| | | |
|---|---|---|
| **TONY DEWITT** | * | **IN THE**     RECEIVED |
| **Petitioner** | * | **CIRCUIT COURT** 2015 AUG 21 PM 4:19 |
| **v.** | * | **FOR** |
| **STATE OF MARYLAND** | * | **BALTIMORE CITY** |
| **Respondent** | * | **Case Nos.: 103006015-16** |
| | | **PC No.: 11165** |

\* \* \* \* \* \* \* \* \* \* \* \*

### ORDER

The Court has considered Tony DeWitt's ("Petitioner") Petition for Post Conviction Relief, the Respondent's Opposition thereto, and the oral arguments of all counsel. For the reasons stated herein by memorandum, pursuant to Md. Code Ann., Crim. Proc., § 7-101 *et seq.*, and in conjunction with Maryland Rules 4-401 through 4-408, it is on this 21st day of August, 2015, by the Circuit Court for Baltimore City, hereby;

**ORDERED** that Petitioner's Petition for Post Conviction Relief is hereby **GRANTED** as a matter of law.

THE JUDGE'S SIGNATURE APPEARS ON _____
THE ORIGINAL DOCUMENT.
Judge Melissa Phinn

CC:    Court File

**Tony DeWitt (DOC # 318-063)**
North Branch Correctional Institution
14100 McMullen Hwy, SW
Cumberland, MD 21502

**Roland Brown, Esq.**
Counsel for the Petitioner
The Law Office of Roland Brown
2225 St. Paul Street
Baltimore, MD 21218

**Cynthia Banks, Esq.**
Assistant State's Attorney
Baltimore City State's Attorney's Office
120 E. Baltimore Street
Baltimore, MD 21202