IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TONY DEWITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-cv-03202-DKC |
| | ) | |
| WILLIAM RITZ, et. al., | ) | |
| | ) | Hon. Deborah K. Chasanow |
| Defendants. | ) | |

**MOTION TO DISMISS PLAINTIFF'S COMPLAINT AS A LITIGATION SANCTION
BASED UPON WITNESS TAMPERING AND THE FABRICATION OF EVIDENCE**

Respectfully submitted,

*/s/ Avi T. Kamionski*
Avi T. Kamionski, Bar No. 20703
Shneur Nathan, Bar No. 20707
Mayer Engelsberg Bar No. 21105
201 N. Charles Street Suite 1202
Baltimore, MD 21202
(312) 612-1928
(952) 658-3011
akamionski@nklawllp.com
snathan@nklawllp.com
mengelsberg@nklawllp.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

    A.    The Underlying Crime, Conviction, and Unsuccessful Direct Appeal ...............3

    B.    Plaintiff's Conviction Is Vacated and He Files Suit Based on the Questioned Document ....................................................................................................................3

CLEAR EVIDENCE OF WITNESS TAMPERING ........................................................5

    A.    Dewitt Promised Maurice and Cornell Booker Ten-Thousand Dollars ($10,000) Each for Their Testimony ......................................................................6

    B.    Plaintiff Conspired with Larry Mitchell to Fabricate Testimony ......................8

    C.    Plaintiff Paid Tyrell Curtis In Exchange for His Testimony ............................9

        i.    "Dude" and "Bobbi Brown" Are Pseudonyms for Tyrell Curtis ..............9

        ii.    Plaintiff Paid Tyrell Curtis for His Testimony ...........................11

        iii.    Plaintiff Influenced the Content of Tyrell Curtis' Testimony ................12

        iv.    Plaintiff Hid His Contact with Tyrell Curtis From the Court.................14

THE QUESTIONED DOCUMENT IS EXPOSED AS FRAUDULENT ...........................15

    A.    The Opinions of Forensic Document Examiners Katherine Koppenhaver and Diana Mears ...........................................................................................................16

    B.    All Other Indications Also Point to the Fact that the Questioned Document Is Not Authentic ......................................................................................................19

ARGUMENT ......................................................................................................................21

CONCLUSION ...................................................................................................................24

Defendants, William Ritz, Gregory MacGillivary, and Kevin Turner ("Defendants"), through their undersigned attorneys, and pursuant to Fed. R. Civ. P. 41 and this Court's inherent authority, for their motion to dismiss Plaintiff's complaint as a litigation sanction based upon witness tampering and the fabrication of evidence, hereby state as follows:

## INTRODUCTION

Plaintiff engaged in blatant and shocking witness tampering and outright fabrication of critical evidence from the inception of his post-conviction proceedings which continue to infect this litigation. After conning the criminal justice system with this fraudulent evidence to procure the dismissal of his murder charge, Plaintiff continues to rely upon this same evidence in this case. In light of this extreme litigation misconduct, the Court should issue the harshest sanctions at its disposal to protect the integrity of the civil and criminal justice system. At minimum, dismissal of Plaintiff's claims with prejudice is warranted to prevent him from profiting from his corrupt and criminal behavior.

As set forth in detail below, Plaintiff offered to pay key witnesses from his criminal trial—Maurice and Cornell Booker—"ten stacks a piece" in exchange for helpful testimony in his post-conviction proceedings and the instant civil case.[1] This evidence recently came to light when Defendants in this civil case obtained Plaintiff's recorded phone calls pursuant to a subpoena to the Department of Public Safety and Correctional Services ("DPSCS"). In a recorded call between Plaintiff and Maurice Booker, Plaintiff said:

> Me and you and my lawyer, we gonna work something out as far as a contract where as though I give you and your brother **ten stacks a piece** because that's when I can sue their ass for a lot of their bull-shit they did in my trial… **I can lace your pocket and your brother pocket for real**, right, because I'm still, I'm still gonna need you all in my civil suit… I'm trying to bust the state for all the money I can get off these motherfuckers. You know what I'm saying. And y'all coming down I see if we can work

---

[1] A "stack" is slang for $1,000. *See* http://onlineslangdictionary.com/meaning-definition-of/stack.

something out whereas my lawyer can put some type of contract whatever together. You know what I'm saying. Whereas though I can, I can tighten you all up as well… Yeah, I'm, I'm, that's why I'm putting you on, that's why I'm putting you on point now and shit so that you'll know that these, you know at my post-conviction I still, I still got that same bitch ass prosecutor, yo. That black bald head bitch… the same motherfucker thing but by her doing, she doing the same case. So I'm going in front of a black, this a black judge, this a new judge that's down there now. She only been a judge down there for like three years… my lawyer, he was talking real good, like she real liberal and shit… I been just hoping that everything pan out and shit, whereas though uh, though Ty, uh, uh, uh, **Tyrell**, he's supposed to come too, right.

*See* CD 1 of Recorded Prison Calls, attached hereto as Ex. 1, at 6/14/2015, 8:22:39 PM, 12:33–21:06 (emphasis added).[2]

The recordings also establish that Plaintiff paid Tyrell Curtis for his helpful post-conviction testimony and closely coordinated with Curtis regarding the details of that testimony. In order to lend credibility to this purchased, false testimony from Curtis, Plaintiff obtained a wholly fabricated police report (the "Tyrell Curtis Report" or "Questioned Document") which purports to memorialize a prior statement from Curtis to BPD Officer Mark Veney identifying an alternative suspect in the crime at issue. Plaintiff then pointed to this fraudulent evidence at his post-conviction proceedings and argued that it was newly discovered exculpatory *Brady* material which required his murder conviction be reversed. To be clear, the Tyrell Curtis Report is nothing but a forgery. As explained in more detail below, a team of forensic document examiners analyzed the Tyrell Curtis Report and concluded it was manufactured from other known documents that Plaintiff obtained from the State's Attorney's Office ("SAO") during discovery in his criminal case. These scientific findings are independently conclusive, but the conclusion that the document was fabricated is further corroborated by context, common sense, the face of the document itself, and all other known evidence. In light of the significance of the fraud

_____

[2] A complete index of the "Recorded Prison Calls" cited within is attached hereto as Appendix A.

perpetrated by Plaintiff and the strong public interest in maintaining the integrity of the judicial system, the only appropriate remedy is dismissal of the complaint, with prejudice.

## FACTUAL BACKGROUND

### A.      The Underlying Crime, Conviction, and Unsuccessful Direct Appeal[3]

On July 5, 2002, Sherene Moore and Maurice Booker were shot in Baltimore City. *See* Court of Special Appeals of Maryland Opinion, at ¶ 3, attached hereto as Ex. 5. Ms. Moore, who had just celebrated her sixteenth birthday, died from a single gunshot wound to her chest. *Id.* Booker, who was eighteen, sustained a gunshot wound to his arm and chest. *Id.* at ¶¶ 2-3. Booker was eventually interviewed by members of the Baltimore Police Department ("BPD") and identified the Plaintiff, Tony Dewitt, as the shooter. *See id.* at ¶ 14. At trial however, Booker was one of several witnesses to recant his previous statements, alleging that his identification was the product of police manipulation. *See id.* at ¶¶ 12-16. Nonetheless, in November 2003, a jury sitting in the Circuit Court for Baltimore City convicted Dewitt of first-degree murder relating to Moore, and attempted first-degree murder of Booker, as well as related crimes. *Id.* at ¶ 1. Dewitt was sentenced to life imprisonment plus a consecutive term of twenty years. *Id.* The Court of Special Appeals affirmed the conviction on February 22, 2007, Ex. 5, and the Court of Appeals of Maryland denied a petition for writ of certiorari on June 8, 2007. *See* Court of Appeals of Maryland Order, attached hereto as Ex. 6.

### B.      Plaintiff's Conviction Is Vacated and He Files Suit Based on the Questioned Document

Having exhausted his opportunities for direct appeal, Dewitt filed a petition for writ of actual innocence on August 9, 2010, based on what he characterized as "newly discovered evidence." *See* Petition for Writ of Actual Innocence, attached hereto as Ex. 7. His petition was

---

[3] A brief "Timeline" providing temporal context is attached hereto as Appendix B.

denied for failing to state a claim by order of the Baltimore City Circuit Court on August 19, 2010. *See* Order Denying Petition for Writ of Actual Innocence, attached hereto as Ex. 8.

In December 2013, Dewitt filed a Petition for Post-Conviction Relief. *See* Petition for Post-Conviction Relief ("PC Petition"), attached hereto as Ex. 9.[4] [5] In his PC Petition, Plaintiff alleged "there was another eyewitness to the crime by the name of Tyrell Curtis, who gave a statement that he witnessed George Gaines, committ [sic] the crime." *Id.* at ¶ 38. Plaintiff attached the Tyrell Curtis Report (a.k.a. Questioned Document) as Exhibit 4 to his PC Petition and characterized it as newly obtained exculpatory evidence. Questioned Document, attached hereto as Ex. 12. Plaintiff alleged that he first learned of this document after his conviction when he received it from the SAO in response to a Maryland Public Information Act ("MPIA") request. *See* Ex. 9, at ¶ 39. Plaintiff also relied on the Questioned Document to support an ineffective assistance of counsel allegation that his "attorney failed to investigate the witness and the detective that took Tyrell Curtis [sic] statement." *Id.*

A hearing was held on the PC Petition in the Baltimore City Circuit Court on July 15, 2014, and continued on August 6, 2014. *See* 7/15/15 Post-Conviction Hearing Transcript, attached hereto as Ex. 13; 8/6/15 Post-Conviction Hearing Transcript, attached hereto as Ex. 14. Maurice Booker and Tyrell Curtis each testified on behalf of Plaintiff at the July 2014 hearing. Tyrell Curtis testified that he in fact gave the statement attributed to him in the Questioned Document. *See* Ex. 13, at ¶¶ 6-40. Maurice Booker testified at the hearing that, contrary to the

---

[4] Plaintiff filed an Amended Post-Conviction Petition on June 13, 2014, and filed a Second Amended Post-Conviction Petition on July 25, 2014. These amended petitions were orally waived at a hearing on July 15, 2015. *See* Memorandum Opinion Granting Post-Conviction Relief, attached hereto as Ex. 10, at ¶ 1, n.1.

[5] In October 2014, with his Petition still pending before the court, Dewitt filed a Motion to Correct Illegal Sentence which was denied by the court. *See* Order Denying Motion to Correct Illegal Sentence, attached hereto as Ex. 11.

statement he provided the police which inculpated Plaintiff, he could not actually identify Dewitt. *See id*. at ¶¶ 66-72.

Although the Baltimore City Circuit Court found that the SAO's open file policy precluded a finding that *Brady* was violated and further rejected twenty-three (23) separate grounds asserted in the PC Petition, it granted the PC Petition as to the allegation of ineffective assistance of counsel as to Tyrell Curtis. Ex. 10, at ¶¶ 63-71.[6] In other words, the court assumed the Tyrell Curtis Report was authentic and found that Plaintiff's attorney should have interviewed Curtis in light of the favorable testimony Curtis presumably would have provided had he testified consistent with the Questioned Document and his July 2014 testimony.

## CLEAR EVIDENCE OF WITNESS TAMPERING

Plaintiff's recorded prison calls reveal his direct involvement in paying Maurice Booker and his brother Cornell Booker, as well as Tyrell Curtis, in connection with Plaintiff's direct and indirect procurement of their false testimony in support of the PC Petition. Notwithstanding regular DPSCS announcements at the start of every call that Plaintiff's calls as an inmate were being recorded and his typical efforts to conceal his discussions about his witness tampering through the use of pseudonyms, Plaintiff and his co-conspirators slipped up with sufficient frequency and clarity that it is beyond question that he offered to pay the Bookers and Tyrell Curtis in exchange for favorable testimony in support of his PC Petition. As to Maurice Booker, Plaintiff spoke directly with him, as cited above, and offered to pay him ten-thousand dollars ($10,000). Ex. 1, at 6/14/2015, 8:22:39 PM, 12:33–21:06.

Regarding Tyrell Curtis, Plaintiff attempted to conceal his identity through the use of a *nom de guerre*, such as "Dude" and "Bobbi Brown." But these conspiratorial efforts are exposed

---

[6] Other than the testimony of Curtis, no evidence was presented in connection with the PC Petition to support the authenticity of the Questioned Document.

herein because Plaintiff and his accomplices would sometimes get sloppy and directly name "Tyrell" and discuss that they were paying Tyrell Curtis in exchange for his testimony.

In the end, Plaintiff's scheme to purchase false testimony from the Booker bothers and Curtis succeeded in unlocking the prison gates and simultaneously opened the door to this lawsuit. The recorded prison calls reveal, however, that the testimony of these critical PC Petition witnesses was purchased by Plaintiff. This scheme was spearheaded by Plaintiff and, at times, effectuated with the help of Plaintiff's girlfriend, Yvette Frances Gray ("Yvette"), and his longtime friend, Antonio McDougald ("Doodles").[7] The blatant witness tampering is set out in detail below utilizing direct quotes from Plaintiff's recorded prison calls. Given these clear admissions and the forensic document evidence establishing that the Questioned Document was forged, the minimally appropriate sanction is the full dismissal of this civil case.

### A.   Dewitt Promised Maurice and Cornell Booker Ten-Thousand Dollars ($10,000) Each for Their Testimony

On June 14, 2015, Plaintiff called his girlfriend, Yvette, who then patched in Maurice Booker on a separate line so that Plaintiff could speak directly with Maurice. During this call, Plaintiff spoke directly with Maurice and offered him and his brother ten-thousand dollars ($10,000) each in exchange for their testimony at his hearing on the PC Petition. Plaintiff's words are simply jaw-dropping: "Me and you and my lawyer, we gonna work something out as far as a contract where as though I give you and your brother **ten stacks a piece** because that's when I can sue their ass for a lot of their bull-shit they did in my trial. And… if everything, if everything pan out right, I, I, I can definitely I wanna lace, **I can lace your pocket and your brother pocket for real**, right, because I'm still, I'm still gonna need you all in my civil suit."

---

[7] It appears that Plaintiff also offered Doodles compensation for his efforts coordinating the payments and testimony of Maurice and Cornell Booker and Curtis. *See* CD 4 of Recorded Prison Calls, attached hereto as Ex. 4, at 3/29/2013, 9:10:12 PM, 1:47–1:52 ("You know everything go good man, you know I'm gonna break bread yo, you hear.").

*See* Ex. 1, at 6/14/2015, 8:22:39 PM, 12:33–21:06 (emphasis added). In addition to the

unambiguous promise made by Plaintiff to pay Maurice, other recorded calls demonstrate that

Plaintiff also coordinated the substance of Maurice's testimony. On February, 12, 2015, Plaintiff

told Maurice's brother, Cornell:

> So basically, **what I need you to do is… say that… the state gave you a deal and shit**, and that's how you copped out to the time that you got, and your… brother, he… said the things that he said because of the simple fact that the police promised to do this that. You know what I mean, you know the, you know the, you know… **that's basically what I need you to do** for real, right… So… I definitely, I definitely need your help though Dawg. I want to know, you know what I mean,… I definitely need your help… I definitely appreciate this shit… I get my lawyer and shit to uh, to send you a summons and shit, right… So if you need a ride down that motherfucker I can get my wife or... If you want Doodles to come scoop you up… if you don't got no ride to go down to courthouse and shit, she would do that… But before you all get down there to do a deposition **I just wanna chop it up… first with you so you'll know exactly what to say** and what, you know what I mean… before I put it in [my lawyer's] hands, I wanted to make sure that y'all were straight with it though… I didn't wanna… press, press the issue without getting, getting the green light from you and your brother

CD 2 of Recorded Prison Calls, attached hereto as Ex. 2, at 2/12/2015, 12:32:37 PM, 16:26–

27:57 (emphasis added). Later that same day, in a recorded call between Plaintiff and Maurice,

Plaintiff emphasized to Maurice that he needed to be "convincing" and stick to "the whole

script." *See id*. at 2/12/2015, 8:20:42 PM, 10:27–16:12.[8]

---

[8] The selected quotations in context are: "So the main thing is, basically, is you sticking to the whole, the whole script. You just gotta be convincing. You know what I mean… you just gotta basically be, you know, you know what was said and everything far as you being there… and you just gotta be… convincing and shit, right… I'm gonna highlight Roland, that's my lawyer name, Roland, Roland Brown… So I'm gonna highlight you and shit. And I talk to him probably tomorrow. Once I highlight him... I'll probably get my wife, probably to text you and let you know what date they set up so you and your brother can go down that motherfucker, right…'cuz I… wrote uh, I got a letter, half of it, what I got one written to your brother. I, I was wantin' to wait to talk to you first before I can… put the joint together for you… I'm gonna mail that out so you should get it between… Wednesday and Thursday… so if you need a ride down, I can get my wife and shit, or I get Doodles and shit… I definitely, I definitely appreciate that dawg. You know what I mean…". Ex. 2, at 2/12/2015, 8:20:42 PM, 10:27–16:12.

On February 14, 2015, Plaintiff stressed to Yvette that it was critical that Maurice receive Plaintiff's letter before Yvette took Maurice to meet with Plaintiff's criminal defense counsel. Yvette responded:

| | |
|---|---|
| Yvette: | Oh, I know. So he'll know what to say. You right. |
| Dewitt: | Oh Lord. Lord, you ain't have to say all of that. |
| Yvette: | I know. Sorry about that. I gotchu. I know. |

*Id*. at 2/14/2015, 7:45:25 PM, 2:32–3:13.

On February 15, 2015, in a three-way call, Plaintiff, Yvette, and Cornell Booker discussed when Plaintiff's letter was scheduled to arrive at Maurice Booker's place. *See id*. at 2/15/2015, 12:41:32 PM, 3:12–5:10. On March 2, 2015, Plaintiff reiterated to Yvette that she should "make sure that they read… that letter and shit that was sent, right. Make sure he, I mean he basically read that so he'll know what, what's going on."[9] *Id*. at 3/2/2015, 6:47:59 PM, 21:31–22:19.

### B.     Plaintiff Conspired with Larry Mitchell to Fabricate Testimony

Larry Mitchell (a.k.a. "Brother") is a witness Plaintiff relies upon in his complaint for the proposition that the shooter was "light skinned" even though Plaintiff "is described as having dark skin." *See* Compl., at ¶ 41. Plaintiff's recorded prison call, however, establishes that Plaintiff conspired with Brother to completely fabricate testimony consistent with Plaintiff's scheme. In a three-way call between Plaintiff, Yvette, and, Brother, Plaintiff explained to Brother:

| | |
|---|---|
| Dewitt: | I need you out there, need you to come through again for me yo… Basically, **I need you, basically to hit them up on shit like, man [the Detectives] was trying to force you to say that you seen me uh, with guns and all the other type of shit,** and, and, and you stuck with your guns… Yeah, but this the thing, this the thing yo, from that last trial joint, |

---

[9] Defendants issued a document request pursuant to Fed. R. Civ. P. 34 on February 18, 2020, for any correspondence between Plaintiff and his representatives and any witness, relating to the allegations in the complaint. Plaintiff has not responded to this request and has not produced his letter to Maurice Booker.

I subpoenaed, from the prosecutor, they gonna, they got the transcript. So you can't use… the plastic gloves shit. You dig what I'm saying. Because… all your testimony was that you just, all you know is that the motherfucker was light skinned and shit, right. In court, you gonna just straight stick with same, straight stick with the same thing. But the whole thing is, I'm, I'm just trying to pinpoint, man **I'm only trying to pinpoint the corruption from the police department and shit, right… as far as the threats and coercion and shit like that that they was trying to force upon you** because the same detectives and shit that, that, that, uh, is no longer detectives no more, **they the ones that questioned you.**

Brother:  **They never questioned me. That's what I'm saying.**

Dewitt:  **Yeah, I know.**

Brother:  **They never questioned me on your shit.**

Dewitt:  **That's the, that's the point that I'm trying to make. I know that.**

Brother:  **Oh, I get what you're saying. I get what you're saying. Oh, I get what you're saying.** Aye ya, this, this what you gotta do, te-, text me the uh, their names. You get what I'm saying… A'right, that's for real yo, I got you. You know damn well man, anything I can do to help. I don't like to be in the, in the forefront with that shit, but see what I mean, I don't mind. (inaudible)…

Dewitt:  I'm gonna send Doodles a letter for you, and I'm gonna get him to give to you, and you, and you'll know everything from there… I'm gonna get [Yvette] to text you the names, you gonna know the names and shit.

Ex. 1, at 6/20/2015, 7:52:47 PM, 3:27–10:02 (emphasis added). Thus, even though Brother told Plaintiff that he was "never questioned" by police regarding Plaintiff, Plaintiff nevertheless asked Brother to testify that the police "was trying to force you to say that you seen me uh, with guns and all the other type of shit." *Id.* This is clear evidence that Plaintiff was asking a witness in this civil case to fabricate testimony of police wrongdoing and is independent evidence of sanctionable litigation misconduct.

### C.   Plaintiff Paid Tyrell Curtis In Exchange for His Testimony

#### i.   "Dude" and "Bobbi Brown" Are Pseudonyms for Tyrell Curtis

Plaintiff is on tape many times with Yvette and Doodles discussing payments to Tyrell Curtis in exchange for his cooperation and testimony in connection with the PC Petition. While Plaintiff attempted to conceal Curtis' identity with the pseudonyms "Dude" and "Bobbi Brown,"

Plaintiff, Yvette, and Doodles got sloppy at times and revealed they were discussing the witness, Tyrell Curtis. For instance, on May 30, 2013 in a phone call with Plaintiff, Yvette said: **"The Dude** signed it, **Tyrell**." Ex. 4, at 5/30/2013, 8:12:53 AM, 26:21–26:25 (emphasis added). Moreover, on July 3, 2014, Yvette and Plaintiff overtly discussed that "Dude" was synonymous with "Curtis" when they said:

| | |
|---|---|
| Yvette: | What's the last, what's the last name, what's the last name? |
| Dewitt: | What last name? |
| Yvette: | The **Dude**. |
| Dewitt: | (mumbles) |
| Yvette: | I'm, I'm on the computer |
| Dewitt: | **Oh Curtis** |
| Yvette: | Okay. I got it. Alright hold up. Let me see where this clown at. |
| Dewitt: | Uh, 2549365 that's the ID number… (mumbles) |
| Yvette: | What's his, his birthday October '85? |
| Dewitt: | Yeah. |

CD 3 of Recorded Prison Calls, attached hereto as Ex. 3, at 7/3/2014, 5:01:52 PM, 22:12–22:56 (emphasis added). In fact, Curtis' date of birth is October 14, 1985, and his Inmate SID # is 2549365. *See* Maryland DOC Locater, attached hereto as Ex. 15.

In addition to "Dude," Plaintiff and his co-conspirators used the code name "Bobbi Brown" when referring to Curtis. In a recorded call with Doodles, Plaintiff referenced "Bobbi Brown" as someone who was a witness in Plaintiff's case. *See* Ex. 2, at 3/3/2015, 12:36:33 PM, 11:06–12:03 ("Yeah, make sure, man, look. When you see, when you see Roland [Plaintiff's criminal defense counsel], right, when you're at the courthouse, tell him to come downstairs and check to make sure Bobbi Brown down there, to make sure we there, in the, in the right fucking courtroom, yo.").

The fact that "Bobbi Brown" is a veiled reference to Curtis is further substantiated by the fact that Plaintiff's recorded references to "Bobbi Brown" and Bobbi Brown's court dates line up perfectly with three separate court dates of Tyrell Curtis. In a **November 2, 2014** call to Yvette,

Dewitt stated: "Oh yeah, you know what's his name go to court **tomorrow** too. That's what I wanted to remind you. Bobbi Brown… Bobbi Brown… Yeah, check on it. Yeah, check on it. Tell Doodles to check on that too, yeah." Ex. 3, at 11/2/2014, 12:57:18 PM, 1:59–2:10. Indeed, the Circuit Court for Baltimore City's Case Information Sheet reveals that Tyrell Curtis appeared in court on **November 3, 2014**. *See* Case Information Sheet, attached hereto as Ex. 16, at ¶ 2. On January 21, 2015, Plaintiff and Yvette discussed that Bobbi Brown would have court on **"February the 5th."** *See* Ex. 2, at 1/21/2015, 8:43:45 AM, 4:57–5:30 (emphasis added). Again, per the Case Information Sheet, Curtis appeared in court on **February 5, 2015**. *See* Ex. 16, at ¶ 2. In a call with Plaintiff on February 5, 2015, Yvette informed Plaintiff that Bobbi Brown's next court date would be **April 6, 2015**. *See* Ex. 2, at 2/5/2015, 6:51:32 PM, 2:24–5:01. Plaintiff told Yvette "to ask Doodles to find out if, if Bobbi Brown gonna get a bail, and if not, I just wanna know if he gonna get a bail and if not tell Doodles Imma send him something in the mail 'cuz I need him to send [Bobbi Brown] something for me." *Id.* Yet again, the Case Information Sheet confirms Curtis appeared in court on **April 6, 2015**. *See* Ex. 16, at ¶ 2. These examples confirm that "Dude" and "Bobbi Brown" were pseudonyms Plaintiff used to refer to Tyrell Curtis.

### ii.     Plaintiff Paid Tyrell Curtis for His Testimony

Similar to Plaintiff's dealings with the Bookers, Plaintiff paid Curtis for his testimony in connection with the PC Petition. On March 14, 2013, Yvette told Plaintiff, "Doodles said he told the Dude he's gonna give him a buck fifty… and then give him the rest when you go to court." Ex. 4, at 3/14/2013, 7:27:43 PM, 1:49–2:05. The next day, March 15, 2013, Yvette, Doodles, and Plaintiff discussed payment to Curtis on a three-way call. Doodles said: "I'm not gonna give it to him no whole fucking five hundred… I was gonna give him a hundred maybe two. You feel me?" *Id.* at 3/5/2013, 12:31:17 PM, 8:24–9:30. Later that same day, Yvette told Plaintiff "[T]he

Dude asked for 50. Aye, the Dude asked Doodles for 50. I told Doodles, I said give him the 50 and come get it from me." *Id*. at 3/15/2013, 8:30:33 PM, 5:30–5:39. On July 30, 2013, Doodles explicitly said: **"I got Tyrell a deposit."** *Id*. at 7/30/2013, 8:34:34 PM, 8:09–8:19 (emphasis added).

At Plaintiff's insistence, Doodles visited Curtis on July 19, 2014, to check-in and confirm that Curtis was okay and prepared to testify. Later in the day, Plaintiff quizzed Yvette as she reported to Plaintiff on Doodles' visit with Curtis.

| | |
|---|---|
| Dewitt: | Did [Curtis] say he got my letter? Did he say he get my letter? |
| Yvette: | Yeah, he had it in his pocket yup he had it in his pocket yup. He pulled it out and showed Doodles the letter yup. He had it in his pocket… |
| Dewitt: | Did Doodles say he'll hit him up? |
| Yvette: | Yeah but not all of it. He gave him some, but you know to keep him so and told him when, when he need something else call him and he got him and I told him next week you know I'll give him Doodles to give it to him too. I mean well I don't know if he gonna give him the whole 50 or whatever but I mean just enough to keep him you know. |

Ex. 3, at 7/19/2014, 4:59:15 PM, 2:26–6:30.

### iii.    Plaintiff Influenced the Content of Tyrell Curtis' Testimony

In addition to Plaintiff coordinating payment of up to five hundred dollars to Curtis, the prison calls are rife with examples of Plaintiff coordinating the substance of Curtis' testimony. Plaintiff utilized at least two primary methods to coordinate with Curtis. One method was to communicate through Doodles. For example, on March 14, 2013, Plaintiff told Yvette to "tell [Doodles] to make sure that Dude know everything that this shit gonna be. Once he put it on record it's on record. Ain't no switching up." Ex. 4, at 3/14/2013, 7:27:43 PM, 7:58–8:10. Another example of Plaintiff's coordination with Curtis is from a call on June 26, 2013, when Plaintiff told Doodles, "you gotta definitely make sure that uh. You know what I mean like all the stuff that I wrote you because you know they gonna ask him questions and shit like that

right?... make sure everything tight. A'right." *Id*. at 6/26/2013, 6:05:34 PM, 3:18–3:36. Doodles

responded: "Yeah. I already, I prepped him, I prepped him. But I'm gonna, I'm gonna do it

again, you know what I mean when it get closer, you feel me?" *Id*. A third example of Plaintiff's

coordination with Curtis is from a call on November 24, 2013, when Doodles reassured Plaintiff

that he had "been keeping that, keeping tight contact on Tyrell." *Id*. at 11/24/2013, 7:14:36 PM,

20:02–20:12.[10]

---

[10] As noted, there are many of examples of Plaintiff coordinating Curtis' testimony through Doodles. A selected sampling is included below.

In a February 25, 2014 exchange between Dewitt and Doodles, Tyrell is referenced by name, albeit accidently:

| | |
|---|---|
| Dewitt: | I sent him a, I sent a letter there, I sent a letter to, to his grandmother house for him and shit right. And I sent you a letter um, uh, Sunday… Yeah, he should get that by tomorrow and shit. I sent him a letter out Sunday and shit put, giving uh, giving him uh, E [Yvette] number and I gave him uh, the lawyer number and shit right. But I… was basically telling him there to contact you so y'all can hook up so y'all can go down there 'cuz yo need to rap to yo again because he supposed to come and see me in two weeks… But he definitely… definitely need to talk to yo and make sure everything good and shit right. Right… Damn well when you leave, leave from up there go, go down the way and check down there and, I need… You know this important Dawg. |
| Doodles: | Yeah, listen, listen. I'm doing it now. That's what I was saying I, I told you I'm in the area I'm gonna stop pass the lawyer's office right… And uh see, then I'm gonna go up to **Tyrell** and tell him that I need him, like uh |
| Dewitt: | Right. You know you ain't supposed to do that man. |
| Doodles: | Yeah, yeah, yeah… I ain't thinking man. |

Ex. 4, at 2/25/2014, 3:48:08 PM, 5:24–7:27 (emphasis added).

On July 16, 2014 in a call between Dewitt and Doodles, Doodles slipped and explicitly told Plaintiff "we supposed to go see **Tyrell**, uh, Shorty, um, shit. We supposed to go see Shorty." Ex. 3, at 7/16/2014, 12:12:28 PM, 2:44–4:03 (emphasis added). Plaintiff repeatedly expressed his concern: "Did you read, did you read the envelope that I sent you?" *Id*. Doodles responded, "Yeah, I read all of it." *Id*.

On March 31, 2015, Plaintiff told Doodles: "I gotta keep track of **Bobbi Brown**, and make sure, see if, is he coming home or, is he getting postponed, or he getting some time, or whatever and shit, right." Ex. 2, at 3/31/2015, 12:32:52 PM, 13:26–16:14 (emphasis added). Plaintiff then referenced "Londa." *Id*. Yolanda Curtis ("Londa") is Tyrell Curtis' sister and Plaintiff's prison records confirm that Ms. Curtis visited Dewitt in prison on at least two occasions. *See* Dewitt Visiting Records, attached hereto as Ex. 17, at ¶¶ 1-2.

On April 4, 2015, Plaintiff told Doodles to deliver a message to Curtis at Curtis' court appearance on April 6, 2015. "When you see him, let him, let him know man that you mailed him something too man, and find out, check and make sure that little nigger a'right, man." Ex. 2, at 4/4/2015, 7:59:57 AM, 18:43–19:52. Doodles reassured Plaintiff: "Yeah, yeah, yeah. He's gonna know what's up when he sees me, he's gonna know what's up when he sees me." *Id*.

The other primary method Plaintiff utilized to coordinate with Curtis was sending letters to Curtis directly. Plaintiff often mailed these letters to Yvette, who then placed them in the mail for Curtis. For example, on December 13, 2014, Plaintiff told Yvette: "I was writin' a letter to uh, Bobbi Brown. 'Cuz I'm gonna mail that off the weekend so you can mail him this letter… So uh, when it's close, whatever, you and Doodles can go, or Doodles, you know what I mean, y'all can meet up and go." Ex. 2, at 12/13/2014, 7:09:35 PM, 8:24–8:40. Two days later, on December 15, 2014, Plaintiff told Yvette that "I sent it out Sunday night. I sent you one, too. I put a, a letter in there, I already put the stamp on it, but you gotta do is drop it in the box for uh, for Bobbi Brown." *Id*. at 12/15/2014, 8:33:56 PM, 5:49–6:08. On December 18, 2014, the letter is mentioned again on another call. Plaintiff asked Yvette, "Oh yeah, you said, you said, uh, uh, you sent Bobbi Brown the letter?" *Id*. at 12/18/2014, 7:56:26 AM, 3:36–3:44. Yvette reassured saying, "I put it in the mailbox yesterday." *Id*.[11] These many examples demonstrate Plaintiff's extensive coordination with Curtis.

### iv.    Plaintiff Hid His Contact with Tyrell Curtis From the Court

Had these prison calls been uncovered prior to the criminal court's decision to vacate Plaintiff's conviction, there is little doubt that Plaintiff would still be serving his life sentence for the senseless murder of an innocent sixteen-year-old girl. Plaintiff knew this level of coordination and scheming was beyond the tolerance of any judge. In fact, Plaintiff did not want

---

[11] The calls contain many references to Plaintiff's correspondence directing his scheme. Another example of a letter Plaintiff sent to Curtis is included below.

On February 6, 2015, Plaintiff discussed a letter he sent to Curtis with Yvette: "I mailed you out something too that I need you to mail out for uh, to Bobbi Brown for me… I mailed it off uh, I mailed it off yesterday." Ex. 2, at 2/6/2015, 7:18:07 PM, 22:17–22:27.

On February 13, 2015, Plaintiff discusses the importance of the letters to Bobbi Brown: "I wanted him to read over, so he can know. You know what I'm saying… Yeah, so he, you know what I mean, won't be getting there lookin' stupid, sounding crazy." *Id*. Worried that prison security may open his letter, Plaintiff said, "I don't put my name on shit… Attorney at Law… Yeah. Because look. I don't trust these motherfuckers, baby. I don't trust them. And when you be paranoid, that's when you, that's when you, everything right. I don't trust them. Far as I can see, and when you put that on there, they can't open your shit up, because that's a violation. Attorney-Client privileges, right." *Id*.

anyone to know he, or any of his surrogates, had any contact with Curtis. At the post-conviction hearing on July 15, 2014, in response to a question by Plaintiff's criminal defense counsel, Curtis testified he did "not really know [Plaintiff], but I heard of him…[l]ike, not really heard of him. Like, I seen him before but I don't know him, though." Ex. 13, at ¶ 6. On cross examination, Curtis doubled down claiming that he had not had any contact with Plaintiff or Plaintiff's defense counsel since the shooting in 2002. See *id*. at ¶ 36. The prison calls expose Curtis' testimony was a bald-faced lie, and Plaintiff sat by and benefited from this perjured testimony in connection with the PC Petition.

## THE QUESTIONED DOCUMENT IS EXPOSED AS FRAUDULENT

Plaintiff's prison phone calls alone warrant immediate dismissal of this case. However, there is also clear evidence that Plaintiff forged and fabricated the Questioned Document in order to concoct a false *Brady* claim and corroborate the false testimony he purchased from Curtis. It was this Questioned Document that the criminal court ultimately relied upon to vacate Plaintiff's criminal conviction. Copied below is an image of the Questioned Document:



Ex. 12. The Questioned Document was attached to Plaintiff's PC Petition, where he alleged "there was another eyewitness to the crime by the name of Tyrell Curtis, who gave a statement that he witnessed George Gaines, committ [sic] the crime." Ex. 9, at ¶ 38. Plaintiff needed to ensure Curtis went along with this bogus story that a "George Gaines" and not Plaintiff committed the murder and, as such, was very concerned that Curtis review the report before he testified. This Questioned Document was sent for forensic examination by two forensic document examiners, each of whom have concluded that it was fabricated.

### A.    The Opinions of Forensic Document Examiners Katherine Koppenhaver and Diana Mears

Katherine Koppenhaver, is a Certified Questioned Document Examiner with more than 30 years of experience, and a published author. *See* CV of Katherine Koppenhaver, attached hereto as Ex. 18. Ms. Koppenhaver has given expert testimony in court and deposition in over 500 cases. *Id*. She has handled over 3,500 cases, involving thousands of documents since 1983. *Id*. In addition, Ms. Koppenhaver has authored "Attorney's Guide to Document Examination," published by Greenwood Publishers, and "Forensic Document Examination, Principles and Practice," published by Springer. *Id*. Ms. Koppenhaver is also the Founder and President of the International Association of Document Examiners (IADE), as well as the Founder of the Scientific Association of Forensic Examiners (SAFE). *Id*. Diana Mears is a Certified Questioned Document Examiner and has testified in both state and federal courts. *See* CV of Diana Mears, attached hereto as Ex. 19. She spent four years training with Katherine Koppenhaver before joining her team full time. *Id*. In addition, Ms. Mears serves on the board of IADE. *Id*.

In this case, Document Examiners Koppenhaver and Mears evaluated the Questioned Document and found it was not genuine. *See generally* Letter of Opinion with Exhibit, attached hereto as Ex. 20. The experts explained that their conclusion was based on a myriad of scientific

reasons. First, the Questioned Document was forged using the back page of a known, two-page (double sided) BPD report, also referred to as a "bubble report." Each BPD bubble report has its own unique identifying number—in this case, "793331"—located at the lower right-hand corner of both pages of the document. *Id*. at ¶¶ 6-7. Below is a graphic image of the unique identifying number which appears on the known blank document and the Questioned Document:

793331

This identifying number is similar to a Bates number in that it facilitates document tracking. The Questioned Document, however, has the same identification number as an existing document in the BPD file in this case.[12] *Id*. The backside of the BPD file version of this bubble report, with the same unique identifying number as the Questioned Document, is completely unfilled. *See* K-4A, at ¶ 2, attached hereto as Ex. 21; K-5A, at ¶ 2, attached hereto as Ex. 22. Similarly, this same document is completely unfilled in the SAO file. *See* K-4B, at ¶ 2, attached hereto as Ex. 23. As such, the experts determined that the blank, known BPD document was used to fabricate the Questioned Document. *See* Ex. 20, at ¶¶ 6-7. The unique identifying number exposes the fact that the document Plaintiff presented in his post-conviction motion and at his post-conviction hearing is not genuine. *Id*.

Second, the signature of Sergeant Garnell Green that appears on the Questioned Document was not written by Sergeant Green. *See id*. at ¶ 7. Although the purported signature of Green appears similar to a known exemplar contained in the BPD homicide file for the death of Sherene Moore ("Homicide File"), scientific inspection reveals tremors in the signature, a lack of

---

[12] The original bubble report marked with this unique number, is currently maintained by BPD's Case Management System ("CMS") Department, and is also completely blank. *See* K-4C, attached hereto as Ex. 24, at ¶ 2.

pressure patterns, and blunt endings, exposing the signature as a fake. *Id*. The below side-by-side graphics showcase the defects in the copied as compared to the original signature.

Questioned Document                    Known Signature

            

Third, the purported "signature" of Detective Mark E. Veney that appears on the Questioned Document bears no resemblance to other known signatures or handprinted examples of the word "Veney" in the Homicide File. *See id*. at ¶¶ 7-8. The following graphics showcase the obvious differences, such as that the final stroke of the "N" in the Questioned Document is diagonal and connects to the letter "Y," and that the letter "E" was added between the "N" and "Y" only afterward. *Id*. at ¶ 8.

Questioned Document        Known Signature        Known Handprinted

            

In fact, the experts opined that the model "VENEY" utilized to forge the "signature" was actually a report created by Detective Gregory S. MacGillivary, who wrote the word "VENEY" on his own report. *Id*. The experts opined that the word "VENEY" written on the Questioned Document was not written by the same person who authored the same word on MacGillivary's official report. *Id*.

Questioned Document            MacGillivary Report

          

18

Finally, the Questioned Document contains hole punches and "trash marks" (imperfections, scratches or dirt from a copy machine which is visible on a photocopy) that line up perfectly with the unfilled SAO copy, as opposed to the known document in BPD's central records which does not contain hole punches or "trash marks." *Id.*



Based on the aforementioned reasons, the experts concluded that the Questioned Document is not genuine and was created from a known document in the SAO file which would have been available to Plaintiff. *Id.* at ¶ 6.

## B.   All Other Indications Also Point to the Fact that the Questioned Document Is Not Authentic

The fact that the science establishes that the Questioned document is a fraud comes as no surprise given the factual background. Plaintiff's own recorded calls establish in overwhelming fashion that he fully manipulated the evidence presented in support of his PC Petition. Other than Plaintiff's obvious desire to overturn his murder conviction, none of the other evidence adds up. The PC Petition claims that Plaintiff received the Questioned Document on May 17, 2010, *See* Ex. 7, at ¶ 2; Ex. 9, at ¶¶ 35, 39, yet he did not even reference the document in his Petition for Writ of Innocence filed in August of 2010. *See generally* Ex. 7.

19

As noted above, the Questioned Document has a unique identifying number—akin to a Bates number—which establishes that it was created from a known document. This known document was a two-page "bubble report" dated July 5, 2002, where an Officer Steve Hohman documented his transport of a witness. *See* Ex. 24. Given the pro forma nature of this event, the second page of the bubble report was left blank (as in unfilled). This blank police report served as the foundation for Plaintiff's forgery.

While itself not outcome determinative, it is also notable that Curtis gave a taped and transcribed interview with BPD on April 4, 2003, where he stated that he could not identify the shooter, that he was black, and that he was "not that tall but kind of thick." *See* Interview of Tyrell Curtis April 4, 2003, attached hereto as Ex. 25, at ¶¶ 2-3. Curtis says nothing in this taped interview or at any other point about an alternative suspect named Gaines, as is attributed to Curtis in the Questioned Document purportedly dated December 10, 2002. *See id*.

In addition, the Question Document contains basic mistakes which an actual police officer is unlikely to have made. The text of the Questioned Document, purportedly authored by Detective Veney, contains a reference to **Detective** Garnell Green. *See* Ex. 12 (emphasis added). However, Garnell Green was a sergeant. *See* Trial Transcript 11/18/2003, at ¶ 153, attached hereto as Ex. 26; *see also* Ex. 24, at ¶ 1. It is highly unlikely that Detective Veney would insult a superior officer by referring to him with an inferior rank. Additionally, as a homicide detective, it is highly unlikely that Detective Veney would misspell the word "homicide" as "homocide," as it appears on the Questioned Document. *See* Ex. 12. Finally, the bubble report form indicates that the subject's name should be completed in the order of last name and then first name. Inexplicably, the Questioned Document ignores this instruction and reads "Tyrell Curtis" – first name and then last name. *See id*. These pertinent facts provide additional corroboration to the

opinions of Document Examiners Koppenhaver and Mears, who based their conclusion that the Questioned Document is not genuine on the basis of scientific reasoning alone.

## ARGUMENT

Federal courts have the inherent power to impose sanctions "for conduct which abuses the judicial process." *Chambers v. NASCO*, *Inc*., 501 U.S. 32, 44–45 (1991). Such conduct includes situations when the Court finds that "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. at 45–46 (internal quotations and citations omitted). Appropriate sanctions may include everything from outright dismissal of an action to the assessment of attorneys' fees. *Id.* at 45. The sanction of dismissal is appropriate "when a party deceives [the] court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 654 (4th Cir. 2006) (quoting *United States v. Shaffer Equip. Co*., 11 F.3d 450, 462–63 (4th Cir. 1993)).

Dismissal of an action as a litigation sanction is within the discretion of the district court and is afforded deferential treatment. *Hartford Ins. Co. v. Am. Automatic Sprinkler Sys., Inc*., 201 F.3d 538, 543–44 (4th Cir. 2000). In *Hartford*, the court identified the following factors to consider: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the conduct was committed by his attorney; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest. *Shaffer Equip. Co*., 11 F.3d at 462–63. These factors do not constitute a rigid test and, therefore, the absence of any one factor is not determinative. *See Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir.1992)

(there is no "magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation"); *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1325 (D. Utah 2016), *aff'd sub nom. Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018).

Plaintiff's outrageous litigation misconduct easily satisfies and exceeds the factors outlined in *Hartford*. As to the first and second factors, the degree of culpability here is exceedingly high and directly attributable to Plaintiff personally. Plaintiff meticulously planned the testimony of Tyrell Curtis, Maurice Booker, and Cornell Booker with these witnesses, and paid them for their participation in Plaintiff's fraud. Plaintiff used a forged document to convince a State court to vacate his murder conviction and to bring the instant lawsuit. Plaintiff has brazenly promised significant payments to Maurice Booker and Cornell Booker for their testimony in this very proceeding. Plaintiff's actions display a horrifying degree of culpability and he is fully to blame for his misdeeds.

Regarding the third and fourth factors—prejudice to the judicial process and victim—it is difficult to conceive of a situation more prejudicial to the administration of justice than the undoing of a jury's guilty verdict in a murder case based on falsified evidence orchestrated directly by the accused and in concert with multiple co-conspirators. Simply put, Plaintiff's litigation misconduct prejudiced the criminal justice system by allowing a convicted murderer to walk free. Adding insult to injury, Plaintiff now seeks to further benefit from his crime in a cynical effort to extort money from Defendants utilizing a civil justice system infected by Plaintiff's litigation misconduct. In one swoop, Plaintiff victimizes (a) the family of Ms. Moore, who were deprived of the closure afforded by Plaintiff's conviction; (b) the Defendants, who are retired public servants now faced with defending themselves from Plaintiff's fabricated allegations; and (c) the general public, who will suffer from the chilling effect engendered by this

false lawsuit on other BPD officers, now keenly aware that they may be sued with paid false testimony by a convicted murderer with nothing to lose.

Finally, the fifth and sixth factors identified in *Hartford*, the availability of other sanctions and the public interest, suggest that this Court should not only dismiss this lawsuit but also identify additional sanctions against Plaintiff and his co-conspirators. A convicted murder facing a life sentence similar to the one Plaintiff faced has very little incentive to play by the rules when attempting to craft post-conviction arguments. In contrast, the possibility of reward, i.e., regained liberty combined with the likelihood of financial compensation, is great. The strong public interest in a fair criminal and civil justice system which is free of blatant bribery and forged evidence compels the need for the strongest sanction where, as here, Plaintiff was caught committing gross litigation misconduct. At minimum, the Court should dismiss the complaint to punish Plaintiff, protect the innocent Defendants, and deter similar conduct in the future.

The public interest can only be served by zero tolerance for actions that make a mockery of our laws and courts, and the human life they protect. "Claims of witness tampering are accusations of the utmost seriousness, because they call into question the very foundation of fair play and objective fact-finding on which the American trial system is predicated." *Goel v. Tishcon Corp.*, No. CIV. L-10-2536, 2011 WL 836680, at *3 (D. Md. Mar. 4, 2011). When a plaintiff infects his own case with false evidence, dismissal is appropriate. *Green v. Mayor and City Council of Baltimore*, 198 F.R.D. 645, 647 (D.Md. 2001) (dismissing case based upon the submission of false documents). The deafening explosion of public confidence in criminal and civil proceedings Plaintiff has created is inexcusable.

As explained in *Vargas v. Peltz*, 901 F.Supp. 1572 (S.D.Fla.1995), the sanction of dismissal is especially appropriate "where a party manufactures evidence which purports to

corroborate its substantive claims." Courts across the country recognize that litigation misconduct of the variety established above requires nothing short of dismissal. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, (1st Cir.1989) (Conduct of plaintiff in filing complaint based upon bogus purchase agreement constituted fraud on the court warranting dismissal of action); *Pope v. Federal Express Corp.*, 138 F.R.D. 675 (W.D.Mo.1990), *aff'd in relevant part*, 974 F.2d 982 (8th Cir.1992) (dismissal warranted where plaintiff in sexual harassment lawsuit manufactured evidence by altering documents to create a fraudulent document laden with sexual content); *Vargas*, 901 F.Supp. at 1572 (dismissing sexual harassment suit under court's inherent authority where plaintiff relied, in part, upon evidence of panties allegedly gifted by harasser that had not been manufactured at time in question); *Rybner v. Cannon Design, Inc.*, 1996 WL 470668 (S.D.N.Y.1996) (collecting cases and dismissing case where party relied upon fake resume and false testimony during deposition); *Eppes v. H.E. Snowden*, 656 F.Supp. 1267 (E.D.Ky.1986) (awarding monetary sanctions in addition to dismissal of counterclaim where backdated letters were produced in support of counterclaim); *Access Innovators, LLC v. Usha Martin Ltd.*, No. 09-2893, 2010 WL 11508119, at *3 (N.D. Ga. Apr. 28, 2010).

## CONCLUSION

Plaintiff deceived the criminal court and the prosecutor and secured his release from prison utilizing shockingly unacceptable means. He promised Maurice and Cornell Booker that he would pay them ten-thousand dollars ($10,000) each in exchange for their testimony; encouraged Larry Mitchell to invent false allegations of police misconduct; and paid Tyrell Curtis for testimony, the substance of which was carefully dictated by Plaintiff. In addition, Plaintiff brazenly forged the Questioned Document to support Curtis' false testimony, then presented the forgery to the court to procure the reversal of his conviction. This sort of

24

outrageous litigation misconduct violates the very "temple of justice" and undermines the ability of courts to adjudicate disputes in a manner worthy of public confidence. *Chambers*, 501 U.S. at 45–46.

Based on the foregoing, the only appropriate sanction to address Plaintiff's litigation misconduct is dismissal. In addition, the Court should award Defendants their attorneys' fees under 42 U.S.C. §1988 for the time spent defending this frivolous suit. Anything short of this remedy would be a pronouncement to future litigants "that they have everything to gain, and nothing to lose, by manufacturing evidence." *Wolfe v. GC Servs. Ltd*. *P'ship-Delaware*, No. 08-10628, 2009 WL 230637, at *5–9 (E.D. Mich. Jan. 30, 2009).

Respectfully submitted,


*/s/ Avi T. Kamionski*
Avi T. Kamionski, Bar No. 20703
Shneur Nathan, Bar No. 20707
Mayer Engelsberg Bar No. 21105
201 N. Charles Street Suite 1202
Baltimore, MD 21202
(312) 612-1928
(952) 658-3011
akamionski@nklawllp.com
snathan@nklawllp.com
mengelsberg@nklawllp.com

*Attorneys for Individual Defendants*

25

## EXHIBIT INDEX

Exhibit 1        CD 1 of Recorded Prison Calls

Exhibit 2        CD 2 of Recorded Prison Calls

Exhibit 3        CD 3 of Recorded Prison Calls

Exhibit 4        CD 4 of Recorded Prison Calls

Exhibit 5        Court of Special Appeals of Maryland Opinion

Exhibit 6        Court of Appeals of Maryland Order

Exhibit 7        Petition for Writ of Actual Innocence

Exhibit 8        Order Denying Petition for Writ of Actual Innocence

Exhibit 9        Petition for Post-Conviction Relief

Exhibit 10       Memorandum Opinion Granting Post-Conviction Relief

Exhibit 11       Order Denying Motion to Correct Illegal Sentence

Exhibit 12       Questioned Document

Exhibit 13       7/15/15 Post-Conviction Hearing Transcript

Exhibit 14       8/6/15 Post-Conviction Hearing Transcript

Exhibit 15       Maryland DOC Locater

Exhibit 16       Case Information Sheet

Exhibit 17       Dewitt Visiting Records

Exhibit 18       CV of Katherine Koppenhaver

Exhibit 19       CV of Diana Mears

Exhibit 20       Letter of Opinion with Exhibit

Exhibit 21       K-4A, at ¶ 2

Exhibit 22       K-5A, at ¶ 2

Exhibit 23       K-4B, at ¶ 2

Exhibit 24       K-4C

Exhibit 25       Interview of Tyrell Curtis April 4, 2003

Exhibit 26       Trial Transcript 11/18/2003, at ¶ 153

Appendix A       Recorded Prison Calls Index

Appendix B       Timeline

## **<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned attorney, hereby certify that I have caused true and correct copies of the above and foregoing to be served on all counsel of record via to the Court's CM/ECF system, in accordance with the rules of electronic filing of documents, on this 22nd day of July, 2020.

*/s/ Avi T. Kamionski*
