# EXHIBIT 5

UNREPORTED

IN THE COURT OF SPECIAL

APPEALS OF MARYLAND

No. 2493

SEPTEMBER TERM, 2003

---

TONY DEWITT

v.

STATE OF MARYLAND

---

Hollander,
Kenney,
Sharer,
        JJ.

---

Opinion by Hollander, J.

---

103006015

Filed:   FEBRUARY 22, 2007

This appeal arises out of the tragic and senseless murder of Sherene Moore, a teenager, and the nonfatal shooting of Maurice Booker in July 2002. In November 2003, a jury sitting in the Circuit Court for Baltimore City convicted Tony DeWitt,[1] appellant, of the first degree premeditated murder of Moore and the attempted first degree premeditated murder of Booker, as well as related crimes.[2] DeWitt was sentenced to life imprisonment for the first degree murder conviction, a concurrent life term, with all but thirty years' suspended, for the attempted first degree murder, and a consecutive term of twenty years' imprisonment for one count of use of a handgun in commission of a crime of violence. The remaining convictions were merged.

The case is an example of the prevalence and dangerous use of guns in our society. At trial, the State theorized that "the shootings occurred because of a dispute over drug money and territory" between appellant and George Gaines, on the one hand, and Maurice Booker and James Wright, Jr., a/k/a "Daddy," on the other. It also maintained "that the bullet intended for 'Daddy' killed Moore instead." In retaliation, Gaines was shot and killed

---

[1] In the record, appellant's name is spelled DeWitt and Dewitt. We adopt the spelling used by appellant in his brief. Appellant is also known by the nickname of "T.O." That name sometimes appears in the record as "Tio" or "Teo."

[2] The related offenses included second degree murder, attempted second degree murder, first degree assault, second degree assault, two counts of use of a handgun in commission of a crime of violence, and two counts of wearing, carrying, and transporting a handgun on or about his person.

about fifteen hours later.[3]  Appellant was shot about a month after the underlying incident.  And, Booker, a victim in this case, was convicted of the attempted murder of Marquis Brown in a shooting incident that occurred just eight days before the shootings at issue here.[4]  At the time of this trial, Booker was serving a ten-year sentence for that offense.

Notably, shortly after these shootings, several individuals described the events of the evening of July 4, 2002, continuing into the early morning hours of July 5, 2002.  By the time of trial, however, the accounts that they gave differed markedly from the statements that they provided to the police shortly after the incident.

Appellant presents six questions for our review.  To answer these questions, quoted below, a thorough review of the conflicting evidence is required.  Appellant asks:

> I.  Did the trial court err in refusing to redact other crimes evidence from [Mr. DeWitt's] statement to the police?
>
> II.  Did the trial court err in not suppressing Maurtice [sic] Booker's and/or Tasha Booker's identifications of [appellant] as they were the product of promises and threats?
>
> III.  Did the trial court err in allowing impermissible impeachment evidence?

---

[3] In his brief, appellant explains that George "Rice" had a reason to shoot Booker, which led to the shooting death of "Rice" a few hours after the shootings in issue.  We believe appellant inadvertently referred to George Gaines as George Rice.

[4] In the record, Brown's first name is spelled as Marquis and Markiss.  In his brief, appellant uses the spelling of "Marcus."

2

IV.  Was the evidence sufficient to support [appellant's] convictions?

V.  Did the trial court err in its instructions to the jury?

VI.  Did the trial court improperly exceed its role as neutral arbitrator and become an arm of the prosecution?

For the reasons that follow, we shall affirm.

### FACTUAL SUMMARY[5]

At 2:30 a.m. on July 5, 2002, Sherene Moore and Maurice Booker were shot while on the porch of a vacant residence in the 1700 block of Montpelier Street in Baltimore City.  Ms. Moore, who had just celebrated her sixteenth birthday, died from a single gunshot wound to her chest.  Booker, who was eighteen, sustained a gunshot wound to his arm and chest.

Shavon Stanley, who was seventeen years of age at the time of trial, described Moore as her "best friend."  She testified that July 4 was Moore's birthday and, on that date, they went to the Inner Harbor with another friend named Lakia.  At about 8:00 p.m., they returned home to 1626 Montpelier Street, and then went down the street to "Marty's" house, i.e., Maurice Booker, at 1702 Montpelier Street, where they remained until the early morning hours of July 5, 2002.

Stanley recalled that a group had gathered in front of, on the

---

[5] When the record for this case was first transmitted to this Court, several transcripts were missing.  After numerous requests, made over a period of nearly six months, we were finally able to obtain the transcripts needed for this appeal.  Our factual summary derives from the evidence adduced at the six-day trial held in November 2003.

3

steps to, and on the porches of the residences at 1700 and 1702 Montpelier, which included Booker, Moore, Stanley, Wright, and others. Some of the individuals were drinking alcohol and smoking marijuana.

At about 2:15 a.m., while Ms. Stanley was standing next to Ms. Moore and talking to "Daddy" (i.e., Wright) and Maurice, she heard six or seven shots coming from her right. According to Stanley, upon hearing gunshots, everyone ran; she ran onto the porch at 1700 Montpelier Street and laid down. Moore also ran up on the porch, but Stanley saw that she had blood on her back. In the statement she gave to police that night, and at trial, Ms. Stanley claimed that she did not see who fired the shots.

Booker testified[6] that, at around 2:00 a.m., he was on the porch steps of his Montpelier Street home, "chilling" and drinking with "a bunch of people," when "[s]omebody stuck their arm around the corner [on Polk Avenue] and shot me." He ran from the scene, through an alley off Montpelier Street, and toward Harford Road. An ambulance on Homestead Street transported him to the hospital. Homicide detectives responded to the hospital, but Booker declined to speak with them. We shall return to Booker's testimony, *infra*.

Baltimore City Police Officer Charles Jones responded to a call for a shooting on Montpelier Street, a one-way street. He

---

[6] Maurice Booker testified for the State and was recalled as a defense witness. In our factual summary, we have included evidence adduced from both the State's case and the defense's case.

4

found Ms. Moore fatally injured on a porch.  Jones cordoned off an area "from the upper part of Polk Avenue, around the 1700 block of Montpelier, up several houses within the 1700 block of Montpelier."

Officer Jones recalled that while he and Evidence Technician John Frinch were still at the scene "two vehicles ... sped through the crime scene on various occasions coming from the 1700 block of Montpelier from Harford Road, and from Polk Avenue which intersects into Montpelier."  Within a span of five to seven minutes, the vehicles traveled through the area three times.  Jones noted that both vehicles had four doors, the lead car was silver, bearing a tag number of JLL 098, and the second car, which followed right behind the first car, was a "reddish-burgundy" color, bearing the tag number KMT 576.  Each vehicle was operated by an African-American male, according to Jones, but Jones was unable to determine if there were any passengers in the vehicles.

Frinch testified as an expert in crime lab evaluation and techniques.  He, too, saw "[t]wo cars came racing through the intersection."  He added that the cars were traveling "[v]ery fast," with the second car following "[c]losely" behind the first. Because the cars drove by once or twice more, Frinch wrote down a description of the cars and their tag numbers and gave the information to Officer Jones.[7]

---

[7] In a search of the area, the police recovered two shell casings from the corner of Polk Avenue and Montpelier Street.  Mark Tackas, who testified as an expert in firearms examination, explained that semiautomatic firearms eject the
(continued...)

Maurice Booker's sister, Tasha Booker,[8] was twenty years old at the time of the incident. She had been inside the Booker residence at 1702 Montpelier Street when she heard "more than three" gunshots. It is undisputed that she did not see the shooting. Afterwards, she went outside and saw "the girl" (i.e, Moore) laying on the "vacant porch."

Tasha recalled that, after the shooting, she saw two cars driving "fast" down Montpelier Street, two to three times; the lead car was a blue Taurus and the other was "a burgundy car." Tasha identified the owner of the Taurus as "Mika," later identified as Shamecca Bryant. The burgundy car was owned by someone Tasha knew as "Daddy" (i.e., Wright). Tasha also saw appellant, whom she knew as "T.O.", in the front passenger seat of the Taurus, but was unable to see whether someone was in the vehicle with Wright. According to Tasha, at one point the cars stopped on Montpelier Street and appellant "got out and ran," but Tasha did not see where he went. Notably, when asked if appellant had anything in his possession, Tasha responded: "I didn't see nothing."

_____

[7](...continued)
cartridge casings after the projectile is fired. In contrast, stated Tackas, a revolver retains the fired cartridge casings within its cylinder. No fingerprints were recovered from the casings. A spent round, which Evidence Technician John Frinch described as "a smashed bullet," was recovered from the window of a car parked in front of 1706 Montpelier Street. Ballistics analysis determined that the casings were fired from the same weapon. However, the caliber of the smashed bullet could not be determined due to its damaged condition.

[8] To avoid confusion between Tasha Booker, Maurice Booker, and Cornell Booker, we shall sometimes refer to them by their first names. Our occasional reference to "Booker" refers only to Maurice. In the record, Tasha's name is sometimes spelled as Tarsha.

Tasha testified that she had known appellant for "two or three" years.[9] Although Tasha saw appellant on Montpelier Street after the shooting, she stated that she did not know the time.

On the date of the shooting, Tasha spoke with the police at the hospital. Later on that date, while at the Homicide Unit, she gave a taped statement to Detective Gregory MacGillivary.[10] Tasha provided another taped statement on July 30, 2002.

At trial, Tasha denied that she told the detective that she had seen appellant in possession of a gun when he exited the car on Montpelier Street, stating: "I didn't tell him that." When pressed, she persisted: "I said I didn't say none of that." When her taped statement of July 5, 2002, was played for the jury, Tasha denied that it was her voice on the tape.[11] Later, she stated: "I didn't give them no statement."

In Tasha's taped statement of July 5, 2002, she indicated that, afer the shooting, she saw Mika driving the Taurus, with T.O. in the passenger seat. The tape continued: "They stopped in the middle of the block.... Tio jumped out with a gun, a black long gun, ran to the alley..... 'Daddy' followed them. And then Tio came back through our block again. Tio got back in the car."

---

[9] In her pretrial statement, Tasha indicated that she had known appellant for five years as of 2002.

[10]In the record, the detective's surname is sometimes incorrectly spelled "McGillivary."

[11] Previously, Tasha had acknowledged that her statement of July 5, 2002, was taped.

According to the statement, T.O. "kept running through the street" until he got back into the car. Tasha described the gun as a black automatic, "either .44 or .45."[12]

As to the statement of July 30, 2002, Tasha did not recall providing that statement to the police. She also denied that the voice on the tape was hers.

In that statement, which was played for the jury, Tasha reiterated that she had been inside her residence at the time of the shooting and did not see who shot her brother or Moore. She noted that her brother had been "beefing" with someone named Paris Moore.[13]   She indicated that, after the shooting, Bryant and appellant "kept riding ... down the block" on Montpelier Street in Bryant's blue Taurus, with Wright's "red" car following the Taurus. She recalled that she saw the cars "soon as the ... ambulance ... pulled off with [Moore] ... that's when um the blue station wagon coming rolling down the street, speeding through ... like a couple of times." Moreover, Tasha indicated that, the third time that the cars came through, the cars "stopped in the middle of the block where there's like a little alley" and "Teo jumped out with a gun, a black long gun" and he "ran through the alley." She added that "Meeka kept on going" and "Daddy followed them." She did not see

---

[12] We have relied on the trial transcript for the content of Tasha's statement of July 5, 2002.

[13] The record indicates that Paris's last name is Moore, although Tasha did not mention the last name.

appellant, whom she described as having dark brown skin, chasing anyone. But, when Bryant came back through the block, "Teo got back in the car and Daddy was still following them...." She claimed that "Daddy kept on" saying to the police "there go the boy, there go the boy right there."

Tasha also viewed a photographic array. She identified appellant as the person who jumped out of the car.

On cross-examination, Tasha testified that, on the afternoon of July 30, 2002, Detective MacGillivary and another officer came to her house and lied about their identities to gain entry. Tasha stated that she told the officers that she was not outside at the time of the shooting, and "did not see" who did the shooting. According to Tasha, the officers said that if she "didn't go with them and talk[] to them, they was going to lock me, have me arrested...." Further, she claimed that the officers told her that they already "knew who did the shooting" and that she "might as well just go ahead and talk because they could hold me for know[ing] it and not speaking."

In addition, Tasha stated that, at the relevant time, Maurice was involved in a dispute with someone named Paris concerning motorcycles. She claimed that she told Detective MacGillivary on July 5, 2002, that she had been informed by her cousin, Crystal Gitting, that Gitting had seen someone named Paris shooting at Maurice. Tasha recounted that, after the shooting of Moore and Maurice, Paris and three others came to the hospital in a burgundy

9

car, pulled up to her, and started laughing. She ran into the hospital because she was afraid. According to Tasha, the burgundy car she saw drive through Montpelier Street was the same car she saw Paris in at the hospital.

Shamecca Bryant owned the blue four-door Ford Taurus station wagon, tag number JLL 098, which had been seen traveling on Montpelier Street on the date in question.[14] Bryant, who was twenty-four years of age at the time of trial, presented alibi testimony. She testified that, on July 5, 2002, she was with appellant from around midnight (i.e., before the shooting) until she dropped him off on Montpelier Street at around 3:30 or 4:00 a.m. (i.e., after the shooting). Bryant explained that she had known appellant for ten years and they were sexual partners in July of 2002.

According to Bryant, on July 5, 2002, she met appellant between midnight and 1:00 a.m. on Harford Road, and then they drove around. They got some drinks and some marijuana, drove around a while longer, went to the Inner Harbor, where they walked around, then drove to a parking lot, where they had sex. Bryant stated that she had not seen a car following them. In addition, she claimed that she had done all the driving.

Bryant testified that she dropped appellant off on Montpelier

---

[14]Bryant was recalled as a defense witness. In our factual summary, we have included portions of her testimony from both the State's case and the defense case.

Street between 3:00 a.m. and 4:00 a.m.  Bryant recalled that she began to drive away, but then returned because she wanted appellant to pay for half the gas, since she was not working at that time. She did not see appellant so she came back around the block again and then noticed that she had driven through some tape at the intersection of Montpelier, Polk, and Asquith.  She added that she had been speeding.  Bryant stated that she saw a police officer, who first told her to stop, but then told her to keep going. Bryant did not attempt to speak to the officer because she had been drinking; instead she drove home.

In August 2002, Bryant gave an oral statement to the police. She testified that Detective MacGillivary had threatened her with incarceration.  Moreover, Bryant stated that someone spoke to her in the elevator at the police station and asked her how she was doing.  When she responded that she was fine, the individual replied, "[N]o, you're not."  She was then put in a room by herself for approximately one hour.  Although she was not handcuffed, Bryant claimed she was not free to leave.

Bryant also testified that she told Detective MacGillivary that, on the morning in question, she had picked appellant up at 3:30 a.m. on Montpelier Street.  Rather, she stated that she had dropped appellant off at about that time.  Although Bryant agreed that she had informed Detective MacGillivary that she had driven through Montpelier Street two or three times, she denied stating that appellant was in her vehicle or that a burgundy car followed

11

them.  Further, Bryant denied telling the detective that, on her
third pass through Montpelier Street, she stopped her car,
appellant got out and ran through the alleyway toward Homestead,
and that she later met appellant at Harford Road and 25th Street.

As noted, Maurice shot Marquis Brown in June 2002, eight days
before Maurice was shot.  In connection with that offense, on
September 25, 2002, the Warrant Apprehension Task Force arrested
Maurice at his residence at 1702 Montpelier Street.  Maurice's
brother, Cornell Booker, was also arrested, because police found
him "bagging up weed."[15]  Maurice's mother, two sisters, and niece
were present at the home.

Maurice and Cornell were transported to the Eastern District,
where Detective Kevin Turner interviewed Maurice.  Maurice
testified that Detective Turner spoke to him about the attempted
murder charge, as well as the shooting in which he was a victim.
According to Maurice, Turner told him that appellant was the one
who shot him, and threatened to "lock up" Maurice's mother and
older sister and place his younger sister and niece in foster care
if he did not identify appellant as the shooter.  Moreover, Maurice
claimed that Detective Turner promised him that, if he identified
appellant as the shooter, the detective would "let [Cornell] go,
drop his charges, and he wasn't going to lock my mother and my

---

[15]Cornell Booker was convicted of the marijuana charge and sentenced to
eighteen months' incarceration.  As noted, at the time of trial in this case,
Maurice was serving ten years for the attempted murder of Brown.

12

sister up." Maurice explained that because he had seen his mother and sister at the police station, he believed that Detective Turner had brought them there.

Further, Maurice testified that Detective Turner showed him a photo array, while Cornell was in the room. Maurice recalled that the array was first presented to him face down and, when he turned it over, Detective Turner stated: "[T]hat's him right here. Just sign your name on the top." Maurice testified that he placed his signature on top of appellant's photograph because the detective directed him to do so, and in order to secure his brother's release. On the back of the array, Maurice wrote: "[H]e shot me."

Maurice was later transported to the Homicide Unit, where he was interviewed about the underlying matter by Detective MacGillivary. Maurice claimed that he told Detective MacGillivary about Detective Turner's promise to release his mother, sisters, and niece. Maurice recalled that he gave a taped statement and viewed another photo array, again identifying appellant. He also again wrote on the back of the array: "He shot me."

Regarding the taped statement that he provided, Maurice conceded that he stated that he had seen an armed man in the alley when he fled after he was shot, but explained that it was a lie, and he merely said what Detectives Turner and MacGillivary told him to say. Moreover, Maurice stated that Detectives MacGillivary and Turner had also instructed him to say that a light-skinned man had stuck his arm around the corner and started shooting. Further, he

13

claimed that he was instructed to state that a man had run up the alley and was trying to shoot him, but the gun jammed.

Maurice's taped statement was then played for the jury. In that statement, Maurice stated that he was on the porch when he heard gunshots and felt his "arm being numb...." When Maurice first heard the shots, he turned and did not see anyone, and "ran up the street." He stated that he "seen an arm hanging around the corner" at Polk Avenue, "just seen an arm sticking around the corner and that's when I ran and I seen him in the alley." Maurice recalled that, after he was shot, he saw "T.O. in the alley," who "was still trying to shoot the gun." Maurice believed the weapon was an automatic. According to Maurice, the gun jammed, appellant was unable to shoot the weapon, and Maurice ran away. He added that he did not know why appellant would want to shoot him.

Maurice made a photographic identification of appellant as the one who shot him and Moore. He explained his selection, stating: "Because I seen him in the alley. He was running up [the alley] with a gun."

In his statement, Maurice also indicated that, while he was at the hospital for treatment of his gunshot wound, he learned that George Gaines had just been shot and killed. Maurice stated that Gaines would "hang" with appellant and described Gaines as appellant's "home boy." When Detective MacGillivary asked if Gaines was killed in retaliation for Maurice's shooting and Moore's death, Maurice responded, "Probably."

14

Maurice then stated that no one had forced him to give the statement and that he had not been mistreated. However, when asked if any promises had been made to him, Maurice stated: "That dude that bring me down here and say he was going to let my brother and them go." Detective MacGillivary did not ask Maurice any follow up questions concerning this alleged promise.

On cross-examination, Maurice acknowledged that his attempted murder conviction arose from his shooting of Brown on June 26, 2002. According to Maurice, Brown was friends with an individual named Paris. On June 26, Maurice was "beefing" with Brown and Paris because he (Maurice) had taken Paris's dirt bike. He confirmed that, on July 5, 2002, Paris had "a reason to beef" with him. Maurice also denied that appellant had anything to do with the June 26 shooting of Brown.

Further, Maurice reiterated that he did not see who shot him, and that he only saw an "arm stick around the corner," which was that of "a light-skinned dude"; appellant described Mr. DeWitt as dark skinned.[16] Maurice also denied that he saw appellant in the alley attempting to clear a gun. He maintained that he had included that information in his taped statement because that was what Detective Turner told him to say.

In his testimony for the defense, Maurice denied that he saw appellant on July 5, 2002, denied that appellant shot him, and

---

[16]Tasha also described appellant as dark skinned.

15

denied that appellant had a gun.  When asked why he lied about these matters, Maurice stated: "Because of Detective Turner, he said he was going to lock my mother and my sister, my niece put in a foster care and my little sister Brittany."

Detective Turner testified that, at about 11:00 a.m. on September 25, 2002, after Maurice and Cornell Booker had been arrested, he went to the Booker residence to execute a search warrant.  Maurice's mother, sister, and another family member were present.  Later, after 2:00 p.m., patrol officers transported members of Maurice's family to the Eastern District in an effort to determine if they had any information concerning the marijuana recovered from the residence, and to see if they had any knowledge of the shooting of Brown.  According to Detective Turner, it was Sergeant Jones who made the decision to transport Maurice's family to the police station.  When the family arrived, they were not under arrest.

Turner recalled that Maurice and Booker were transported to the police station and placed in different cells, located as far apart from each other as possible.  Detective Turner first conducted "a pre-interview" with Cornell and then, at about 12:15 p.m., he spoke with Maurice.  Maurice was advised of his rights and agreed to answer questions without an attorney.  According to Detective Turner, they spoke only for two to three minutes about the shootings at issue here, in which Maurice was a victim.  The detective claimed that he did not ask Maurice about any suspects or

16

if he knew who had shot him, nor did he ask about appellant, because he did not know who appellant was at that time. The detective added that because he did not have a suspect in the shooting, he did not show Maurice a photo array.

According to Turner, Maurice never saw his family at the police station. Moreover, Detective Turner denied that he made any promises or threats in regard to Maurice's family. At approximately 3:00 p.m., Maurice was transported to the Homicide Unit at Central District.

Detective MacGillivary investigated the shootings of Moore and Maurice Booker. He testified that, initially, Paris Moore had been a suspect, but eventually appellant was developed as a suspect. The detective had been unable to speak with Maurice concerning the shootings, however, until Maurice was arrested on the charge of attempted murder of Brown.

According to Detective MacGillivary, Maurice arrived at the Homicide Unit at 3:15 p.m., and he was interviewed jointly by Sergeant Garnell Greene and MacGillivary. The detective explained that, during a "pre-interview," he tries to ascertain what an individual has to say and they then move to a taped interview. Detective MacGillivary claimed that, during the pre-interview of Maurice, he did not tell Maurice what to say. Moreover, he claimed that Maurice spoke with him voluntarily; neither he nor Greene made any promises or threats to Maurice.

As noted, Maurice's taped statement was played for the jury.

17

It began at 4:25 p.m.  Following the taped statement, Maurice was shown a photographic array, from which he identified appellant as the person who shot him.

Over defense objection, the State was permitted to impeach Bryant through Detective MacGillivary.  He testified about his interview of Bryant on August 12, 2002.  Detective William Ritz and Assistant State's Attorney Cheryl Atkins, in whose office the interview took place, were also present.[17]

MacGillivary acknowledged that he advised Bryant that, "if she had any knowledge of a homicide prior, during, or after, that she could be charged with an accessory, during, or after the fact." When asked to explain what he meant, the detective stated: "If she was instrumental in the death of this young lady and the shooting of Maurice Booker prior, if she was instrumental during, or instrumental in after that she could be charged with this case." He also told Bryant that she could be charged with murder.  The detective then informed Bryant "[t]hat she needed to tell me what happened."  According to the detective, Bryant was not under arrest, did not want to be involved in the case, and was willing to tell the detectives and the prosecutor what had happened.

During the interview, Bryant advised that, at approximately 3:45 a.m. July 5, 2002, she went to Montpelier Street, where she

---

[17]The interview took place in the prosecutor's office because Bryant was at the courthouse after being subpoenaed to appear before the grand jury. Detective MacGillivary explained that the interview was not recorded because a tape recorder was not available.

met some friends and learned of the shooting. At 4:00 a.m., appellant got into her car and they drove somewhere and had sex. As they drove, she noticed a car following them. Eventually, Bryant drove down the 1700 block of Montpelier Street, stopped the car, and appellant got out and ran down an alleyway.

Detective MacGillivary also testified that, on July 5 and July 30, 2002, he interviewed Tasha Booker. Regarding Tasha's interview on July 30, 2002, he recounted that he had responded to 1702 Montpelier Street in an attempt to locate Maurice. Maurice was not there, but he asked Tasha to accompany him to the police station to discuss the shooting. Tasha was transported in his vehicle, but she was not under arrest.

Tasha's interview on July 30, 2002, was conducted by Detectives MacGillivary and Ritz, and began at 5:25 p.m. The interview was tape recorded, and concluded at 6:10 p.m. During that interview, Detective MacGillivary showed Tasha a photographic array, from which she identified appellant. When Tasha's statement was completed, she was transported to her home. MacGillivary denied that any promises or threats were made to Tasha in order to obtain her statement.

Detective MacGillivary interviewed appellant on December 12, 2002, at approximately 11:00 a.m., in the presence of Sergeant Greene and Detective Melissa Anderson. Appellant, who was then twenty-three years old, was in custody. According to Detective MacGillivary, appellant was first advised of his rights and agreed

19

to make a statement without an attorney. Appellant signed the advice of rights form at 11:10 a.m. At 11:15 a.m., Detective MacGillivary began a "pre-interview[.]" At 12:05 p.m., the taped interview began.

Appellant's taped statement was played for the jury.[18] In that statement, appellant claimed that he did not commit the shooting, did not have a gun in his possession, did not know what happened on July 5, 2002, and did not know Moore. He also denied getting out of a car in the 1700 block of Montpelier Street on that date, or running up the alley with a gun. But, he acknowledged that he knew Maurice "from the neighborhood[.]"

According to DeWitt, a disagreement had arisen between Gaines and Wright over drug money. He explained that he and Gaines sold "Ready Rock" in yellow-topped vials, and Maurice and Wright sold Ready Rock in different colored vials. Although they were all selling the same substance, appellant claimed that he and Gaines were making more money than Maurice and Wright, which upset the latter two. As a result, approximately one week prior to the shooting on Montpelier Street, an altercation arose between Gaines and Wright. Appellant stated that he was not present, but that Gaines later informed him that he had fought with Wright. According to appellant, Gaines indicated that he had won the fight,

---

[18] Before trial, appellant moved to suppress his statement; the motion was denied. On appeal, appellant does not claim that the trial court erred in its ruling.

20

but claimed that Wright threatened to kill Gaines. In a conversation that took place a few days after the fight, Gaines said that he needed to kill Wright before Wright killed him.

Regarding July 4, 2002, appellant recounted that he had gone to the Inner Harbor with Gaines to see the fireworks and to meet girls. After the fireworks, they walked around the Inner Harbor, ate, then returned to Harford Road around midnight. Appellant and Gaines went their separate ways. Later, as appellant was standing on the corner by his house, he saw Bryant driving down Harford Road in a blue wagon.

Appellant stated that it was around midnight when he met up with Bryant. He got into the passenger seat of her car and the two drove around; no one else was in the car. Appellant recalled that they drove down Harford Road, Montpelier Street, and Asquith Street to a gas station. They then obtained "some blunts" and "some weed" and drove around smoking. Then, they stopped at a bar, purchased alcohol, and drove around some more. Eventually, they stopped along Kirk Avenue and had sex. Afterward, at around 3:30 a.m. or 4:00 a.m. Bryant dropped appellant off on Harford Road and told him that she was going home. He claimed that they did not drive on Montpelier Street. He also denied that he had been in a car that was chased by Wright. When he got home, he saw the police and flashing lights one block away, but did not go to see what had happened.

Further, appellant indicated that he knew "Little Marty"

21

(i.e., Maurice) had been shot on Montpelier Street, but he did not know why. Appellant thought his "rap buddy," Gaines, with whom he was "real tight," had shot Maurice. He added that Marty was not supposed to get shot. Instead, said appellant, Wright was supposed to get shot, because Gaines had to get Wright before Wright got him. Appellant explained: "There was beef and so words been said, and it's either I'm going to get your or you're going [to] get me first. That's how it goes."

As noted, Gaines was killed a few hours after Moore and Maurice were shot. Appellant believed that the two shooting incidents were related. He explained that "George [Gaines] was trying to shoot one of them" because of the fight.

Appellant also acknowledged that he was shot in August of 2002. Initially, he stated that this shooting was not related to the incident in question. He reiterated that the fight in issue concerned drug territory and drug money: Wright and Maurice were upset that Gaines and appellant were making more money, and Gaines was killed and taken out of the picture. Appellant added that Wright killed Gaines over "jealousy" and "what happened that night." Appellant then confirmed that he was shot in August because "the drug battle was still going on."

When Detective MacGillivary indicated that the bullet that killed Gaines was meant for DeWitt, appellant responded: "He probably had one meant for me and him." When asked why Wright and Maurice would want to kill him, appellant responded:

22

> Why? Jealousy, jealousy. Me and him [Gaines]
> hustling together and him shooting him, and knowing that
> I'm going to know who shot him. So to get rid of me is
> either to send me to jail or kill me, that's how it goes.
> That's what he's trying to do now.

At the conclusion of his statement, appellant indicated that he had not been threatened and that he had been treated fairly.

Larry Mitchell, a.k.a "Brother," was nineteen years old at the time of trial. Testifying for the defense, he recalled that, on the night in question, he was sitting on the porch at 1702 Montpelier Street, and estimated that there were eight people outside the house. Three individuals were also on the porch at 1700 Montpelier Street, which was vacant. At approximately 2:30 a.m., Mitchell heard gunshots, which came from around a brick wall at the corner at Polk Avenue. Although Mitchell did not see anyone fire the shots, he "saw an arm" belonging to "[a] light-skinned guy" that came "around the corner shooting and everybody run...."

We shall include additional facts in our discussion.

### DISCUSSION

### I.

Appellant claims that the trial court erred "in refusing to redact other crimes evidence from Mr. DeWitt's statement to police." To analyze this contention, we must review additional factual background.

After appellant unsuccessfully moved to suppress his statement, defense counsel moved *in limine* to redact all references

to drugs, complaining that the taped statement "refers extensively to drug trafficking" between appellant and Gaines.  He maintained that "while it may be very helpful to the State's perceived motive, the State's theory of the case, it's not germane to this case as to whether or not the Defendant committed the shooting."  When the trial court asked why motive was not relevant, counsel responded, in part: "[I]f it's absolute proof of motive Your Honor, it may be relevant."  Counsel maintained, however, that the prejudicial effect of appellant's comments outweighed their probative value.

Further, defense counsel argued that appellant's comments resulted from Detective MacGillivary's assurance that appellant was "not going to be charged with drugs."  He pointed to the following testimony of Detective MacGillivary, elicited at the suppression hearing:

> I wanted to relay to him that our office had nothing to do with drugs, we are a homicide unit.  This is the investigation of death.  That he was free to talk about the drugs, it was not drug-related, and he would not be charged with anything that he said.

In particular, defense counsel asked the court to exclude the following portion of appellant's statement,[19] asserting that appellant "is basically admitting that he's in the drug trade...."

MacGillivary:  Earlier in our conversation, you had indicated to us that maybe both George [Gaines] and

---

[19] Although we summarized appellant's statement in our factual recitation, for the purpose of this issue it is necessary to set forth the specific portions of the statement that are in issue.

24

[Daddy][20] were having some type of argument or an altercation?

Dewitt:  Yes.

MacGillivary:  What was that over?

Dewitt:  Money.

MacGillivary:  What kind of money?

Dewitt:  Drug money.

MacGillivary:  Why don't you go on to explain to me why both [Daddy] and George....

Dewitt:  Making more money than [Daddy].

MacGillivary:  You and George were?

Dewitt:  Yes.

MacGillivary:  Okay.  So you were selling drugs?

Dewitt:  Yes.

MacGillivary:  And what kind of drugs were you selling?

Dewitt:  Ready rock.

MacGillivary:  And what ... how were you packaging your product?

Dewitt:  In vials.

MacGillivary: What color tops?

Dewitt  Yellow.

MacGillivary: Yellow?  And um [Daddy] and Maurice ... do you know how they were packaging their product?

Dewitt:  Same thing ... but different tops.

---

[20]The transcript of appellant's statement has the name "Danny" throughout. But, as recognized by defense counsel, the name should have been transcribed as "Daddy," the nickname of James Wright, Jr.

MacGillivary: What color tops did they have?

Dewitt: I don't know.

MacGillivary: You don't know? But at some point you guys got into a disagreement at the fact that you and George were making more money than [Daddy] and Maurice, correct?

Dewitt: Yes.

MacGillivary: And there was an altercation about this?

Dewitt: Yes.

In addition, defense counsel identified the following portion of appellant's statement, asserting that it was "not necessary to the State's burden of proof in this case and it's highly prejudicial to the Defendant."

MacGillivary: Okay. So what time did you guys [i.e., Gaines and appellant] get back from the mall?

Dewitt: I don't know exactly.

MacGillivary: Estimate.

Dewitt: Before 3.

MacGillivary: Alright. And what did you do for the rest of the day?

Dewitt: *Sold drugs.*

MacGillivary: Sold drugs?

Dewitt: Yes.

(Emphasis added.)

Defense counsel also sought redaction of the following excerpt:

MacGillivary: What did you guys [i.e., Bryant and appellant] do there [at the gas station]?

26

Dewitt:  Got some blunts.

MacGillivary:  Where did you go from there?

Dewitt:  (Inaudible) me some weed.

MacGillivary:  Where did you get your weed?

Dewitt:  On Orleans and Rose.

MacGillivary:  Orleans and Rose.  Do you know what time it is now?

Dewitt:  No.

MacGillivary:  Who did you cop from down there?

Dewitt:  I don't know ... I just got the weed.

MacGillivary: How much weed did you buy?

Dewitt:  Like two dimes.

MacGillivary:  Two dimes?

Dewitt:  Yeah.

MacGillivary:  Where did you go from there?

Dewitt:  Riding around smoking ... stopped at a bar....

According to appellant's attorney, "[t]he discussion of weed ... is not even necessary to the State's theory of motive as I understand it." DeWitt's lawyer added: "Your Honor, I would point out that there's ample evidence, I believe, of motive in following the State's theory for motive without referring to the drugs in the remainder of the Defendant's statement if in fact that's what the State intends to use it for."

In denying the motion *in limine*, the court stated:

> Motion in Limine is denied.   That under the

27

circumstances, in light of the charges, and facts, and circumstances, and allegations, the Court does not find it unduly prejudicial and does find it arguably reasonably probative as to the charges.

Later, at trial, during Detective MacGillivary's direct examination, defense counsel objected to the admission of appellant's taped statement. The following exchange occurred:

[DEFENSE COUNSEL]: I would object to [appellant's taped statement] being admitted and object to it being played. And the reason, Your Honor, is that as established in the pre-trial hearing, this officer basically lulled the Defendant into feeling free to talking about this —

* * *

The Defendant is encouraged to speak freely about selling drugs, about using drugs, and he does. And I don't know how that's germane to the case, or the State's theory of the case. It's clearly evidence of other bad acts that aren't charged in this case that portrays the Defendant in a derogatory light. Additionally, Your Honor, I would also object because the Defendant refers to —

THE COURT:       The objection is denied.

[DEFENSE COUNSEL]: Thank you Your Honor. The Defendant refers to George [Gaines] as his rap buddy. And I'm afraid that that is reference to the fact that they were incarcerated at one point together. Again, that's not germane to the case, it's —

* * *

I'm afraid that the jury may interpret it as such.

THE COURT:       I think you may be the only one in here that comes to that conclusion, but if that's your objection it's overruled.

Based on the record discussed above, appellant complains that the trial court improperly admitted "other crimes" evidence by permitting the jury to hear, through appellant's taped statement,

28

that: (1) appellant had previously sold drugs, *i.e.*, "Ready Rock"; (2) appellant had sold drugs on the afternoon before the shootings; (3) during the evening before the shooting, appellant went with Bryant to buy "weed;" and (4) appellant had stated that Gaines was his "rap buddy," which he claims was a clear reference to a prior incarceration.

Appellant also claims that the court erred by failing to state its reasons for allowing admission of "the other crimes drug reference." He alleges: "Absent this verbalization, this Court is handicapped in its ability to review the propriety of the decision and on this ground alone, the trial court's decision should be reversed." (Citation omitted). Given the lack of forensic evidence linking Mr. DeWitt to the crime, and the absence of eyewitnesses to the shooting, appellant argues that the error cannot be considered harmless. Moreover, he contends that the court erred in failing to "make any finding that the other crimes evidence fell within any ... exception."

In particular, appellant asserts:

The evidence adduced at Mr. DeWitt's trial ... shows that the other crime drug selling evidence could not fit under any of the Rule 5-404(b) or court created exceptions. There was no evidence that any assertion that Mr. DeWitt sold drugs that afternoon established any motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity[, or] absence of mistake or accident. In his statement, Mr. DeWitt postulated that a man

29

identified as George [Gaines[21]], who was shot later that morning, and "Daddy" [Wright] had been in a fight a week before the shooting as a result of an argument they were having about drug money, specifically, that George [Gaines] was "making more money" than "Daddy," and that George [Gaines] won this fight.  Nonetheless, George [Gaines] told Mr. DeWitt that after the fight, "Daddy" threatened to kill him.

This portion of Mr. DeWitt's statement certainly gives *George [Gaines]* a motive to shoot at Daddy, who was on the porch that morning, as well as to shoot at **Maurice**.  If George [Gaines] fired the shots, it certainly provided someone with a motive to shoot and kill *him* that morning - not Mr. DeWitt - three hours after Maurice Booker was shot.  However, it provides Mr. DeWitt with absolutely no motive for any shooting.  All it does is paint Mr. DeWitt as a criminal, a criminal drug dealer, who knows a violent man.  There was no evidence presented that Mr. DeWitt had a motive to shoot Maurice Booker or anyone.  There was no evidence that the shooting was related to Mr. DeWitt's drug sales that afternoon or earlier.  All the reference to Mr. DeWitt's past-time as a drug dealer in "Ready Rock" did was to prejudice him in front of the jury.  What it did was to tell the jury that Mr. DeWitt was a criminal and thus that it was more probable that he committed the crime for which he is on trial.  Not excising these references accomplished the prohibited objective of proving a person acted in conformity with his or her character. [citations and footnote omitted; emphasis in original.]

The State urges us to uphold the court's ruling as a proper

exercise of its discretion.  In its view, the evidence was relevant

to provide the context in which the jury could examine [appellant's] defense that it was Gaines who was the shooter, as well as to show his own motive and intent in committing the crimes.  As the prosecutor argued, DeWitt's statement in its entirety was "self-serving" because DeWitt blamed his deceased friend, Gaines, for the shootings. . . . Gaines' motive and intent for the shooting, however, was identical to DeWitt's, *i.e.*, to protect their drug selling turf against the competing

---

[21]As noted earlier, appellant incorrectly refers to George Rice, rather than George Gaines; we have substituted the correct name.

30

drug sellers of "Daddy" and Maurice Booker.  The fact that DeWitt and Gaines sold drugs together, that "Daddy" and Maurice Booker were competing drug sellers, and that there was a disagreement between them over drug money was all substantially relevant to the issue of, and the jury's evaluation of whether, and why, DeWitt committed the crimes.

Regarding the references in DeWitt's statement that he spent the late afternoon of July 4th selling drugs, and bought "weed" when he was with Bryant that night, the State claims the statements were admissible as part of DeWitt's alibi.  As the State points out, DeWitt explained his whereabouts from the time he awoke on July 4th through the morning of July 5th.  DeWitt claimed that he was with Gaines all day until just after midnight; they went to the mall, sold drugs, went to the Inner Harbor, and returned home.  Then, DeWitt claimed he was with Bryant until after the shooting on July 5th.  During this time, they bought "blunts" and "weed," which they smoked.  According to the State, this evidence provided the context through which the jury could evaluate DeWitt's alibi claim, and was integral to the non-drug related portions of DeWitt's activities on July 4th through the early morning of July 5th.

With regard to DeWitt's reference to Gaines as his "rap buddy," the State points out that the term was never defined by DeWitt in his statement.  Thus, it maintains that "there is no basis upon which to assume that the jury would think that the term referred to a prior incarceration."  In any event, argues the State, the fact that appellant "thought of Gaines as his 'rap buddy' was intertwined with his description of their close

31

relationship, which was relevant to the motive for the shooting."

Finally, as to appellant's claim that the trial court erred in failing to make proper findings regarding the admission of the other crimes evidence, the State argues: "Here, the record reflects that the trial court was fully aware of the other crimes issue, and ruled accordingly.   Indeed, it was the trial judge who first suggested that the drug trafficking evidence was relevant to motive."  It adds: "The trial court ruled the other crimes evidence admissible, and found that the evidence was not 'unduly prejudicial.'  The record therefore reflects that the trial court made the proper determinations regarding the admissibility of the other crimes evidence."

Generally, "evidence of a defendant's prior criminal acts may not be introduced to prove guilt of the offense for which the defendant is on trial." *Ayers v. State*, 335 Md. 602, 630 (1994), *cert. denied*, 513 U.S. 1130 (1995) (citations omitted).   Stated another way, evidence of a defendant's bad acts or other crimes may not be introduced "'to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial.'"  *Streater v. State*, 352 Md. 800, 806 (1999) (citation omitted). Reference to such conduct is excluded to avoid confusing the jurors, prejudicing their minds against the defendant, and predisposing them to a belief that the defendant is guilty.  *Terry v. State*, 332 Md. 329, 334 (1993).

Maryland Rule 5-404 embodies these principles and provides, in part:

> **(b) Other crimes, wrongs, or acts.** - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Thus, "Evidence of other crimes may be admitted ... if it is substantially relevant to some contested issue in the case and if not offered to prove the defendant's guilt based on a propensity to commit crime or his character as a criminal." *State v. Faulkner*, 314 Md. 630, 634 (1989) (citations omitted). Indeed, there are numerous well recognized exceptions to the general exclusionary rule. *Ayers*, 335 Md. at 631-32. As Maryland Rule 5-404(b) indicates, evidence of "other crimes" is admissible when the evidence tends to establish motive, intent, absence of mistake, a common scheme or plan, identity, opportunity, preparation, or knowledge. Moreover, "admissibility of evidence of other bad acts is not confined to a finite list of exceptions, even under the exclusionary rule." *Harris v. State*, 324 Md. 490, 497 (1991). The *Harris* Court explained, *id.* at 497-98:

> Evidence of other acts that has sufficient relevance, other than merely by showing criminal character, may be admissible. The so-called exceptions are helpful as classifications of those areas where evidence has most often been found admissible even though it discloses other bad conduct, enabling the bar and bench to quickly focus upon the areas most likely to be involved.

*See also Anaweck v. State*, 63 Md. App. 239, 257 (1985) (the list of other crimes evidence exceptions "is an open-ended list always capable of expansion wherever a clear instance of relevance might arise that somehow fails to fit neatly into one of the pigeonholes"), *overruled, in part, on other grounds, Wynn v. State*, 351 Md. 307, 315 n.4 (1998).

"A three-pronged test governs the admissibility of other crimes evidence." *Behrel v. State*, 151 Md. App. 64, 125, *cert. denied*, 376 Md. 546 (2003) (citations omitted). "First, the trial court must determine if the evidence fits within one or more of the exceptions to the rule." *Id.* at 125. "The first determination is an exclusively legal one, with respect to which the trial judge will be found to have been either right or wrong." *Oesby v. State*, 142 Md. App. 144, 159, *cert. denied*, 369 Md. 181 (2002). Thus, no deference is extended to the trial court in this determination. *Emory v. State*, 101 Md. App. 585, 604, *cert. denied*, 337 Md. 90 (1994). Second, the trial court must decide "whether the accused's involvement in the other crimes is established by clear and convincing evidence." *Faulkner*, 314 Md. at 634 (citations omitted). Third, the trial court must carefully balance the necessity for and probative value of the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 635. This is a discretionary determination on the part of the trial court. *Id.* As we said in *Oesby*, 142 Md. App. at 167-68:

"This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge.... Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so."

Here, the trial court did not err or abuse its discretion in concluding that the evidence that appellant had previously sold "Ready Rock," that he had sold drugs on the afternoon in question, and that Gaines was his "rap buddy" were admissible under the motive exception to the general rule excluding other crimes evidence. "Motive is the catalyst that provides the reason for a person to engage in criminal activity." *Snyder v. State*, 361 Md. 580, 604 (2000) (citations omitted). "Like intent, motive is a mental state, the proof of which necessarily requires inferences to be drawn from conduct or extrinsic acts." *Johnson v. State*, 332 Md. 456, 471 (1993). Thus, "[e]vidence of previous quarrels and difficulties between a victim and a defendant is generally admissible to show motive." *Snyder*, 361 Md. at 605 (citation omitted).

In appellant's statement, he indicated that there had been an altercation between Gaines and Wright, and that Maurice Booker and Wright worked together. The fact of the altercation between Gaines and Wright does not lead to the conclusion that only Gaines had a motive to shoot Maurice and Wright. It ignores that appellant also

35

stated that he and Gaines sold Ready Rock; he was "real tight" with Gaines; and Wright and Booker were upset because appellant and Gaines sold the same illicit substance as Booker and Wright, yet Gaines and appellant made more money. The jury could rationally infer that appellant and Gaines were partners, and that they were in competition with Wright and Booker. Accordingly, appellant's involvement in the drug trade, and his partnership and relationship with Gaines, who had been threatened by Wright, were central to what occurred and constituted key evidence of motive.

Put another way, the jury could conclude that because appellant's partner was threatened, appellant was also threatened. Indeed, this was demonstrated by the fact that Gaines was killed within hours of the shooting of Maurice, and appellant was shot about a month later. Although appellant initially denied that his shooting was connected, he later agreed that he was shot because of the dispute between Gaines and Wright. Therefore, the evidence that appellant sold Ready Rock with Gaines and that he had sold drugs on the afternoon of the shooting helped establish his motive to commit the shooting: to defend his territory, his drug trade, and his partner, who was threatened by Wright.

Appellant's complaint that the trial court erred because it made no finding that this evidence fit within an exception is also without merit. Throughout the exchange between the court, defense counsel, and the prosecutor, there were repeated references to the motive exception. The trial court even asked counsel why the

36

motive exception was not relevant, and counsel conceded that "it may be relevant." Further, shortly before the trial court denied the motion, counsel again referred to the motive exception. Accordingly, although the trial court did not expressly mention the motive exception in its ruling, it is clear that this was the basis on which the court found the evidence admissible. *See Ayers v. State*, 335 Md. 602, 635-36 (1994) (recognizing that trial judges are not required to spell out every step of their reasoning, and affirming admission of other crimes evidence because record revealed that the trial judge was fully aware of the rule governing admissibility of other crimes evidence, that the judge appreciated the importance of the other crimes evidence, and that the prejudicial effect of the other crimes evidence was outweighed by the probative value of this evidence), *cert. denied*, 513 U.S. 1130 (1995); *Beales v. State*, 329 Md. 263, 273 (1993) (noting that there is a "strong presumption" that judges properly perform their duties in weighing the probative value and prejudicial effect of other crimes evidence and that trial judges "are not obliged to spell out in words every thought and step of logic" in weighing the competing considerations); *Bangs v. Bangs*, 59 Md. App. 350, 370 (1984) (A judge "is not required to articulate every step in his thought process. A judge is presumed to know the law and to properly apply it. That presumption is not rebutted by mere silence.") (Citation omitted). *Cf. Streater v. State*, 352 Md. 800, 821-22 & n.10 (1999)

37

(reversible error occurred when there was absolutely no indication that trial court determined the relevancy of the other crimes evidence, the sufficiency of the other crimes evidence, or the probative value and potential prejudice of admitting the other crimes evidence).

In addition, we are satisfied that the probative value of the evidence far outweighed its prejudicial effect. *See Commonwealth v. Gunter*, 692 N.E.2d 515, 519-20 (Mass. 1998) (evidence of defendant's drug dealing properly admitted as it was probative of a motive to murder); *Commonwealth v. Hall*, 565 A.2d 144, 149 (Pa. 1989) (trial court committed no error in permitting prosecution to question defendant about his past drug dealings; the evidence established that the victims were known drug dealers, that the victims had recently cheated the defendant in a drug deal, and that the defendant had killed the victims in revenge for cheating him; prosecution's questions were designed to establish the defendant's motive for the killings and thus were proper); *State v. Campbell*, 901 P.2d 1050, 1055-56 (Wash. Ct. App.) (evidence that defendant was a gang member who responded with violence to challenges to his status and to invasions of his drug sales territory properly admitted as it was relevant to show motive, was highly probative of State's theory of the case, and was not unduly prejudicial), *review*

*denied* 907 P.2d 296 (Wash. 1995).[22]

With regard to the portion of appellant's statement that he purchased "weed," we are of the view that it was not other crimes evidence. *Dixon v. State*, 133 Md. App. 325 (2000), *rev'd on other grounds*, 364 Md. 209 (2001), provides guidance. There, the defendant was convicted of first degree assault and use of a handgun in the commission of a crime of violence in the shooting of one Edward Johnson. In that case, Dixon attempted to characterize events at the crime scene as other crimes evidence. Writing for this Court, Judge Moylan provided an illuminating discussion of other crimes evidence, 133 Md. App. at 329:

> The ultimate end to be served by the ban on "other crimes" evidence is that the State should not be permitted to bring in "out of left field" the fact that on some other occasion the defendant committed a crime. The danger being guarded against is that such past behavior will be offered to show and will be used by a jury to conclude that the defendant has a propensity to commit crime. The fear is that the jury may convict him in the case on trial because of something other than what he did in that case, to wit, because of his criminal propensity. There are also some well recognized exceptions to the evidentiary ban, permitting the evidence of "other crimes" to come in, if it is important to show something other than criminal propensity, such as identity, intent, motive, common scheme, etc. Md. Rule 5-404(b).

> \* \* \*

> Although the direct evidence of what happens at a

---

[22] Although appellant makes no claim regarding the second and third steps in determining the admissibility of other crimes evidence, we note that the evidence was established by clear and convincing evidence, given that appellant admitted his involvement in the drug trade and his relationship with Gaines in his statement.

crime scene may sometimes show some possible crime in
addition to the one literally charged, that coincidental
possibility does not necessarily engage the gears of
"other crimes" evidence law. What we have in this case
is evidence essentially integral to, even if not
literally inextricable from, the criminal incident on
trial. In earlier decades, it would have been
felicitously referred to as part of the *res gestae* of the
crime.

The Court then turned to the facts of the case. On the

morning in question, after consuming their supply of crack cocaine,

Johnson and a friend went out to purchase more. Johnson testified

that he approached Dixon, from whom he had previously purchased

drugs. According to Johnson, Dixon pulled out a gun. Johnson hit

Dixon and ran. As he ran, Johnson was shot in his back and

buttocks.

Dixon complained on appeal that Johnson's testimony that he

had approached Dixon because he had previously purchased drugs from

him was inadmissible other crimes evidence. We discerned no error,

stating, 133 Md. App. at 331 (footnotes omitted):

> Although we could validate that testimony on the
> theory that it undergirds Edward Johnson's ability to
> make a reliable identification of the appellant as the
> criminal agent, *Harris v. State*, 324 Md. at 501, *State v.
> Faulkner*, 314 Md. at 634, that would be to dignify the
> contention more than it deserves to be dignified.
> Fundamentally, this was simply not extrinsic evidence
> showing the appellant's criminal propensity. It was
> direct evidence as to why Johnson stopped the car and
> approached the appellant in the first instance. In view
> of the fact, moreover, that the entire confrontation was
> one between a would-be purchaser of drugs and an
> ostensible seller of drugs, the coincidental fact that
> the two had been involved on an earlier occasion or
> occasions was inconsequential in terms of prejudicial
> impact. But for Johnson's knowledge that the appellant

40

was someone from whom he could purchase "more crack," his entire narration of the incident that morning would have been unintelligibly bizarre.  We see no error.

Another witness, one of Dixon's companions, testified that, as Dixon fired at Johnson, he saw another individual, identified only as Mike, fall to the ground.  Dixon's companion further testified that he saw "blood and stuff" and that Mike "got shot."  According to Dixon, this constituted impermissible other crimes evidence.  Again, we disagreed:

> [W]e simply do not elevate this to the level of "other crimes" evidence establishing the appellant's criminal propensity.  It is a layman's description of what happened as the appellant fired five or six shots at the fleeing Edward Johnson.  It is no more significant than if one of those shots had smashed a flower pot or stilled a yelping dog.  One witness may observe and describe a crime scene epigrammatically, *a la* Emily Dickinson. Another may observe and describe the same scene panoramically, *a la* Walt Whitman.  The fact that a stray bullet winged "Mike" was simply part of the unfolding panorama.  Could it have been excised?  Of course!  Does it make any difference that it was not?  Of course not! We might, of course, expatiate on "same transaction" relevance....  It is pointless, however, to haul out heavy analytic equipment when instinct tells us clearly that the contention does not even break the horizon of possible significance.

*Dixon*, 133 Md. App. at 333-34 (footnote omitted).

In appellant's case, the evidence that he had purchased "weed" was simply part of appellant's alibi, that is, an explanation of what he and Bryant did while they were together.  Moreover, in light of the evidence properly admitted concerning appellant's drug dealing, we are unable to conclude that the evidence that he may have purchased marijuana prejudiced him in any way.

41

Finally, as recognized by the trial court, few individuals would understand the term "rap buddy" in the way that appellant claims. Even if the jurors did understand the term, we would conclude that the trial court properly permitted the reference, as it underscored the close relationship between appellant and Gaines. It would thus support the inference that Gaines's dispute with Wright and Maurice was also appellant's dispute, even if he was not there at the time of the altercation.

II.

Appellant next claims that the trial court erred in failing to suppress the pre-trial photo identifications of appellant made by Maurice and Tasha Booker. Resolution of this contention requires  us to review the evidence adduced at the motion hearings, at which both Maurice and Tasha repudiated their pre-trial statements and identifications.[23] In sum, they claimed they were told by the State to select DeWitt's picture. They also asserted that their statements were induced by improper police threats and promises.[24]

### A. Maurice Booker's identification of appellant

At the time of the motion hearing, Maurice Booker was nineteen years old and had completed the tenth grade. On the night in

---

[23]The motion hearing was conducted during the trial. We have omitted the testimony that duplicates the trial testimony, unless necessary to resolve the issue.

[24]As noted, at trial both witnesses disavowed their pre-trial statements and identifications of DeWitt. Consequently, their pretrial statements and identifications were admitted as substantive evidence.

question, he claimed he was "intoxicated." Maurice testified that
he did not see who shot him. He only saw a gun "stuck around the
corner[]" of Montpelier and Polk Streets, which was held by "[a]
light-skinned hand" that Maurice believed was a man's hand. When
asked if he knew appellant, he answered "Yes," noting that he knew
him for "[a] couple years, I've known him for a while."

Maurice also recalled that he was arrested on September 25,
2002, for the attempted murder of Marquis Brown. His brother,
Cornell, was arrested at the same time for possession of marijuana.
Following Maurice's arrest, Detective Kevin Turner interviewed him
in a conversation that was not recorded. Maurice testified that
Detective Turner spoke to him about the attempted murder of Brown
as well as the incident in which Maurice was shot. Regarding the
shooting on July 5, 2002, Maurice stated:

> [Detective Turner] asked me who shot me and all of
> that. And then he tell me - he tell my brother and them,
> he said he was going to let all of them go. He said if
> I ain't tell him who did it he was going to lock my
> mother up, my sister, going to put my little sister
> Brittany in ... a foster home, and my little niece Ireka
> into foster care. And then he showed me the photo array
> of Tony DeWitt and a couple other dudes. He was pointing
> to them like; is this the person, right here and right
> here? He said; you tell me it was him right here and
> I'll go ahead and let your family go, I ain't going to
> lock them up. And then my mother and them came there,
> they was up the station, and then they let them go after
> I signed the paper.

* * *

> [Detective Turner] told me to sign a paper right
> there saying it was [appellant] who shot me and they was
> going to let my mother and them go. That's all they said
> about him.

43

Maurice was asked again why he signed a paper stating that appellant shot him. He answered:

> Yeah, the dude told me that he was going to let my mother and them go.

> * * *

> Because my mother, they had my mother and all of them, they had them up the station ready to lock them up. And they were going to put my little niece and my sister inside of foster case [sic], that's why.

On September 25, 2002, Maurice gave a taped statement to Detective MacGillivary at the Homicide Unit. Maurice recalled that, in the statement, he indicated that appellant had a gun on the night in question. At the hearing, however, Maurice insisted that he had lied about appellant possessing the gun. The following testimony is pertinent:

> [DEFENSE COUNSEL]: Why did you say that you noticed that T.O. had a gun?

> [MAURICE]: I don't know.

> [DEFENSE COUNSEL]: Is it true?

> [MAURICE]: No, it's false.

> [DEFENSE COUNSEL]: Well, why did you tell a lie then?

> [MAURICE]: I don't know.

> [DEFENSE COUNSEL]: You don't know?

> [MAURICE]: Don't know.

> [DEFENSE COUNSEL]: Had you been threatened?

> [MAURICE]: No.

> [DEFENSE COUNSEL]: Had the police threatened to arrest your family?

44

[MAURICE]: Yeah, my mother and them.

[DEFENSE COUNSEL]: What did the police say; this was Detective Turner that said this?

[MAURICE]: Yeah.

[DEFENSE COUNSEL]: What did he say about arresting your mother?

[MAURICE]: He said he was going to lock them up because my brother, he got caught.  When they raided my house they had - my brother had some drugs and stuff in the house so they told me they was going to lock my mother and them up for it.

* * *

[DEFENSE COUNSEL]: What, if any, promise did Detective Turner make you in exchange with your agreeing to identify Tony DeWitt as the shooter?

[MAURICE]: That he was going to let my brother, my mother, and my sister; he said he was going to - my brother was already locked up, he said he was going to let him to.  And my mother and them, they wasn't locked up yet, they had them up the station.  And he said if I don't, then he was going to lock my mother and my sister up and he was going to put my niece and my little sister inside of foster care.

The following testimony is also noteworthy:

[DEFENSE COUNSEL]: When Detective Turner questioned you about the murder of Sherene, you told him T.O. did it didn't you?

[MAURICE]: Yeah, after he told me he was going to let my mother and them go, yeah, that's what I said.

[DEFENSE COUNSEL]: And you didn't have a beef with T.O. did you?

[MAURICE]: No.

[DEFENSE COUNSEL]: You two were cool weren't you?

[MAURICE]: Right.

[DEFENSE COUNSEL]: You were okay, right?

[MAURICE]: Yeah.

[DEFENSE COUNSEL]: So you had no reason to lie on him did you?

[MAURICE]: Huh?

[DEFENSE COUNSEL]: You had no reason to lie on him did you?

[MAURICE]: No. For my mother and them, yeah.

Maurice also agreed that he acknowledged at the time of his interview that he had "been treated all right" by the police, and that no one had forced him to make the statement. However, Maurice indicated that a promise had been made to him concerning his family. The following excerpt from the transcript of the taped statement is relevant:

MacGillivary: Anybody force you into giving us this statement?

Booker: No.

MacGillivary: Anybody make any promises to you?

Booker: Yeah.

MacGillivary: What's that?

Booker: Them dudes that, that bring me down here say he was going to let my brother and them go.

Detective MacGillivary made no inquiry into Maurice's allegation that the police had promised him something.

On cross-examination by the State, Maurice indicated that "[t]hem dudes" was a reference to Detective Turner. Maurice also maintained that both Detectives Turner and MacGillivary showed him

46

photo arrays. According to Maurice, he told Detective Turner that appellant had shot him and Moore only after the detective said he would let Maurice's family go. Further, he stated that Detective Greene told him who to pick from the array. The following testimony is pertinent:

> [PROSECUTOR]: Detective MacGillivary, the white dude, did he make any promises to you?
>
> [MAURICE]: No.
>
> [PROSECUTOR] Did he force you to pick out anyone?
>
> [MAURICE]: No.
>
> [PROSECUTOR]: Did he tell you to pick out anyone?
>
> [MAURICE]: No.
>
> [PROSECUTOR]: Did the other detectives in the room tell you to pick out anyone?
>
> [MAURICE]: Yeah, the other little light-skinned dude with the freckles on his face.
>
> * * *
>
> [PROSECUTOR]: He told you [who] to pick out?
>
> [MAURICE]: Yeah, he brung me - that's the one that brung me that photo array.
>
> * * *
>
> [PROSECUTOR]: How did he show you the picture?
>
> [MAURICE]: How did he show it to me?
>
> [PROSECUTOR]: Yes.
>
> [MAURICE]: Face down.
>
> [PROSECUTOR]: Face down?
>
> [MAURICE]: Yeah.

47

[PROSECUTOR]: And you turned it over?

[MAURICE]: Right.

[PROSECUTOR]: And then you picked out the person?

[MAURICE]: Right.

[PROSECUTOR]: So he didn't tell you who to pick out?

[MAURICE]: Who?

[PROSECUTOR]: He did not tell you who to pick out then?

[MAURICE]: Why do you say that? Just because I had it
face down and turned it over, what's that supposed to
mean that he didn't tell me who to pick him out.

[PROSECUTOR]: How did he tell you to pick him out?

[MAURICE]: Is this him right here; I already knew who he
is.

Detective Kevin Turner testified that, on September 25, 2002,
he interviewed Cornell and Maurice at the Eastern District. He
first spoke to Cornell about the marijuana, and he and Detective
Weld interviewed Maurice at around noon. At that time, Maurice was
also advised of his rights. Detective Turner maintained that he
questioned Maurice about the shooting of Brown, not about the July
5th shooting on Montpelier Street. According to Turner, he knew of
that homicide, but he did not know the name of the suspect.
Detective Turner also denied that he showed a photo array to
Maurice, or that he had Maurice sign any papers in connection with
the shooting on July 5, 2002. Further, Turner denied that he made
any promises to Maurice about his family, none of whom were under

48

arrest, except for Cornell.[25]  Turner transported Maurice to the

Homicide Unit at about 3:00 p.m., where MacGillivary and Greene

took custody of Maurice. On cross-examination, Detective Turner

stated that he was not present when Maurice was arrested.  Nor was

he aware of whether any of the arresting officers made any promises

to Maurice.

Detective MacGillivary testified that, on September 25, 2002,

at approximately 3:15 p.m., Maurice was brought to the Homicide

Unit by Detective Turner, and was interviewed by MacGillivary and

Sergeant Greene.  MacGillivary advised Maurice that he was a

witness in a homicide case that MacGillivary was investigating.

According to the detective, Maurice voluntarily spoke with him.

In the course of the interview, Maurice indicated that, on

July 5, 2002, he saw T.O.[26] in the alley with a gun; T.O. was trying

to pull the trigger, but the gun was either jammed or out of

bullets.  The detective stated that he never gave the name of the

gunman to Maurice.

During the interview, Detective MacGillivary showed a photo

array to Maurice.  The transcript reflects the following exchange:

> MacGillivary: Ah listen to what I have to say.  This
> group of photographs may or may not contain the picture

_no judicat_
_he ever saw_
_array before_

[25] Turner explained that he could not have made any promises in regard to
Cornell, because it was "Federal Day" and everyone "locked up would be charged
federally and they would have their trial over at the Federal Building."
Therefore, Turner claimed he "didn't have any jurisdiction over any charges on
that particular day."

[26]Initially, Detective MacGillivary referred to appellant as T.L., but then
began to call him T.O.

of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards and mustaches may be easily changed. Also photographs may not always depict the true complexion of a person. The complexion may be lighter or darker than shown in the photograph. When you look at all of the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone. Do you understand that?

Booker: Not audible.

MacGillivary: What I'm going to do is I'm going to turn this photographic lineup face down. I want you to turn it over and I want you to see if you recognize anybody on there that tried to shoot you? Who is that?

Booker: Tio.

Maurice also signed the photo that he selected. Detective MacGillivary maintained that he did not tell Maurice whom to identify, nor did he tell him what to write on the back of the array. Moreover, Detective MacGillivary denied that he ever made any promises to Maurice in regard to his brother. The detective agreed, however, that, at the end of his statement, Maurice indicated that someone had made a promise to him about Cornell.

Detective Greene testified that, during the pre-interview, which was not taped, he advised Maurice "that no one in the Police Department can make any promises for anything because he was under arrest for attempted murder...."

In denying the motion to suppress the statements and identification as to Maurice, the court said:

> The circumstances before the Court is as to Mr. Booker's, A); photographic identification of the Defendant, and B); as to his statement. The difficulty raised at this juncture is whether or not the evidence

supports the contention that they should be suppressed.
The Court is aware that there are two separate things
that we're talking about; photographic array and that of
the statement given.   While there is and will be
discussion of the two, the Court must look at the fact as
to whether or not the witness's testimony and
identification is such that causes concern.  The concern
being as to whether or not there is evidence that there
was suggestion.   And if not suggestion, downright
corruption of the actual identification. By that meaning
the actual photographic identification and that which is
in the statement.

There is no question that the witness knows the
Defendant, that is true. And everything in the evidence
suggests that he knows him and knows him well.  What is
also clear is that the issue of promises or threats
existed not from today, but existed at the time of the
statement.   It is probably easier for the Court to
suggest it in this way if I may; the Court's concern as
to whether or not the State by putting on this witness
and for his identification is condoning perjury. That is
that the actual identification of the Defendant is untrue
and caused by that which was the actions prior to the
actual identification.

We are reminded that there is a pre-interview and
that there are discussions pre the actual identification
or interview. And so if the State's argument is well no,
it's not in the actual record, that isn't the point.  In
fact the testimony is as to whether or not Detective
Turner at the time of the gathering of the witness,
and/or during the course of the transport of the witness
that there were threats and inducements that caused the
actual identification of this Defendant, and even more so
as to whether it directed or caused the actual statements
in the - sorry, during the course of the statement an
actual verbal identification, if you will, of the
Defendant as being the shooter, not only of him, but the
decedent.

Well, the circular fashion of the discussion is;
well, he's here and he doesn't want to identify the
Defendant during the course of the trial and they are
friends.   Contrary to that would be well, they were
friends at the time of the inducement and it was not
based on friendship or hatred, it was arguably because
the question of concern as to his brother and/or his
sister and niece and what occurred. There is no question

that his brother was arrested, there is no question that
there was an interview of the brother that led the police
officers through the witness if you will, to gather
information as to the shooting.

* * *

The State is correct as to the photographic array,
that there's nothing in the photograph, or photographs,
of that would suggest that it caused the witness to
identify the Defendant as the shooter.   The issue is
whether or not the officer said you have to pick out this
person. And there's no question that even if the officer
had done so, is that the witness knew the Defendant, and
so therefore as picking him out versus someone else, it
was not, [per] se, based on the direction to zero on the
Defendant as the person that he would have known to be
the Defendant but for the actions of the officer.

The question does come back as to the reliability of
the actual identifications and testimony.  This Court is
and does point to the actual statement that was before
MacGillivary that clearly indicated something is up here
and there was discussion.  Whether or not that caused the
actual statement and the manner of the statement is still
of question.  The Court however is going to rule in the
following fashion: as to the photographic array the Court
is going to deny the Motion because A) is; that the
witness knew the Defendant and needed no direction or
concentration if you will, of efforts to end up being the
person that he intended to identify in a photographic
array as being this Defendant.  B), as to the statement,
this Court will allow the statement and testimony, and
all of its warts before the jury with appropriate
instructions at the time.

The area of questions that should follow as to the
reliability of that in the Court's finding, that it is a
jury finding as to the reliability.  The evidence as such
raises the questions and issues, and therefore this Court
will do the same in its instructions to the jury as to
its review of the actual identification by way of the
statement as well as the photographic array, and its
determination as to the credibility of the witness's
testimony in light thereof.

This Court again points out that it is a concern.
We can not put ourselves in a position that allows the
way that things are done to cause us to give a blind eye

52

when it comes to court.  That in court, what is clear here, is that there was some suggestion outside of Court during the course of the identification.  This Court is not comfortable as saying that the Prosecutor is at the point of suborning perjury or condoning perjury, but it is a question of whether or not the motivation of the actions of Mr. Booker was caused by promises, threats, or inducements.  But at the same time Mr. Booker clearly can stand his own to Cross Examination and review by the jury.  Therefore the Court denies both of the Defendant's Motions as to suppressing the actual out-of-court identification by way of the statement, and the actual photographic identification is hereby denied.

### B.  Tasha Booker's identification of appellant[27]

Tasha Booker was twenty-one years of age at the time of trial. On July 5, 2002, she was living at 1702 Montpelier Street with her mother, two brothers (Maurice and Cornell), her younger sister, and her daughter.[28]

Tasha recounted the events of the night in question, stating that she was inside the house when Maurice was shot and did not witness the event.  Later that morning, she spoke to the police at the hospital where Maurice was being treated.  Tasha also gave taped statements to the police on July 5, 2002, and July 30, 2002. According to Tasha, the police insisted that she knew who shot her brother and Ms. Moore.  Although Tasha told the police that she did not see who fired the shots, Tasha claimed that the police

---

[27] Tasha Booker's appearance for the suppression hearing was obtained by means of a body attachment; the suppression hearing took place during a recess in the trial.

[28] Curiously, when Tasha was asked with whom she lived, she did not mention her child. *See* Transcript of November 19, 2003, at page 86.  Later, however, she claimed the police threatened to "lock up [her] daughter...." *See* Transcript of November 19, 2003, at page 98.

threatened to "lock [her] up," take her daughter away from her, and take the baby she was then carrying.

Tasha viewed a photographic array, and identified appellant. She testified that she identified appellant because she was asked to sign the array if she knew appellant; she signed appellant's photo because she knew him, even though she did not witness the shooting.

Tasha agreed that, in one of her taped statements to the police, she had stated that, on the night of the shooting, she saw Bryant's blue Taurus in the middle of Montpelier, and appellant got out of the vehicle. She had also informed the police that the blue car was followed by a burgundy car. In addition, she told the police that the cars drove down Montpelier Street two or three times and, on the last occasion, appellant jumped out of the blue Taurus. However, Tasha denied that she said that she saw a gun in appellant's hand. Moreover, claiming that the police kept her "sitting in a little chair for two days" and "kept questioning her," telling her that they "can lock you up." She stated that she gave the police the information "so they could let me go." She maintained that she did not see appellant get out of a car, run through an alley, or with a gun.

Tasha testified that she had known appellant for two or three years. In her pre-trial statement in 2002, however, she indicated that she had known him for about five years. At that time, she also indicated that she would know appellant "when it's pitch dark

54

outside" and that she knew "how he walk[ed] and all of that."

Detective MacGillivary testified that, on July 5, 2002, at approximately 6:30 a.m., he spoke with Tasha at the Homicide Unit in regard to the shooting. Tasha told him that when she returned to Montpelier Street from the location of the ambulance, she observed two cars, a gray one and a red one, travel through the police tape. The cars came through the area twice. At one point, Tasha saw "the boy" jump out of the car and run through the alleyway with a "real long and black" gun. At that time, Tasha did not identify "the boy." Tasha then went to the hospital where Maurice was being treated, and where she saw Paris Moore in a similar red car.

Further, MacGillivary testified that, on July 30, 2002, he responded to 1702 Montpelier Street to locate Maurice. Although Maurice was not there, Tasha was at home, so he asked her to accompany him to the Homicide Unit. According to the detective, Tasha was not required to come with him for another interview, and was not under arrest. He added, however, that if she had refused to accompany him for another interview, he would have requested a Grand Jury summons for her. Detective MacGillivary could not recall if he had informed Tasha that he would obtain the summons.

The detective and Tasha left the residence at approximately 5:00 p.m. and the taped interview began at 5:25 p.m. The interview took place in Sergeant Greene's office, in the presence of Detectives MacGillivary and Ritz. There was no pre-interview, and

55

the interview concluded at 6:10 p.m.

During the interview, Tasha again informed MacGillivary that she saw two cars drive through Montpelier Street several times. She recalled that, on the third trip through, the Taurus stopped in the middle of the block near the alley, appellant jumped out of Bryant's car carrying a long, black gun, and ran through the alley. Wright was in the car behind Bryant's and was trying to tell the police "that's him right there; that's him right there." Bryant then continued driving, with Wright following.

Detective MacGillivary also testified about Tasha's photographic identification of appellant. The transcript of the interview contains the same admonition quoted earlier in regard to Maurice. In addition, it states:

> M[a]cGillivary: ... I'm gonna take this Photographic Line Up and I'm gonna lay it flat on this desk here. I want you to turn it over and see if you see anybody on there that you recognize. Go ahead and turn it over.
>
> Booker: Um-hum I recognize Teo.

Detective MacGillivary testified that no threats or promises were made to Tasha in order to obtain her identification of appellant. Nor did he or the other officers tell her which photograph to select.

In denying appellant's motion to suppress Tasha's identification, the trial court stated:

> A) There are some matters of great concern that the Court hears again in this case as to the methodology of investigation. What the Court does note is that the information as to the methods of investigation do come

56

from brother and sister as well.

B) What is clear no matter what we say as to the testimony is that the identification being made of the Defendant is identification of T.O. is the person I'm identifying.  There is no identification by the witness in question as to seeing the Defendant shooting the victims in the statements.  I don't know the theory of the State's case and the State is only the one to figure out as to how it fits together.  We do have an alleged victim who has testified, albeit reluctantly, and does raise some questions as to how he was treated during the investigation; and we have this witness as well.

B) [sic] It does not take a scientist to conclude that even if the information comes in, it is the cars and the situation of the person she identified, even if the person has a gun, is later than the shooting if you tie in all of the information between the technicians and persons who were on the scene.  You may come to a better time line than the Court is able to draw at this moment.  How that fits into the State's case I don't plan to answer.

I'm going to deny the Motion as to the circumstances of whether or not the identification of the photograph is impermissibly suggestive.  The circumstances surrounding how this witness and others have been, quote "encouraged" unquote, to speak to the police is of concern.  How the Defense uses it for cross examination is entirely up to the Defense.  If the State is going to rely on these two witnesses as its main witnesses in its case, that is up to the State.

### C.  Discussion

At the outset, we underscore that appellant challenges only the photo identifications of the Bookers, not their pretrial statements.  In the caption of his argument, DeWitt claims that the "identification" made by Tasha and Maurice "were the product of promises and threats."  In the text of his brief, consisting of three pages devoted to this issue, appellant elaborates, stating

57

that the photo identifications were impermissibly and overtly suggestive. Noting that both Bookers denied that they saw the shooter, appellant asserts: "The Bookers were each shown a six person photo array containing Mr. DeWitt's photo and each selected Mr. DeWitt's photo from the array. In each case, the Bookers testified that they were instructed by police to select Mr. DeWitt's photo or face consequences." Thus, appellant complains:

> These identifications were not the product of any subtle police suggestiveness. The suggestiveness here was overt. The trial court even recognized that there was "some suggestion outside of court during the course of the identification." Faced with [the claims made by Tasha and Maurice Booker] of explicit suggestiveness, the trial court erred in not determining whether or not the identifications were the product [of] police suggestiveness but rather leaving this determination to the jury.

In view of the "explicit suggestiveness," asserts appellant, "the trial court erred in not determining whether or not the identifications were the product [of] police suggestiveness but rather leaving this determination to the jury." He adds that the court "erred in not addressing the issue and concluding that," despite "police pressure, threats and promises exerted on these two individuals," their identifications were admissible."

Ordinarily, a challenge to an extra-judicial identification arises when an identification is made by a person who does not know the accused. The challenge involves a two-stage inquiry. *Evans v. State*, 304 Md. 487, 498 (1985), *cert. denied*, 478 U.S. 1010 (1986). The first inquiry is "whether the identification procedure was

impermissibly suggestive." *Id.* An identification procedure may be suggestive, where, in effect, the police suggest to the witness (who does not know the suspect), "This is the man." *Foster v. California*, 394 U.S. 440, 443 (1969). "To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE." *Conyers v. State*, 115 Md. App. 114, 121, *cert. denied*, 346 Md. 371 (1997) (emphasis in original). If the identification procedure was not suggestive, then the inquiry ends and the extra-judicial identification and an in-court identification are admissible. *Webster v. State*, 299 Md. 581, 620 (1984). If the procedure is found to be impermissibly suggestive, however, the suppression court must proceed to the second inquiry: "whether, under the totality of the circumstances, the identification was reliable." *Evans*, 304 Md. at 498.

In challenging the admission of an extra-judicial identification, "the defense has the initial burden of showing some unnecessary suggestiveness in the procedures employed by the police." *Brockington v. State*, 85 Md. App. 165, 172 (1990), *cert. denied*, 322 Md. 613 (1991). Only after the defendant has made a *prima facie* showing of taint must the State "prove by clear and convincing evidence the existence of reliability in the

identification that outweighs the corrupting effect of the suggestive procedure." *Loud v. State,* 63 Md. App. 702, 706, *cert. denied,* 304 Md. 299 (1985); *see also Barrow v. State,* 59 Md. App. 169, 184 ("An accused is entitled to due process of law to ensure that a pre-trial identification is not 'so unnecessarily suggestive and conducive to irreparable mistaken identification.'"), *cert. denied,* 301 Md. 41 (1984) (quoting *Stovall v. Denno,* 388 U.S. 293, 302 (1967)).

Reliability "is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977). In determining reliability, the court examines the totality of the circumstances. *Foster v. State,* 272 Md. 273, 288 (1974), *cert. denied,* 419 U.S. 1036 (1974). The court may consider several factors to determine reliability: (1) the witnesses' opportunity to view the criminal during the commission of the crime; (2) "the witnesses' degree of attention," (3) "the accuracy of the witnesses' prior description of the criminal;" (4) the level of the witnesses' certainty at the confrontation; and (5) "the length of time between the crime and the confrontation." *Id.* (*citing Neil v. Biggers,* 409 U.S. 188, 199 (1972)). "If the suggestive identification is sufficiently outweighed by these factors of reliability, then the identification is deemed to be valid." *Chase v. State,* 120 Md. App. 141, 152 (1998).

As to Maurice, the trial court recognized that there were two

components to the hearing: his photographic identification of DeWitt and the statement he gave to the police. With respect to the photo identification, the trial court found that the photo array itself was not suggestive. The court noted that nothing in the array "caused the witness to identify the Defendant as the shooter." Appellant has not contested that finding. The court also said that, even if the officer had told the witness to "pick out this person," the witness already knew DeWitt and thus would have no difficulty "picking him out versus someone else." Because Maurice already knew appellant, the identification was, in that sense, reliable.

However, the trial court was mindful that, at the conclusion of his statement, Maurice informed MacGillivary of a promise made to him concerning his brother. The court said that "what is clear here, is that there was some suggestion outside of Court during the course of identification." Nevertheless, the court did not find that Booker's identification was "caused by" any threats or promises of the police. It said: "Whether or not that caused the actual statement and the manner of the statement is still in question." It then opted for the jury to determine the reliability of the identification of appellant as the shooter, ruling that Maurice's statement and identification should go before the jury with "all of its warts," for it to determine the reliability of the identification and the credibility of the witness. And, as we shall see, the court instructed the jury accordingly.

61

In regard to Tasha, the court denied the motion to suppress the photo identification because it was not "impermissibly suggestive." The trial court also denied the motion to suppress her statement, stating: "The circumstances surrounding how this witness and others have been, quote 'encouraged' unquote, to speak to the police is of concern." The court recognized that Tasha knew appellant, and also observed that she had not identified DeWitt as the shooter.

We agree with the State that "the trial court implicitly found" that the process "was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, thus requiring exclusion of the evidence at trial." *See Beales*, 329 Md. at 273 (trial judge not required to "spell out in words every thought and step in logic" leading to its ruling); *Ridgeway v. State*, 140 Md. App. 49, 68 (2001). The court left it for defense counsel to reveal to the jury the alleged improper tactics utilized by the police, which is exactly what occurred. And, it left it for the jury to determine whether to believe the Bookers' accounts of coercion in assessing the accuracy of their pretrial statements and photo identifications.

Moreover, as we mentioned, the trial court instructed the jury regarding the identification of DeWitt. It also modified the instruction regarding the voluntariness of the defendant's statement to include consideration of the voluntariness of a

62

witness's statement.  The court said in its instructions:

You've heard evidence regarding the identification of the Defendant, Tony DeWitt, as the person who committed the crime. And this connection, you ladies and gentlemen of the jury, should consider the witness' opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness' state of mind and any other circumstance surrounding that event. You should also consider the witness' certainty or lack of certainty, the accuracy of any prior description and the witness' credibility or lack of credibility, as well as any other factor surrounding that identification.

However, ladies and gentlemen of the jury, you should examine the identification of this Defendant with great care. It is for you to determine the reliability of any identification and give it the weight you believe it deserves.

* * *

In deciding whether the statement was voluntary, consider all of the circumstances surrounding that statement as introduced including (1) the conversations if any between the police and the Defendant or witness; (2) whether the Defendant or witness was warned of his or her rights if became [sic] a Defendant during the course of the investigation; (3) the length of the time that the Defendant or witness was questioned; (4) who was present; (5) the mental and physical condition of the Defendant or witness making the statement; (6) whether the Defendant or witness was subjected to force or threat of force by the police; (7) the age, background, experience, education, character and intelligence of that Defendant or witness, and any other circumstances surrounding in the taking of that statement.

From time to time a party or witness in this case has been cross examined with respect to testimony or statements made at a pretrial statement or deposition. If you find that a party or witness before testifying at trial testified and gave information that is materially different from what that witness may have said or party may have said during the course of the trial or on the witness stand. Then such differences in testimony may be considered by you as impeaching the recollection or even

63

> truthfulness of that witness or party.  You may consider
> such differences or variance in testimony in estimating
> the weight, if any, which would be given by you to all or
> any part of the testimony of that witness or party.

As we see it, even assuming error as to the admission of the photo identifications -- which we do not find -- any error is a red herring, without legal consequence.  This is because appellant only assails the photo identifications; the various pre-trial statements of Tasha and Maurice are not challenged here (although such a challenge was raised below), and these statements constitute powerful evidence against appellant.  We explain further.

As we have intimated, appellant presents an analysis traditionally associated with identification of a defendant made by a third party witness who does not otherwise know the suspect.  As both Maurice and Tasha knew appellant for years, that analysis is not applicable here.  Rather, appellant asserts that Tasha and Maurice were, in effect, induced by police threats and promises to falsely accuse him of being the shooter.  An allegation of this dimension does not turn on consideration of the *Neil v. Biggers* factors, as appellant seems to suggest.  But, appellant does not argue that, because of improper police conduct, the admission of the pretrial statements fatally undermined his right to a fair trial, thereby denying him due process.

If we generously read between the lines, perhaps we can glean an argument by appellant that the witnesses, who knew appellant for years, involuntarily identified him because of improper police

64

tactics, such as coercion, threats, and promises. Yet, if such a
veiled claim has been made, appellant has not provided us with any
case law, discussion, or analysis addressing the parameters of a
defendant's right to challenge an identification made by a witness,
which was allegedly obtained involuntarily through improper police
conduct. Nor has he outlined the process that the court should
follow in addressing such a claim. Appellant merely refers us to
cases that generally concern suggestive identifications in the
context of an assailant unknown to the witness.[29]

Although we discern no challenge to the pre-trial statements
of Tasha and Maurice, we shall briefly address the matter.

There are, indeed, limited circumstances in which a defendant
may complain if the state, through the violation of another's
rights, denies the defendant a fair trial, in violation of his
right to due process. Numerous courts in other jurisdictions have
made this plain. *See, e.g., United States v. Gonzales*, 164 F.3d
1285, 1289 (10th Cir. 1999) ("defendants' due process rights would
be implicated if the subject witness was coerced into making *false*

---

[29] If the prior statements are in issue here, the State claims that the
suppression motions as to them were properly denied. It asserts generally:

> The trial court also properly denied the motion to suppress the
> witnesses' pretrial statements and left it for the jury to make the
> credibility determination whether the Bookers were telling the truth
> when they spoke with police before the trial and implicated DeWitt
> only because the police had induced them to do so by threats and/or
> promises.

> Even assuming that the due process analysis for
> identifications is applicable to the pretrial statements, the trial
> court nevertheless properly refused to grant the suppression
> motions.

65

statements and those statements were admitted against defendants at trial") (citation omitted); *Clanton v. Cooper*, 129 F.3d 1147, 1157-58 (10th Cir. 1997) ("because the evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person"; "methods offensive when used against an accused do not magically become any less so when exerted against a witness"); *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause.") (Citation omitted); *United States v. Merkt*, 764 F.2d 266 (5th Cir. 1985) ("A defendant may assert her own fifth amendment right to a fair trial as a valid objection to the introduction of statements extracted from a non-defendant by coercion or other inquisitional tactics."; defendant had standing to complain that statements of two witnesses were illegally obtained and the government's unfair investigation methods resulted in a fundamentally unfair trial); *United States v. Chiavola*, 744 F.2d 1271, 1273-76 (7th Cir. 1984) ("The defendant correctly states that a violation of another person's fifth amendment rights may rise to the level of a violation of his rights to a fair trial. Due process is implicated when the government seeks a conviction through use of evidence obtained by extreme coercion or torture.

66

The issue is whether the government's investigation methods resulted in a fundamentally unfair trial.") (Citations omitted); *United States v. Fredericks*, 586 F.2d 470 (5th Cir. 1978)(defendant's right to a fair trial was not prejudiced by introduction of witness's statement since the reliability of that statement was not suspect and since the actions of the DEA officers were "a far cry from the sort of third-degree physical or psychological coercion that might prompt the court to disregard altogether the societal interest in law enforcement by excluding the highly probative testimony of a nondefendant") (footnote omitted), *cert. denied*, 440 U.S. 962 (1979); *LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir.) (where witness at trial had recanted statements in earlier confession, claiming the confession was the product of coercion, court held that a hearing to determine the voluntariness of the confession was required), *cert. denied*, 419 U.S. 1080 (1974); *Bradford v. Johnson*, 354 F.Supp. 1331, 1336-1338 (D. Mich. 1972) (where witness's incrimination is the result of torture the court ought to scrutinize the method to insure the defendant that there was fairness in his prosecution."; witness's testimony was deemed untrustworthy under due process standards because of abuse, which prevented a fair trial), *aff'd*, 476 F.2d 66 (7th Cir. 1973) (per curiam); *Raphael v. State*, 994 P.2d 1004, 1008 (Alaska 2000) ("both our case law and that of other jurisdictions uniformly recognize a defendant's ability to assert a due process

67

violation based on the coercion of witnesses whose statements are used against the defendant at trial"); *People v. Jenkins*, 997 P.2d 1044, 1090 (Cal. 2000) ("Defendant does have standing ... to assert that his own due process right to a fair trial was violated as a consequence of the asserted violation of [a co-defendant's] Fifth Amendment rights.") (Citations omitted); *People v. Douglas*, 788 P.2d 640, 655 (Cal. 1990) ("the 'admission at trial of improperly obtained statements [of a third party] which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial'"), disapproved on another point in *People v. Marshall*, 790 P.2d 676, 688 n.4 (Cal. 1990) (quoting *Wilcox v. Ford*, 813 F.2d 1140, 1148 (11th Cir. 1987)); *McKenney v. State*, 388 So. 2d 1232, 1234 (Fl. 1980) (witness's detention was illegal and detective's offer that witness would either be a witness or a defendant rendered the witness's statement involuntary; nonetheless, defendant did not have standing to challenge violation of witness's constitutional rights as the police tactic of offering the witness a Hobson's choice did not rise to the level of third-degree physical coercion that might prompt the court to exclude the statements; defendant's right to a fair trial was not prejudiced); *Dimminick v. State*, 473 P.2d. 616 (Alaska 1970) (where co-defendant's confession was obtained in violation of *Miranda* because his request for counsel was not honored, confession was admissible at trial of defendant since there was "nothing in the record to

68

suggest that in obtaining the statements from [the co-defendant] the police indulged in coercion which is offensive to due process"). *Cf. People v. Newman*, 197 N.E.2d 12, 14 (Ill. 1964) (witness's statement improperly admitted for purposes of impeachment after witness testified that, at the time of making the statement, she was seven months pregnant and police officers threatened to keep her in jail and make her have her baby there if she did not make a statement; prosecution offered no evidence to contradict witness's testimony).

We have also identified a few Maryland cases that are relevant, although not directly on point. *See, e.g., State v. Stanley*, 351 Md. 733, 748 (1998) (prosecutor's statement to State's witness that "she would be prosecuted for perjury if she did not tell the truth" was not a violation of the defendant's Sixth Amendment right to compulsory process, but warnings "should be general in nature *and must not directly intimidate or coerce a witness into silence*"); *Wilson v. State*, 261 Md. 551, 557 (1971) (concluding that the issue of whether the grand jury testimony of a State's witness was "coerced, and therefore presumably untrue, was a question for the jury...."); *Hensen v. State*, 133 Md. App. 156, 165 (no due process violation when the prosecutor told a State's witness on the day of trial, "if you fuck with me, you'll be sorry. All I want is the truth"), *cert. denied*, 360 Md. 486 (2000); *Pinder v. State*, 70 Md. App. 218, 227-28 (addressing

69

defendant's due process rights in regard to admission for impeachment of a witness's involuntary statement; "under normal circumstances, the voluntariness of a witness's statement affects its weight and credibility, not its admissibility.... [A]lthough a defendant has no constitutional right to be free from incrimination, under certain circumstances the violation of another's fifth amendment rights may rise to the level of a violation of defendant's constitutional right to a fair trial"); concluding that admission of witness's statements did not deprive defendant of a fair trial), *cert. denied*, 310 Md. 2 (1987).

Even assuming appellant has challenged the pre-trial statements of Tasha and Maurice, and further assuming that the alleged misconduct of the police actually occurred, we are satisfied, based on our review of the transcripts and the case law, that such police conduct was hardly "so opprobrious" as to require the exclusion of the statements at appellant's trial. *Pinder*, 70 Md. App. at 231. The problematic conduct in some of the cases cited above is a far cry from what was alleged here. Therefore, under the circumstances of this case, the court below correctly permitted defense counsel to elicit the witnesses' versions of events, with the jury as the ultimate arbiter of the voluntariness and reliability of the witnesses' statements.

> [I]f the *police, during the investigatory stage,* threaten a witness into making a *statement*, without using egregious tactics, there is a lesser likelihood of constitutional violation—a violation of the defendant's

70

*due process right to a fair trial*, free of unreliable
evidence being admitted against him at trial.[1] However,
like most inquiries into due process voluntariness, the
issue turns on the totality of the facts in each case.

Andrew V. Jezic, et al., MARYLAND LAW OF CONFESSIONS § 5.8 at 198-99.

### III.

Appellant next claims that the trial court erred in allowing
the State to impeach Bryant with her oral statement to Detective
MacGillivary on August 12, 2002.   He contends that the State
violated Md. Rule 5-607,[30] claiming: "It is only in the absence of
prior knowledge or suspicion that a witness is recanting that a
party may impeach its own witness under Rule 5-607."

When Bryant was called to testify in the State's case-in-
chief, she provided an alibi for DeWitt (in contrast to her pre-
trial statement).    According to appellant, based on "the
prosecution's direct examination of Bryant, the State knew that Ms.
Bryant was not going to testify in accordance with her pre-trial
statement, in which she claimed that she picked up DeWitt at around
3:45 a.m., i.e., after the shooting.  He adds: "The prosecution
certainly was not taken by surprise that Ms. Bryant testified [at
trial] that she picked up Mr. DeWitt at 12:00 a.m. and they went to
the Inner Harbor for a while before they drove to Montpelier Street

---

[30] Maryland Rule 5-607 states:

**Rule 5-607.  Who may impeach.**

> The credibility of a witness may be attacked by any party,
including the party calling the witness.

71

by 3:00 or 4:00 a.m."

Analysis of this contention requires further scrutiny of the facts.

Bryant testified at trial that she owned a blue Taurus station wagon which previously had a license plate numbered "JLL098." She claimed that, on July 5, 2002, she picked up with appellant between midnight and 1:00 a.m. Bryant recounted that she and DeWitt first went and "got some drinks" and "some weed," then rode around "awhile longer," and then went to the Harbor, where they walked around and "sat and talked for a long time[.]" Bryant added that the two "had sex" at a school parking lot, where they spent "[a]bout 45 minutes to about an hour" before heading back to Montpelier Street. According to Bryant, she dropped DeWitt off on Montpelier Street between 3:00 and 4:00 a.m.

The prosecutor then questioned Bryant regarding her statement to Detective MacGillivary in August 2002. Bryant did not recall telling the detective that, on the morning in question, she had picked appellant up at 3:30 a.m. on Montpelier Street. Rather, Bryant insisted that she had dropped appellant off at about that time. Bryant agreed that she told the detective that she drove down Montpelier Street two or three times, but denied that she told Detective MacGillivary that, once appellant was in the car with her and they were driving down Montpelier Street, a red or burgundy car started to follow them. Further, she stated that she did not tell Detective MacGillivary that, on her third pass down the street, she

72

stopped her car and appellant got out and ran down the alleyway. Nor did she tell the detective that she later met appellant at Harford Road and 25th Street.

At this point, defense counsel objected on the grounds that he had not been given Detective MacGillivary's notes from his interview with Bryant. Counsel stated that he would need the notes prior to cross-examination of Bryant. The prosecutor responded that defense counsel had been given an opportunity to review the detective's notes. The following exchange then occurred:

> THE COURT: Well what's bothering me at the moment is, is that you have a right to examine a witness. At the moment this witness hasn't been given an opportunity to review the statements that you claim that was given to someone else. If you are attempting to attack her credibility (inaudible) as to the testimony given. The problem I have here is is that the objection was made (inaudible) but it appears that you have called her for the purpose of simply to cross examine her.

> [PROSECUTOR]: I called her – she – I called her for the purpose - I didn't know when she got on the stand that she was going to recant the statements she has recanted.

> THE COURT: What has she recanted?

> [PROSECUTOR]: Everything that she told Detective MacGillivary she's totally recanted.

> THE COURT: What we now have – my concern is, is that if you've called her purely to cross examine her to (inaudible) Detective MacGillivary's interview of her and statements, I'm concerned as to the ability for you to review notes. I'd ask you to give a copy of the notes to him now.

> [PROSECUTOR]: Okay.

> THE COURT: Proceed.

* * *

73

[DEFENSE COUNSEL]: Your Honor, at this point I would also object because I know that this State's Attorney has been talking to this witness over the course of the past several days at length. I've never heard what was being said. I think the State's Attorney may have knowledge that this witness intended to get on the stand and recant, and I think that if that is so, that this line - what she is doing - what the State's Attorney is doing through this witness is specifically prohibited by Maryland case law; namely putting a witness on the stand knowing that she's not going to testify, just in an attempt to impeach her and put on an inconsistent statement through her.

[PROSECUTOR]: Your Honor, if I may respond? Your Honor, we have been trying to locate Ms. Bryant. I have - I didn't speak to Ms. Bryant until today. We have tried on numerous occasions for the last few days to reach her. I have not spoken to Ms. Bryant until today. When I spoke to Ms. Bryant I asked her some questions. I then came back and explained to Ms. Bryant the importance of her telling the truth. I was not clear on what Ms. Bryant was going to say when she got on that stand. I asked her a couple questions and then I said to her, Ms. Bryant, it's important for you to tell the truth. She shook her head to me saying, yes, I understand that. And I assumed, based on my conferences with her that she would get on the stand and tell the truth as I know it and what she told Detective MacGillivary. And that's what I asked her. I asked her do you recall what you said to Detective MacGillivary? She said yes. And I said basically - and I asked her about that. And I said to her, you know, importance of telling the truth in this case, and she said I understand that. And that was the end of the conversation. I did not know what Ms. Bryant was going to say when she got on the stand (inaudible). And today was the first time I had any conversation with her about her possible testimony. I have not talked to her in the last few days. We've made attempts to call her but have not had actual conversations with her.

[DEFENSE COUNSEL]: Your Honor, I would just point out - and I don't mean to contradict Madam State's Attorney, but I did see her talking to Ms. Bryant in the hall yesterday afternoon at some length. I waited because -

THE COURT: Well, there's nothing wrong with her or you speaking to your witness.

[PROSECUTOR]: We didn't talk about the testimony. I asked her —

THE COURT: Or that you could have spoken to her yesterday as well. No on can prohibit you from talking to a State's witness. (Inaudible). (Inaudible) is that I hold both of you in high regard and I'm kind of just taken aback.

[PROSECUTOR]: Your Honor, I —

THE COURT: Excuse me. What I'm attempting to say is the following. Be reminded that this is the witness that the Court specifically stopped early yesterday to be recalled today. And so for the State to say, didn't have time to speak to her, the Court must conclude that —

[PROSECUTOR]: I didn't talk to her about the case. I talked to her about her ability to be here. I talked to her about, you know, this is a trial. I didn't talk about the facts, Your Honor.

THE COURT: I'm not — I'm not cross examining you.

[PROSECUTOR]: Yes, sir. I just wanted to make it clear when I —

THE COURT: I'm not. I'm not cross examining you.

[PROSECUTOR]: Yes, sir.

THE COURT: I'm just reminding both of you is that the Court (inaudible) what it considered early yesterday.

[PROSECUTOR]: Right.

THE COURT: And that (inaudible) was not called yesterday (inaudible) time to speak to her because obviously you had time after we left yesterday to do so. And if there were matters that could have been discussed between the two of you I would assume before we started this (inaudible) the two of you could have had some conversation. Your objection is overruled at this time, but it does cause me some concern.

Be reminded that what Counsel did do for the State is ask the questions, however, and go in the circle of what she did, where, when, how; and when she dropped off the Defendant and the time, etc. And then came this

75

barrage of questions, leading questions in the sense of close to a cross examination. That's what I'm bringing up. That's what I'm concerned about. However it appears at the moment, it may have been technically correct because the ruling now of case law is that she doesn't have to vouch for (inaudible) but it must be some indication to us that you've begun to attack her credibility as such.

Any witness that is being asked as an inconsistent statement should be given an opportunity to see the statement, review the statement, and then be asked as to whether or not it is true or whether or not the new statement is correct. I just want both of you to understand that in terms of prior inconsistent statements. Lets' move along.

A copy of Bryant's prior statement to MacGillivary was then provided to defense counsel. Direct examination of Bryant resumed.

The trial court later allowed Detective MacGillivary to testify regarding Bryant's earlier statement. Defense counsel was granted a continuing objection to this line of inquiry. The detective proceeded to testify that he, Detective Ritz, and the prosecutor interviewed Bryant on August 12, 2002, at the courthouse. During that interview, Bryant advised the detective that, on the date in question, at approximately 3:45 a.m., she went to Montpelier Street, where she met with some friends and learned of the shooting. At 4:00 a.m., she and appellant got into her car and drove somewhere to have sex. Bryant further informed the detective that, as they drove, she noticed a car following them. Eventually, Bryant drove down the 1700 block of Montpelier Street, stopped the car, and appellant got out and ran down an alleyway.

As indicated, appellant complains that the prosecutor's direct

76

examination of Bryant demonstrates that the State knew that Bryant would recant. He refers us to the trial court's comment that it appeared that the State called Bryant in order to cross-examine her. Further, he points out that the court made no finding that the prosecution was unaware of Bryant's decision to recant. Appellant also argues:

> Admitting this impeachment testimony of Detective MacGillivary was error under *Walker* [v. *State*, 373 Md. 360 (2003)], *Bradley* [v. *State*, 333 Md. 593 (1994)], and *Spence* [v. *State*, 321 Md. 526 (1991)]. The only relevant information Ms. Bryant could present at the trial was the whereabouts of Mr. DeWitt. Despite its protestations to the contrary, it is clear from the State's comments and actions in this case that it knew or believed that Ms. Bryant did not intend to testify in accordance with her prior statement and called her nonetheless for the sole purpose of justifying the admission before the jury of the impeachment testimony which did not give Mr. DeWitt an alibi for the time of the shooting. The trial court erred under *Walker* in permitting the impeachment.

The admissibility of a witness's prior oral statement is governed by Maryland Rule 5-613. Rule 5-613(a) provides, in part, that a party examining a witness about a prior oral statement need not show it to the witness or disclose its contents, provided that, before the end of the examination, (1) the contents of the statement and the circumstances under which it was made are disclosed to the witness, and (2) the witness is given an opportunity to explain or deny it. Subsection (b) of the Rule provides that extrinsic evidence of a prior inconsistent statement by a witness is not admissible until the requirements of subsection (a) are met, the witness fails to admit making the statement, and

77

the statement concerns a non-collateral matter. *See also Foreman v. State*, 125 Md. App. 28, 30 (1999) (discussing Rule 5-613). Moreover, a prior inconsistent oral statement is admissible to impeach a witness's credibility. *Hardison v. State*, 118 Md. App. 225, 235 (1997).

Under Rule 5-607, a party may impeach his own witness. However, the right to impeach the credibility of one's own witness with a prior oral statement is subject to some limitation.

*Spence v. State*, 321 Md. 526 (1991), is instructive. There, three young males broke into a woman's home, attacked her, locked her in a closet, ransacked her house, and stole jewelry, cash, and her car. 321 Md. at 527. The woman was unable to identify any of her attackers. *Id.*

One of Spence's alleged accomplices, Vincent Cole, pled guilty and was sentenced to ten years' imprisonment. *Id.* At Spence's trial, Cole was called to testify in the State's case. *Id.* Spence's counsel voiced concern that Cole's counsel was not present and that Cole had not been informed of his Fifth Amendment rights. *Id.* at 527-28. During the bench conference, "Cole made it clear that he did not want to testify, that he wished to consult with his attorney, and that his testimony would be exculpatory as to Spence since he would testify that Spence was not with him when the crime was committed." *Id.* at 528. The prosecutor also indicated that Cole would testify that Spence was not involved in the burglary and

78

that Cole might deny having previously told the police that Spence was involved. *Id.* 528. The prosecutor explained that his purpose in calling Cole "was to get before the jury prior out-of-court statements Cole had made to police officers that, in fact, Spence was one of the perpetrators of the burglary and robbery of [the victim]." *Id.* The prosecutor asked that Cole be called as a Court's witness because Cole would testify that Spence did not participate in the burglary and the prosecutor wanted to impeach that testimony. *Id.*

Over defense objection, Cole was called as a court's witness and ordered to testify, under threat of contempt. *Id.* at 528-29. During Cole's extremely brief direct examination, he stated that he knew Spence, that he (Cole) had been at the victim's home, and that he had been there with one Arthur Johnson and no one else. *Id.* at 529. The prosecutor then cross-examined Cole concerning the statements Cole had made to various police officers. *Id.* Cole admitted confessing his own involvement to the police, but denied telling the police that Spence had participated. *Id.* He stated that he had told the police only that he was acquainted with Spence. *Id.* The prosecutor also questioned Cole by reading from Detective Naylor's typed notes of an oral statement allegedly given by Cole, in which Cole acknowledged committing the crime with both Johnson and Spence. Cole testified that the detective's notes were inaccurate and denied that he implicated Johnson or Spence. *Id.*

79

Following Cole's testimony, Detective Naylor was called. *Id.* Over objection, he testified that Cole had informed him that he had committed the burglary with several others, including Spence. *Id.*

Spence was convicted of robbery with a deadly weapon and common law burglary. This Court held that Cole's extra-judicial statements, including those implicating Spence, were properly admitted for purposes of impeachment. The Court of Appeals reversed, however. It said, *id.* at 530:

> It is obvious that the prosecutor's sole reason for prevailing on the court to call Cole as a court's witness was to get before the jury Cole's extrajudicial hearsay statement implicating Spence. The prosecutor knew that Cole's testimony would be exculpatory as to Spence. The inescapable conclusion is that the State, over objection, prevailed on the court to call a witness who would contribute nothing to the State's case, for the sole purpose of "impeaching" the witness with otherwise inadmissible hearsay.

The Court noted "that Detective Naylor's testimony about Cole's statements regarding Spence's participation did not fall within the hearsay exception and was inadmissible as substantive evidence against Spence." *Id.* It rejected the State's contention that, even though Cole's extra-judicial statements were not admissible as substantive evidence, they were admissible to impeach Cole. The Court reasoned, *id.*:

> This blatant attempt to circumvent the hearsay rule and parade inadmissible evidence before the jury is not permissible. The State cannot, over objection, have a witness called who it knows will contribute nothing to its case, as a subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay evidence.

80

The Court continued, *id.* at 530-31:

> The sole value to the State from Cole's testimony was that it opened the door for the "impeaching" testimony of Cole's prior inconsistent statement. The statement was one which the State knew Cole would not acknowledge making. The obvious purpose of calling Cole was not because Cole would contribute anything to the State's case, but because Cole's testimony would enable the State to place Cole's prior statement before the jury and to call Detective Naylor to "impeach" Cole. The improper prejudicial effect is obvious. We must conclude that Cole's statement and Naylor's testimony about Cole's hearsay statement implicating Spence was not offered because the State needed to impeach a witness it insisted be called -- the hearsay was really being offered as evidence of Spence's guilt.

Relying on *United States v. Webster*, 734 F.2d 1191 (7th Cir. 1984), the Court of Appeals added that "'"impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible."'" *Spence*, 321 Md. at 531-32 (quoting *Webster*, 734 F.2d at 1192 (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975))).

Appellant also refers us to *Bradley v. State*, 333 Md. 593 (1994). There, as the victim exited her car, a man approached her, placed a gun to her stomach, ordered her back into her car, and forced her to drive several blocks. *Id.* at 596. When the victim screamed, the assailant ordered her out of the car, took her purse, and drove off. *Id.* Ten days later, the defendant was apprehended after he fled from the victim's car. *Id.* The victim made a pre-trial identification of the defendant from a photo array, but

81

evidence was also presented of a pre-trial photo misidentification. *Id*. at 596-97.   At trial, the victim made an in-court identification of the defendant as the assailant. *Id*. at 596.

To establish that the defendant was in the victim's car shortly after the vehicle was taken, the State presented the bill for the victim's car phone, which indicated that calls were placed to a particular phone number from the car phone within one-half hour of the theft. *Id*. at 597.   The State then called Adrian Bradley ("Adrian"), the defendant's cousin, who testified that his home telephone number matched the number on the bill and that he received one or two phone calls from the defendant at a time that would have been after the victim's car was stolen. *Id*.   Over defense objection, the prosecutor elicited testimony from Adrian in which he denied telling a detective that, during their phone conversations, the defendant had said that he had stolen a car. *Id*.   Adrian also denied informing the detective that he told the defendant that he was stupid for stealing the car. *Id*.

The State was not surprised by Adrian's denials as, prior to this line of questioning, the prosecutor informed the trial court: "I am not claiming surprise...." *Id*.   The prosecutor explained that Adrian had since denied that the defendant had called and stated that he had stolen a car. *Id*. at 598.   The State was then permitted to call Detective Sizemore, who recounted an interview with Adrian, in which Adrian said that, in his conversations with

the defendant, the defendant had bragged about stealing a car. *Id.*
The trial court instructed the jury that the testimony concerning
the phone calls in which the defendant had allegedly bragged about
stealing a car were to be considered only in assessing Adrian's
credibility. *Id.*

The defendant was convicted, *inter alia*, of kidnaping, robbery
with a deadly weapon, and use of a handgun. *Id.* Relying on
*Spence*, the Court of Appeals reversed, writing:

> Although *Spence* dealt with the "calling" of a
> witness for the "sole purpose" of introducing, via
> impeachment, an otherwise inadmissible prior inconsistent
> statement, its rationale equally applies to the instant
> case. This case involves what we shall call an
> "independent area of inquiry." The State called Adrian
> Bradley to establish that he was the defendant's cousin,
> that his phone number corresponded with the number on the
> victim's car phone bill (which indicated that a call was
> made shortly after the car was taken), and that the
> defendant did indeed speak with him from the car phone.
> After Adrian Bradley verified all of this information on
> the witness stand, it was improper for the State to
> inquire about the contents of the telephone conversation
> for the sole purpose of impeaching Adrian regarding the
> entirely separate matter of whether or not the defendant
> bragged about the crime in the telephone call. The State
> knew that Adrian Bradley would deny that the defendant
> confessed to the crime, yet still questioned him
> concerning the alleged confession. Thus, we are led to
> the "inescapable conclusion ... that the State, over
> objection, [questioned a witness concerning an
> independent area of inquiry knowing it] would contribute
> nothing to the State's case, for the sole purpose of
> 'impeaching' the witness with otherwise inadmissible
> hearsay." *Spence*, 321 Md. at 530. In accordance with
> the *Spence* rationale, we hold that it is impermissible
> for a party in a criminal case, over objection, to
> venture into an independent area of inquiry solely for
> purposes of "circumvent[ing] the hearsay rule and
> parad[ing] inadmissible evidence before the jury."
> *Spence*, 321 Md. at 530.

*Bradley*, 333 Md. at 601-02 (footnote omitted).

Further, the Court explained:

Today's holding is a limited one. It simply recognizes that, in a criminal case, a defendant is denied a fair trial if the State, with full knowledge that its questions will contribute nothing to its case, questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement. Of course, if the area of inquiry is not clearly independent, then the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case. Thus, in instances where a witness's testimony is not reasonably divisible into clearly separate areas of inquiry, the State may properly impeach any portion of the witness's testimony that disfavors the government's case.

\* \* \*

*We wish to emphasize that our holding is not applicable where there is no clearly independent area of inquiry or where failure to inquire into a possibly independent area of inquiry could create a gap in the witness's testimony such that a negative inference may arise against the prosecution.* Today's holding does not prohibit the State from attempting to fill such a gap by questioning and then impeaching the witness. We believe, however, that no such gap would result in the instant case if the contents of the telephone conversation were not placed before the jury. We do not believe the jury would draw an adverse inference against the State simply because the prosecution failed to ask Adrian Bradley about the contents of the telephone conversation.

*Further, the State is still entitled to impeach a witness with a prior inconsistent statement if the witness's testimony comes as a surprise.* For instance, if the State called Adrian Bradley expecting him to provide testimony favorable to the State, but Bradley unexpectedly did otherwise, impeachment would be permitted. *See Poole v. State*, 290 Md. 114, 118 (1981) (explaining that, even prior to the elimination of the voucher rule, impeachment of one's witness by a prior inconsistent statement would be permissible where "the calling party [was] surprised" by the witness's

84

testimony).  In this case, however, the State expressly informed the trial judge that it knew Adrian Bradley would deny any incriminating statements were made in the telephone conversation.

*Id.* at 604-07 (some citations omitted) (emphasis added).

The more recent case of *Walker v. State*, 373 Md. 360 (2003), also provides guidance. Gerald Myrick sold crack cocaine to an undercover officer on two occasions. *Id.* at 365-67. At the first sale, on May 3, 2000, the officer went to the pizza restaurant where Myrick worked and gave Myrick $100. *Id.* at 366. Myrick told the officer "his guy" was out back and, shortly thereafter, a silver Honda, driven by Walker, departed from the rear of the restaurant. *Id.* Several minutes later, Myrick emerged from behind the restaurant and handed three rocks of crack cocaine to the officer. *Id.* The next day, the undercover officer met Myrick at Myrick's house. *Id.* After receiving money from the officer, Myrick walked down the street and, at the corner, met up with another man where they waited until the silver Honda, again driven by Walker, pulled up. *Id.* Myrick approached the driver's side and the other man approached the passenger's side of the Honda and each appeared to make a hand-to-hand exchange with Walker. Myrick returned to his house and gave three rocks of crack cocaine to the undercover officer. *Id.*

Shortly thereafter, Walker's Honda was stopped. A wallet found underneath the driver's seat contained, *inter alia*, credit

85

cards bearing Walker's name and $70.00 of the marked bills used to make the purchase the previous day. *Id.* at 366-67. In a search of the Honda's passenger, the police recovered the marked $50.00 used to make the drug purchase that day. *Id.* at 367. After being promised immunity from prosecution, Myrick was compelled to testify against Walker. *Id.* at 367. Pursuant to a plea agreement, Myrick gave a statement implicating Walker. *Id.* At the start of Walker's trial, however, the prosecutor learned that Myrick was no longer willing to testify and moved to compel his testimony. *Id.*

Outside the presence of the jury, the prosecutor called Myrick to the stand. He invoked his Fifth Amendment rights, and stated that he would refuse to testify. *Id.* After state and federal immunity was secured for Myrick, the trial court granted the prosecutor's motion to compel. *Id.* Myrick then testified that he had not obtained the crack cocaine he sold to the undercover officer from Walker. *Id.* at 367-68. Thereafter, the prosecutor announced her intention to impeach Myrick with his prior statement to the police, which implicated Walker. *Id.* at 368. The statement, although reduced to writing, had not been signed or otherwise adopted by Myrick. *Id.* Accordingly, the prosecutor acknowledged that the statement was not admissible as substantive evidence under *Nance v. State*, 331 Md. 549 (1993). The prosecutor also proffered that she was taken by surprise by Myrick's testimony. *Walker*, 373 Md. at 368. Although defense counsel was

86

skeptical that the prosecutor was taken by surprise, the trial court found that the prosecutor was surprised by Myrick's testimony and permitted the prosecutor to attempt to impeach him. *Id.* at 369. Myrick then admitted that he had previously stated that he had obtained the crack cocaine from Walker. *Id.* at 369-70. Myrick added, however, that his statement was a lie. *Id.* at 373.

Walker was convicted on the counts relating to the second sale of crack cocaine to the undercover officer and acquitted on the counts arising from the first sale. *Id.* at 373. On appeal, Walker alleged, *inter alia*, that surprise is a necessary element before a party may impeach its own witness. *Id.* at 379. The Court of Appeals disagreed, stating that "proof of surprise is not a necessary prerequisite under Md. Rule 5-607 analysis." *Id.*[31] The Court commented that in *Bradley* it "stated that 'the State is still entitled to impeach a witness with a prior inconsistent statement if the witness's testimony comes as a surprise.'" *Walker*, 373 Md. at 387 (quoting *Bradley*, 333 Md. at 606). The Court further noted that the meaning Walker attributed to that statement was not the meaning the Court attributed to it. *Walker*, 373 Md. at 387.

---

[31]This Court affirmed the judgments of the trial court, holding, in part, "that surprise is no longer a prerequisite to a party's impeachment of its own witness under Md. Rule 5-607" and that "[t]he subterfuge limitation is the only limit to a party's impeachment of its own witness under the rule." *Walker*, 144 Md. App. 505, 518 (2002), *rev'd on other grounds*, 373 Md. 360 (2003). Before this Court, Walker also challenged the denial of his motion for mistrial because the prosecutor questioned Myrick about a prior meeting between Myrick and the prosecutor. 144 Md. App. at 535-42. We affirmed the denial of the motion, 144 Md. App. at 541-42, but the Court of Appeals reversed on that ground. 373 Md. at 404-05.

87

The *Walker* Court explained, *id.* at 387-88 (footnote omitted):

[Walker] asserts that *Bradley* reinvigorates the surprise prerequisite as it existed under the voucher rule. We interpret *Bradley* to mean that a showing of surprise by the calling party is but one possible indication that the calling party did not have full knowledge that the witness would recant on the stand. In the absence of such knowledge, the party may impeach its own witness's testimony pursuant to Rule 5-607. As we stated in *Bradley*, if the State did not create the need to impeach its witness's testimony, then it is permitted to impeach its witness with a prior inconsistent statement. 333 Md. at 607. If a witness is called by a party to provide testimony helpful and relevant to that party's case and the witness's testimony is admissible, then the witness is permitted to testify. If a witness's testimony is intended to be relevant to the calling party's case, but the witness answers the calling party's question(s) in an unexpected manner, such that the calling party then seeks to impeach its own witness through his or her prior statements, the determination must be made by the court, taking into account the entirety of the witness's testimony, whether the calling party called the witness merely as a subterfuge to permit impeachment evidence that advances the party's case or whether the calling party legitimately expected the witness would testify as he or she indicated prior to trial. If the witness's testimony is relevant to matters other than the "recanting" statements, then the witness was not called as a subterfuge and the question eliciting the "recanting" statements must be scrutinized to determine whether the question concerned an "independent area of inquiry." When the area of inquiry is clearly not independent, then "the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case." 333 Md. at 604. Subterfuge, whether examined in terms of a witness's entire testimony or on a question-by-question basis, should not be permitted under our reasoning in *Spence* and *Bradley*.

Applying these principles to the case before it, Judge Harrell wrote for the Court, 373 Md. at 388-90 (footnote omitted):

Unlike the scenarios presented by *Spence* and *Bradley*, the witness in the present case, Myrick,

88

provided testimony relevant to the State's case and the
recanting portion of his testimony was not clearly an
attempt by the prosecution to admit inadmissible
inculpatory evidence. Viewed in a light most favorable
to Walker, the inference that the prosecutor might have
been suspicious that Myrick would give a different
"version" in his testimony does not mean necessarily that
the prosecutor called him merely as a subterfuge or that
the pertinent line of questioning was an independent area
of inquiry designed to open the door to admit otherwise
inadmissible evidence to impeach Myrick's recanting
statements.    Like the witness in *Bradley*, Myrick
possessed relevant testimony to offer aside from the
statements amenable to impeachment. Unlike the witness
in *Bradley*, however, the State in Walker's trial did not
embark on an independent line of inquiry intending to
elicit     statements     requiring     impeachment.     The
prosecutor's pertinent line of questioning was intended
to elicit information about the meeting between Myrick
and Walker on 3 May 2000 at the pizzeria.   Myrick's
testimony departed from the prosecutor's expectations
when he was asked about the transaction behind the
pizzeria. The prosecutor anticipated that Myrick would
testify that Walker gave him the cocaine in exchange for
the money given Walker by [the undercover officer].   He
departed from his statement to the police to that effect
and instead said that he paid Walker for some unrelated
debt behind the pizzeria and picked some cocaine up from
the ground to give to [the undercover officer].    The
prosecutor may have been suspicious as to some things
Myrick might say, but, on this record and without more,
that does not imply solely that she had "full knowledge"
that he was going to give that particular variation on
his statement to the police at trial.    In fact, the
record reveals that the prosecutor had every reason to
expect that Myrick would testify as anticipated.
Although Myrick initially refused to testify at trial and
indicated his intent to exercise his Fifth Amendment
rights if called by the prosecution, the State secured
both State and federal immunity from prosecution in order
to ensure that Myrick would testify truthfully about the
events implicating Walker.

Further, the Court observed that the prosecutor's questions

were "intended to elicit the testimony that Myrick had received the

cocaine from Walker" after he gave Walker the undercover officer's

89

money, which was not an "independent line of inquiry." *Id.* at 390.

The Court of Appeals explained that, without that inquiry, "the

direct examination of Myrick would be incomplete" and "the jury

would be left wondering what happened behind the pizza restaurant

where both Myrick and Walker were present...." *Id.*   The Court

added, *id.*:

> [E]ven if the prosecutor had not been allowed to ask
> Myrick the questions eliciting the recanting testimony,
> Myrick's testimony was helpful and relevant to the State
> insofar as it corroborated [the undercover officer's]
> testimony and established that Myrick did not have
> cocaine on his person when he went behind the pizzeria,
> but reappeared with cocaine shortly thereafter.   It is
> clear that had testimony been allowed only on these
> points the jury would be left wondering where the cocaine
> came from and why Myrick was paying Walker if Walker did
> not give Myrick the cocaine.

The Court of Appeals went on to conclude that the unfair

prejudice of this evidence was outweighed by its probative value.

*Walker*, 373 Md. at 391-92.   The Court penned, *id.*:

> Myrick's prior statement obviously prejudiced Walker
> because the statement directly implicated Walker as a
> participant in the distribution of the cocaine.   The mere
> fact that Myrick's prior statement was not advantageous
> to the defense at trial does not make it unduly or
> unfairly prejudicial within the meaning of the balancing
> test.   The probative value of Myrick's prior statement,
> however, was significant because it indicated that Myrick
> had lied about his meeting with Walker and impeached his
> testimony at trial.   The prejudice to Walker did not
> outweigh the considerable probative value of his prior
> statement and the trial judge therefore did not abuse his
> discretion.

In appellant's case, defense counsel did not raise any

objection until the prosecutor had thoroughly questioned Bryant

regarding her prior statement.  In *Spence* and *Bradley*, however, a defense objection was made as soon as the prosecutor inquired into the witnesses' prior statements.  Also, in *Walker*, when the prosecutor alleged surprise and stated her intention to impeach Myrick with his prior statement, defense counsel challenged that assertion of surprise.

In further contrast to *Spence* and *Bradley*, and akin to *Walker*, here the prosecutor asserted that she did not know, before calling Bryant to the stand, that Bryant would recant her prior statement to Detective MacGillivary regarding the time she had picked appellant up and dropped him off, whether a burgundy car had followed her and appellant, and whether appellant got out of her car and ran down the alleyway.  Also, in appellant's case, the prosecutor proffered that, although she had spoken with Bryant before Bryant was to testify, their conversation concerned Bryant's transportation to the courthouse and the importance of telling the truth.  Thus, appellant's case is more like *Walker*, where the prosecutor also stated that she did not know that Myrick would recant his prior statement.

The court below initially observed that it appeared as if Bryant had been called so that the prosecutor could cross-examine her.  But, after the prosecutor explained the nature of her contact with Bryant, the court retreated from this position, albeit not entirely.  The court commented that it was not "cross-examining"

91

the prosecutor and noted that although the situation caused the court "concern," the court accepted the prosecutor's explanation and proffer that she was surprised by Bryant's testimony.

Accordingly, the prosecutor did not call Bryant for the purpose of presenting her extra-judicial statement to the jury. Rather, as in *Walker*, the prosecutor called Bryant without knowing that she would repudiate her former statement.

Moreover, the circumstances demonstrate that Bryant was not called as a subterfuge. As required by *Walker*, 373 Md. at 387, Bryant's testimony was relevant to matters other than the recanted statements. Her testimony pertained to important matters beyond the time she picked up and dropped appellant off. For example, Bryant testified to the make, model, and tag number of her car, which was seen traveling with DeWitt on Montpelier Street after the shooting. Thus, her testimony was part of the circumstantial evidence that DeWitt was the shooter.

Furthermore, the matters concerning the times appellant was with Bryant in her car, whether they were followed by another car, and whether appellant got out of Bryant's car on Montpelier Street were not independent areas of inquiry; they could not be separated from the whole of Bryant's testimony. Put another way, the recanted statements were part of the same line of questioning regarding the activities of Bryant and appellant on the date in question.

92

Therefore, we conclude that the trial court properly allowed the State to question Bryant about her prior statement. And, when Bryant denied making the prior statement, it properly allowed MacGillivary to offer extrinsic evidence of her statement.

Finally, DeWitt contends that the trial court erred because it failed to make a clear determination that the probative value of the impeachment evidence outweighed its prejudicial effect. The same complaint was rejected in *Walker*, where the Court noted that "there is no requirement that the balancing test explicitly be performed on the record." 373 Md. at 391. Indeed, in the case at bar, defense counsel specifically argued that the trial court needed to weigh the probative value of the impeachment against its prejudicial effect, so the court was well aware of the contention. Moreover, the probative value of Bryant's prior statement was considerable; it tended to show that she was lying when she testified at trial that she and DeWitt were together when the shooting occurred, but were not in the vicinity of Montpelier Street. We agree with the State that the probative value of this evidence outweighed any unfair prejudice to DeWitt.

### IV.

Appellant claims that the evidence was insufficient to sustain his convictions because there was no eyewitness to the shootings. He stresses that neither Tasha nor Maurice Booker identified him as the shooter. Rather, "at most," they observed him with a gun after

93

the shooting. Further, he contends that Maurice's testimony was directly counter to any identification of appellant as the shooter, because Maurice stated that the shooter's arm was light-skinned, but appellant is dark-skinned. He also asserts:

> Moreover, there was no evidence which tangibly or forensically linked Mr. DeWitt to the crime. The handgun was never recovered from the scene or from anywhere else. There were no fingerprints found on the scene on the bullets or otherwise. There was no gunshot residue or DNA evidence or anything concrete and incorruptible to link Mr. DeWitt to the scene.
>
> In sum, there was nothing on which a rational trier of fact could find beyond a reasonable doubt that Mr. DeWitt shot either Maurice Booker or Sherene Moore. His convictions must be reversed.

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (citations omitted). We give "'due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Moye v. State*, 369 Md. 2, 12 (2002) (quoting *McDonald v. State*, 347 Md. 452, 474 (1997) (quoting *State v. Albrecht*, 336 Md. 475, 478 (1994)).

The evidence, viewed in a light most favorable to the State, demonstrated that the shots that killed Moore and injured Maurice Booker were fired from the corner of Montpelier Street and Polk

94

Avenue.   A man's light-skinned arm was seen reaching around a
building at the corner holding a gun.

In Maurice's pre-trial statement to the police, he indicated
that, after he was shot, he ran down the alley frm Montpelier
Street, where he saw appellant in possession of a gun.  According
to Maurice, appellant attempted to shoot him, but the gun either
jammed or was out of ammunition.  Maurice believed that the gun was
an automatic, which would be consistent with the type of weapon
fired from around the corner of Montpelier Street and Polk Avenue,
since cartridge casings were recovered from that corner.   Tasha
Booker also indicated in her pre-trial statement that, when
appellant got out of Bryant's car, he was in possession of a gun,
which Tasha believed was an automatic weapon.

Maurice identified appellant from a photographic array and
wrote on the back of the array, "He shot me."  Although Maurice
denied that he saw the shooter, and later recanted his pre-trial
statement, the jury could rely on his pre-trial identification in
finding that appellant was the shooter.  *See Branch v. State*, 305
Md. 177, 184 (1986) (testimony of a single eye witness will support
a jury conviction); *Walters v. State*, 242 Md. 235, 237-38 (1966)
("Identification by the victim is ample evidence to sustain a
conviction.   The testimony of a victim, unlike that of an
accomplice, needs no corroboration.")  (Citations omitted).

The State's evidence also demonstrated that, shortly after the

95

shooting, appellant was seen as a passenger in Bryant's car as Bryant drove through Montpelier Street several times, followed by Wright in his burgundy car. On one of the passes along Montpelier Street, Bryant stopped the car, appellant exited the car while in possession of a gun, and ran down the alleyway. A rational trier of fact could infer that, by taking the route along which Maurice had fled, appellant was searching for Maurice, a competing drug dealer with whom appellant's partner was involved in a dispute.

In this regard, the jury could conclude from appellant's statement to the police that appellant and Gaines sold crack cocaine together; Maurice and Wright were competing drug dealers; and the shooting arose from a disagreement between Gaines and Wright over drug money. During the altercation, Wright had threatened to kill Gaines. As appellant explained in his statement, because of Wright's threat it was thus necessary for Gaines to kill Wright before Wright had the chance to kill him. To be sure, appellant indicated that he was not present when the altercation arose between Gaines and Wright. However, he was Gaines's partner in the drug trade. In addition, he stated that he and Gaines were "real tight." As a result, the jury could infer that any altercation involving Gaines with rival drug sellers would, of necessity, include appellant. A rational trier of fact could further infer appellant's motive to shoot Maurice and Wright.

As noted, evidence was presented that witnesses saw a light-skinned arm firing the shots from around the corner, but that

96

appellant was a dark-skinned man.  "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley*, 351 Md. 733, 750 (1998).  This discrepancy was for the jury to resolve.  It does not require the conclusion that appellant did not commit the offenses at issue.

Lastly, appellant's conviction may be supported by circumstantial evidence alone.  *See Hall v. State*, 119 Md. App. 377, 393 (1998) ("Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused[.]") (Citation omitted).

In sum, the evidence was sufficient to sustain appellant's convictions.

**v.**

Appellant claims that the trial court committed three errors in its instructions to the jury.  We first set forth some general principles concerning instructions to the jury, and shall then consider appellant's claims *seriatim*.

Maryland Rule 4-325(c) provides:

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding.  The court may give its instructions orally or, with the consent of the parties, in writing instead of orally.  The court need not grant a requested instruction if the matter is

97

fairly covered by instructions actually given.

This rule "has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it." *Hof v. State*, 337 Md. 581, 612 (1995) (citations omitted). Further, in determining whether a trial court's instruction is objectionable, we do not focus on any one portion; rather, we view the instruction as a whole. *Bruce v. State*, 328 Md. 594, 614 (1992), *cert. denied*, 508 U.S. 963 (1993).

### A. The Flight Instruction

During discussions between the court, the prosecutor, and defense counsel concerning jury instructions, defense counsel sought to comment on the flight instruction. The following exchange occurred:

> [DEFENSE COUNSEL]: Your Honor, also, could I be heard on the flight instruction?
>
> THE COURT: You can, but I'm giving it.
>
> [DEFENSE COUNSEL]: Simply, Your Honor, I don't think – I'd just like to say for the record I don't believe there's been any clear evidence of flight by the Defendant generated.
>
> THE COURT: Have you looked at the flight instruction that's in the Pattern?
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: Okay.  Pattern flight instruction says specifically is that [the jury] first must come to a determination as to whether or not there is in fact flight or concealment. That's what the instruction says. That's the way I give it.
>
> [DEFENSE COUNSEL]: Thank you, Your Honor.

98

Thereafter, the court instructed the jury on flight:

> Ladies and gentlemen of the jury, Madame Forelady, you are hereby instructed that a person's flight or concealment immediately after the commission of a crime or act of being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight or concealment under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first determine or decide whether there is in fact evidence of flight or concealment.

> If you decide there is evidence of flight or concealment, you then must decide whether that flight or concealment shows consciousness of guilt.

Following all the instructions, defense counsel renewed his objection to the flight instruction.

On appeal, appellant argues that the trial court "abdicated its role of finding a factual justification" for the flight instruction when it stated that it would give the instruction because the instruction requires the jury to first determine whether or not there is in fact flight or concealment. We disagree.

"To generate a jury issue regarding flight, there must be 'sufficient evidence which, if deemed weighty and credible by the trier of facts, would support a finding' that appellant attempted to flee or conceal evidence." *Rice v. State*, 89 Md. App. 133, 143 (1991), *cert. denied*, 325 Md. 397 (1992) (quoting *Fisher v. State*, 28 Md. App. 243, 249 (1975), *cert. denied*, 276 Md. 743 (1976)). "[W]hile there may be evidence which weakens the inference of guilt

99

implicit in flight, that evidence ordinarily 'does not render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such flight.'" *Sorrell v. State*, 315 Md. 224, 228 (1989) (quoting *Wharton's Criminal Evidence* § 124 at 450 (C. Torcia 13th ed. 1972)). In addition, the flight doctrine has been applied to a broad spectrum of behavior occurring after the commission of a crime, including flight from the scene. *Sorrell*, 315 Md. at 228 (quoting C. McCormick, *McCormick on Evidence* § 271 at 803 (E. Cleary 3rd ed. 1984); *see also Clay v. State*, 211 Md. 577, 584-85 (1957) (flight from scene of crime before arrival of police may be considered as bearing upon defendant's guilt). Further, "[f]light does not have to be practically contemporaneous with the crime to be evidence of some consciousness of guilt, but the lapse of time between the crime and the flight goes to the weight to be accorded to the circumstance." *Hines v. State*, 58 Md. App. 637, 668 (1984) (citation omitted).

In this case, there was evidence that, following the shooting, appellant got out of Bryant's car and ran down the alley off Montpelier Street. Accordingly, there was evidence of flight from the scene. Arguably, appellant could have been running in pursuit of Maurice, rather than fleeing from the scene. We believe that the trial court's response to defense counsel that the jury must first determine that there was flight reflects a recognition of this ambiguity. We are unable to conclude, however, that the trial

court failed to make the necessary determination that the flight instruction was supported by some evidence.

### B. The Transferred Intent Instruction

Appellant next claims that the trial court erred in its instruction on transferred intent, which provided:

> You're further instructed that the state of mind which one has when about to commit a crime upon another person is considered by law to be the state of mind to exist and to be equally applicable when the act causes harm to another person. The fact that the person actually intended to harm or kill another person and actually harmed or killed an unintended person is immaterial. The only issue is what would have been the degree of guilt if the intended result had been accomplished. The attempt to kill or harm the intended victim is transferred to the person who actually was harmed or killed [as] a result of thereof. [TVI. 36-37.]

Appellant contends that this instruction was incorrect, misleading, and confusing. In his view, the trial court erred in failing to "identify for the jury who was the intended victim in this scenario." As a result, asserts DeWitt, the instruction was incorrect because, if Moore were the intended murder victim, then the doctrine of transferred intent would not apply, nor would the doctrine apply to the attempted murder of Maurice Booker.

Further, appellant claims that since both Maurice and Moore were shot as a result of multiple shots fired in their direction, the scenario presented in the case was one of concurrent intent, and thus the jury should have been instructed on concurrent intent and the "zone of harm." Accordingly, appellant alleges that the trial court erred in failing to give an instruction on concurrent

101

intent and in giving a faulty transferred intent instruction.

Conceding that he failed to object to the transferred intent instruction and did not request an instruction on concurrent intent, appellant asks this Court to address his contentions as plain error.  We decline his request.

Maryland Rule 4-325(e) provides:

> (e) **Objection**.  No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.  An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

"Under Maryland Rule 4-325(e), we possess plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court."  *Danna v. State*, 91 Md. App. 443, 450, *cert. denied*, 327 Md. 627 (1992) (citation omitted).    Plain  error  is  "error  which  vitally  affects  a defendant's right to a fair and impartial trial."    *State v. Daughton*, 321 Md. 206, 211 (1990).  As the Court said in *Franklin v. State*, 319 Md. 116, 120 (1990), plain error "occurs when the erroneous jury instruction materially affects the issue to be decided with such impact that it deprives the defendant of a fair and impartial trial."  *See Dawkins v. State*, 313 Md. 638, 643 (1988); *Trimble v. State*, 300 Md. 387, 397 (1984), *cert. denied*,

102

469 U.S. 1230 (1985).

But, "there are some limitations on the affirmative act of noticing error. (1) There must be error. 2) It must be plain. 3) It must be material." *Morris v. State*, 153 Md. App. 480, 507 n.1 (2003)(internal citations and quotations omitted), *cert. denied*, 380 Md. 618 (2004). Accordingly, "[a]bsent plain error, we lack even the discretionary authority to analyze an unpreserved issue." *Stockton v. State*, 107 Md. App. 395, 398 (1995).

As the *Morris* Court observed, 153 Md. App. at 507, "appellate invocation of the 'plain error doctrine' 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon." The discretion recognized by Rule 4-325(e) is properly invoked only under circumstances that are "compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial." *State v. Hutchinson*, 287 Md. 198, 203 (1980); *see Walker*, 343 Md. at 649; *Richmond v. State*, 330 Md. 223, 236 (1993); *Bruce*, 328 Md. at 611. Put another way, "this discretion should be exercised in favor of review when the 'unobjected to error [is] compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.'" *Smith v. State*, 64 Md. App. 625, 632 (1985) (quoting *State v. Hutchinson*, 287 Md. 198, 203 (1980)).

Our decision to grant plain error review may have nothing to do with appellant's fortunes. An appellate court may exercise its discretion to overlook non-preservation "simply to seize the

103

occasion as a vehicle to communicate a desired message to bench and bar that might otherwise go unsent[,]" but, having said something once, there is a less compelling need to say it again. *Stockton v. State*, 107 Md. App. 395, 396-97 (1995), *cert. denied*, 342 Md. 116 (1996).  Other factors include the egregiousness of the trial court's error; the impact of the error on the defendant; and the degree of attorney dereliction in failing to lodge a timely objection to an erroneous instruction. *Morris*, 153 Md. App. at 518-24; *see Austin v. State*, 90 Md. App. 254, 268-72 (1992). Nonetheless, "[t]he touchstone remains, as it always has been, ultimate and unfettered discretion." *Austin*, 90 Md. App. at 268.

As we see it, this case does not present us with an opportunity to further expound upon the law of transferred intent, as the issue has been discussed many times by our appellate courts. *See, e.g.*, *Poe v. State*, 341 Md. 523, 530 (1996) ("The doctrine of transferred intent is typically applied where a defendant, intending to kill A, shoots at but *misses* A and instead kills B, an unintended victim.") (Citation omitted and emphasis in original); *Ford v. State*, 330 Md. 682, 716 (1993) ("In transferred intent, the intended harm does not occur to the intended victim, but occurs instead to a second unintended victim.  The actual result is an unintended, unanticipated consequence of intended harm."); *Gladden v. State*, 273 Md. 383, 405 (1974) (commenting that the "doctrine of 'transferred intent' had its earliest roots firmly embedded in the

104

English Common Law" and holding "that the doctrine of 'transferred intent' is the law of Maryland and that the mens rea of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim").

Further, the instruction was not confusing.  It was clearly based on the evidence that the shooting arose from a dispute between competing drug dealers -- Gaines and appellant against Maurice Booker and Wright.  Booker happened to be in the presence of a crowd of people; there was simply no evidence that Sherene Moore was an intended victim.

Lastly, we are unable to perceive any impact on appellant's case if an instruction on concurrent intent had been given.  In *Ford v. State*, *supra*, 330 Md. 682, the Court said:

> The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.  For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed.  Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group.  The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.  When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether

105

or not the defendant succeeded in killing A, the
defendant concurrently intended to kill everyone in A's
immediate vicinity to ensure A's death. The defendant's
intent need not be transferred from A to B, because
although the defendant's goal was to kill A, his intent
to kill B was also direct; it was concurrent with his
intent to kill A. Where the means employed to commit the
crime against a primary victim create a zone of harm
around that victim, the factfinder can reasonably infer
that the defendant intended that harm to all who are in
the anticipated zone. This situation is distinct from
the "depraved heart" situation because the trier of fact
may infer the actual intent to kill which is lacking in
a "depraved heart" scenario.

*Id.* at 716-17 (footnote omitted).

Accordingly, in concurrent intent analysis, "[t]he essential

questions ... become (1) whether a fact-finder could infer that the

defendant intentionally escalated his mode of attack to such an

extent that he or she created a 'zone of harm,' and (2) whether the

facts establish that the actual victim resided in that zone when he

or she was injured." *Harrison v. State*, 382 Md. 477, 495 (2004).

The Court of Appeals has noted that "courts have permitted an

inference that the defendant created a kill zone when a defendant,

like Harrison, fired multiple bullets at an intended target." *Id.*

Here, appellant merely makes the assertion that the doctrine

of concurrent intent applies, but he fails to inform us how that

would alter the outcome of his case. He presents no argument that

his attack failed to create a zone of harm or that Sherene Moore

was not within that zone when she was injured. *See Perry v. State*,

150 Md. App. 403, 438 (2002) (in declining to reach question as

plain error, this Court noted that the appellant "ignore[d] the

very real question of why the reviewing panel, if not required to address an issue, would wish to do so"), *cert. denied*, 376 Md. 545 (2003); *Jeffries v. State*, 113 Md. App. 322, 326 (explaining that plain error review is a "gratuitous process" and that "only instances of truly outraged innocence call for the act of grace of extending gratuitous process"), *cert. denied*, 345 Md. 457 (1997).

There was no error here, plain or otherwise.

### C.  Instructions Regarding the Verdict Sheet

The trial court instructed the jury to return a verdict for each charge on the verdict sheet and stated:

> Madame Forelady, ladies and gentlemen of the jury, you will be given a copy of a verdict sheet in this case to assist you during the course of your deliberation. In so doing, you will find that the verdict sheet that has been submitted to you has a total of nine separate charges referring to — I'm sorry, ten separate charges referring to two different charge numbers.
>
> You must consider each charge separately and return a separate verdict as to each charge. In other words in going over the charges, once you begin to deliberate and make your decision, you must review each charge separately as if it were the only charge on your paper and whether or not you find the Defendant not guilty or guilty.

Appellant posits that this instruction caused the jury to return inconsistent verdicts. He complains that the instruction

> violated Md. Rule 4-327(d) which provides that "where there are two or more counts, the jury may return a verdict with respect to a count as to which it has agreed and any count as to which the jury cannot agree may be tried again." Appellant argues that because the jury was instructed to render verdicts on all counts, Mr. DeWitt was convicted of both first degree and second degree murder of Sherene Moore and first and second degree

107

attempted murder of Maurice Booker as well as first and second degree assault of Mr. Booker. Appellant specifically argues that because a defendant cannot be guilty of both first and second degree murder of the same person as well as first and second degree attempted murder and assault of the same person, his convictions were inconsistent, a condition permitted by the erroneous jury instructions and one not remedied by the trial court....

Again, because appellant failed to object to this instruction, the contention is not preserved. Md. Rule 8-131(a). In any event, the jury did not render inconsistent verdicts. Rather, the jury convicted appellant of the first degree murder of Sherene Moore and attempted first degree murder of Maurice Booker, as well as lesser included offenses. The verdicts were not inconsistent; the trial court properly merged the lesser included offenses at sentencing.

**VI.**

Appellant maintains that the trial court failed to remain a neutral arbitrator and became an advocate for the prosecution. In his view, the court "ignored the repeated admonition of the Court of Appeals that the trial courts exercise their authority with care and refrain from questions which may pressure a witness to testify in a particular way so as to preserve their role as an impartial arbitrator and avoid the appearance of acting as an advocate." In particular, he posits that the court became an advocate for the prosecution when, during direct examination of Detective MacGillivary, the court instructed the prosecution to ask the detective: "Did there come a time that he in fact excluded Mr.

108

Moore as a suspect. Then go on from there."

At trial, appellant failed to raise any claim that the court acted as an arm of the prosecution. Thus, the claim is not preserved. Nonetheless, we shall address the contention, and readily conclude that it is without merit. We explain.

To present appellant's allegation in context, we quote from a portion of the exchange at issue:

> [PROSECUTOR]: Detective MacGillivary, during the course of your investigation were you able to determine or were you able to develop suspects sir?
>
> [DETECTIVE MACGILLIVARY]: Yes.
>
> [PROSECUTOR]: And who was your initial suspect sir?
>
> [DETECTIVE MACGILLIVARY]: Paris Moore.
>
> [PROSECUTOR]: Who is Paris Moore?
>
> [DETECTIVE MACGILLIVARY]: Paris Moore is a young man who lives down at Garrett and Bonaparte Street.
>
> [PROSECUTOR]: And can you describe Mr. Moore please?
>
> [DETECTIVE MACGILLIVARY]: He's short, around 4'9", 120 pounds. The photograph that I had of him at the time that I got out of our database he had long dread locks.
>
> [PROSECUTOR]: And did you continue your investigation of Mr. Moore?
>
> [DETECTIVE MACGILLIVARY]: I did.
>
> [PROSECUTOR]: And what was the relationship between Mr. Moore and Mr. Maurice Booker?
>
> [DETECTIVE MACGILLIVARY]: Apparently there was a dispute between –
>
> [DEFENSE COUNSEL]: Your Honor, I'm going to object to this.

109

THE COURT: Sustained.

[PROSECUTOR]: Detective MacGillivary, how did you eliminate Mr. Moore as a suspect?

[DEFENSE COUNSEL]: May we approach Your Honor?

THE COURT: Yes.

BENCH CONFERENCE

(Bench conference begins - 11:23:26)

(All Counsel and the Defendant approach the bench where the following ensues:)

[DEFENSE COUNSEL]: Your Honor, before the cat is out of the bag, I believe -

THE COURT: Is there a cat in the bag sir?

[DEFENSE COUNSEL]: Well Your Honor, once it's out it's out. And this - my lawyer sense tells me that this is either going to be hearsay, opinion, or some other inadmissible testimony.

THE COURT: [PROSECUTOR]?

[PROSECUTOR]: (Inaudible).

THE COURT: What is he going to say?

[PROSECUTOR]: He's just going to say that during the course of his investigation of suspects were developed that there's more information (inaudible).

THE COURT: So that [Defense Counsel] is not over reactive since the cat in the hat is playing, and we don't want it out of the bag, just the hat.

[PROSECUTOR]: (Inaudible).

THE COURT: *Would you mind asking him is; did there come a time that he in fact excluded Mr. Moore as a suspect. And then go on from there. Can we do that?*

[DEFENSE COUNSEL]: Thank you Your Honor.

110

THE COURT: Can we do that?

[PROSECUTOR]: Yes.

THE COURT: Wonderful.

(Bench conference concluded – 11:24:21)

(All Counsel and the Defendant return to the trial tables where the following ensues:)

DIRECT EXAMINATION – (Resumed)

[PROSECUTOR]: Detective MacGillivary, did there come a point in time that Mr. Moore was excluded as a suspect sir?

[DETECTIVE MACGILLIVARY]: Yes.

THE COURT: By you that is.

[DETECTIVE MACGILLIVARY]: Yes Your Honor.

(Emphasis added.)

The trial court "must act upon objections, instruct the jury, insure the trial is conducted in an orderly way and, in general, make sure that justice is done." *Spencer v. State*, 76 Md. App. 71, 77 (1988) (citation omitted). In discharging these duties, the trial court must act in a "'calmly judicial, dispassionate and impartial' manner." *Id.* (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (citation omitted)).

In *Acquah v. State*, 113 Md. App. 29 (1996), this Court explained the steps a party must take when faced with allegedly improper conduct on the part of the trial court:

"[W]e recognize that counsel is in a precarious position when he or she believes that the trial judge, by his actions, has

111

> caused harm to his or her client's case.  The
> dilemma is he or she must choose between, on
> the one hand, remaining mute and not
> protecting a client's interest or, on the
> other hand, incurring the wrath of a trial
> judge in an effort to preserve a record on
> which the lower court's actions may be
> reviewed.  Nevertheless, it is incumbent upon
> counsel to state with clarity the specific
> objection to the conduct of the proceedings
> and make known the relief sought."

*Id.* at 60 (quoting *Braxton v. Faber*, 91 Md. App. 391, 407 (1992)

(footnote omitted)).

As a result,

> [i]n order to gain review of the conduct and
> actions of a trial judge, the aggrieved party
> must (1) raise the issue during trial, (2)
> make a record with facts set forth in
> reasonable detail to show the purported bias
> of the court, (3) factual assertions
> supporting the claim must be made in the
> presence of the judge and opposing counsel,
> (4) the party must not be ambivalent in
> setting forth his or her position regarding
> the judge's actions, and (5) the specific
> relief sought must be stated with
> particularity.

*Acquah*, 113 Md. App. at 61 (citations omitted).  *But see Suggs v.*

*State*, 87 Md. App. 250, 257-58 (1991) (allegations of judicial

misconduct preserved even though counsel failed to object as

counsel was not wrong in fearing that he would "incur the great

wrath of the already outraged trial judge").

It is readily apparent from the exchange quoted above that the

trial court merely responded to defense counsel's concern that the

prosecutor's questioning would elicit inadmissible evidence from

112

Detective MacGillivary.  Defense counsel wanted to avoid having the evidence set before the jury even if his ensuing objection were sustained.  The trial court suggested a question that would satisfy the defendant's concerns, after which defense counsel thanked the court.  On the basis of this exchange, we do not see any ground for the accusation that the trial court acted as an arm of the prosecutor.

**JUDGMENTS   OF   CONVICTION   AFFIRMED.
APPELLANT TO PAY THE COSTS.**

113