# United States District Court for the District of Maryland

---

### Case No.:1:18-cv-03202-DKC

---

## Tony Dewitt

*Plaintiff*

v.

## William Ritz, *et al.*

*Defendants*

---

*RESPONSE AND OPPOSITION TO DEFENDANTS'*
*MOTION TO DISMISS PLAINTIFF'S COMPLAINT*
*AS A LITIGATION SANCTION BASED UPON*
*WITNESS TAMPERING AND THE*
*FABRICATION OF EVIDENCE*

---

**INTENTIONALLY BLANK**

Now comes the Plaintiff, Tony Dewitt, to prevent a grave injustice that has to stop, responds to the Defendants' Motion to Dismiss Plaintiff's Complaint as a Litigation Sanction Based Upon Witness Tampering and the Fabrication of Evidence, and states the following in support thereof:

1.      This Honorable Court is required to view the evidence in the light most favorable to the nonmoving party, Tony Dewitt, and draw all reasonable inferences in his favor.

2.      The moving parties claim that Mr. Dewitt "engaged in blatant and shocking witness tampering and outright fabrication of critical evidence...[insofar as he] conned the criminal justice system with fraudulent evidence to procure the dismissal of his murder charge...[and] offered to pay key witnesses from his criminal trial...in exchange for helpful testimony in his post-conviction proceedings and the instant civil case." Def. Motion at pg. 1.

3.      To the extent that the Defendants clam that Mr. Dewitt is a bad boy that needs to be spanked with the ultimate sanction of dismissal, they intentionally gloss over the overwhelming evidence that the witnesses in question had already testified in Mr. Dewitt's favor in his underlying criminal case and that Mr. Dewitt did not come into the evidence that the Defendants clam he fabricated until he filed a claim under the Maryland Public Information act that eventually produced Mr. Dewitt's case file containing the document referenced by the Defendants as the "Questioned Document." *Id.* at pg. 4.

4.      Moreover, Mr. Dewitt's Complaint does not rely on the Questioned Document to prove that the Defendants violated his rights secured under the United States Constitution.

**THEREFORE, BASED ON THIS RESPONSE AND OPPOSITION AND THE INCORPORATED MEMORANDUM OF LAW, THIS HONORABLE COURT MUST DENY THE DEFENDANTS' MOTION IN ITS ENTIRETY.**

Respectfully submitted,

/s Charles H. Edwards IV
_____

Charles H. Edwards IV, Esquire
4808 Butler Road
Glyndon, Maryland 21071

## CERTIFICATE OF SERVICE

The Plaintiff hereby affirms that the Defendants were served through the CM/ECF system care of their  attorneys on this 4th day of January, 2021.

Respectfully submitted,

/s Charles H. Edwards IV
_____

# United States District Court
# for the District of Maryland

---

**Case No.:1:18-cv-03202-DKC**

---

### Tony Dewitt

*Plaintiff*

v.

### William Ritz, *et al.*

*Defendants*

---

### *MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT AS A LITIGATION SANCTION BASED UPON WITNESS TAMPERING AND THE FABRICATION OF EVIDENCE*

---

**INTENTIONALLY BLANK**

I.      **INTRODUCTION**

The Plaintiff's claims of misconduct by homicide detectives are not unusual in Baltimore, where numerous murder convictions have been overturned, most often because police and prosecutors suppressed exculpatory or impeachment evidence. At issue herein are the wild allegations by the Defendants that the Plaintiff arranged illegal deals for favorable testimony in this civil litigation against the Defendants and that the Plaintiff somehow manufactured from prison a police report memorializing information that was already in the prosecutor's file prior to the Plaintiff's underlying criminal trial. What follows is the Plaintiff's Response and Opposition to the Defendants' wild claims.

II.     **MUCH OF THE EVIDENCE MATERIAL TO THE FEDERAL MALICIOUS PROSECUTION CLAIM   WAS ALREADY IN AND ON THE RECORD FROM THE UNDERLYING CRIMINAL PROSECUTION WHICH PRECEDED ANY OF THE PLAINTIFF'S PHONE CALLS.**

In an exchange during Maurice Booker's pretrial statement with Detective MacGillivary and Sergeant Greene, Maurice Booker was unmistakably clear that one of the Defendants had made a deal with him that would result in letting his family that was being held on unrelated charges arising out of "bagging up some weed" go. See Memo. Opinion at pg. 31, in pertinent part reproduced below.

DETECTIVE MACGILLIVARY: "Anybody make any promises to you?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "What's that?"

MAURICE BOOKER: "That dude that [brought] me down here say he was going to let my brother and them go."

DETECTIVE MACGILLIVARY: "And who's your brother?"

MAURICE BOOKER: "Cornell Booker"

DETECTIVE MACGILLIVARY: "And what happened with Cornell Booker?"

MAURICE BOOKER: "That dude found some weed he was in there bagging up some weed or something."

DETECTIVE MACGILLIVARY: "He was bagging up some weed?"

MAURICE BOOKER: "Yeah."

DETECTIVE MACGILLIVARY: "Okay, anything else?"

MAURICE BOOKER: "That's it."

DETECTIVE MACGILLIVARY: "Sergeant?"

SERGEANT GREENE: "No other questions."

DETECTIVE MACGILLIVARY: "Okay.  It is the 25th of September.  It is approximately 10 minutes of 5:00.  This interview is concluded. Nothing to follow[20]."

(TR, 11/19/2003, P-253).

Maurice Booker was not questioned any further about the arrangement that one of the Defendants had made with him prior to giving his pretrial statement. It is more than likely the case that all of the Defendants were in on the arrangement that had been made, but nevertheless even if they had not previously been a part of the illegal deal, they were at a very minimum on

notice and chose to ignore the illegal activity that Maurice Booker had brought to their attention.

At trial, Maurice Booker elaborated on the illegal deal. See Memo. Opinion at pgs. 18, 25, and

33, in pertinent part reproduced below.

> MS. BANKS:  The conversation you had with Detective Turner was about what?
>
> MAURICE BOOKER:  About the charge that I'm locked up for.  When he started talking [to] me [about] who shot me and he was going to let my mother and all them go, so I lied and told that them T.O. shot me.
>
> MS. BANKS:  That's what you told Detective…
>
> MAURICE BOOKER: After he showed… yeah; and we was talking and he was like here [is] the picture, and all this.  And he was like, we going to lock your mother and them up if you don't tell us who shot you or whatever.  So he was like, tell us T.O. shot you and we going to let your mother and them go.  They said they was going to lock my mother and them up.  My mother, my sister, they was going to put my niece in a foster care and they was going to put my little sister inside a foster care, too.  And they was like, just tell us T.O. did it; so I said all right.  I lied and told them that T.O. did it.
>
> (TR, 11/19/2003, at P-195-196).

MS. BANKS: You told Detective Turner that you – or, I'm sorry; Detective McGillivary that you ran after you were shot and you ran through the cut, and you saw the Defendant standing in the alley with a gun trying to un-jam it; is that true?

MAURICE BOOKER:  No, it ain't true.  That's what he told me to say.

MS. BANKS: That's what who… that

MAURICE BOOKER: Turner.  Detective – Detective Turner

MS. BANKS:  Detective Turner told you to say that you saw the Defendant standing in the alley trying to un-jam a gun?

MAURICE BOOKER: Yeah.

(TR, 11/19/2003, at P-272).

MS. BANKS: The conversation you had with Detective Turner was about what?

MAURICE BOOKER: About the charge that I'm locked up for.  When he started talking about telling [him] who shot me and he was going to let my mother and all them go, so I lied and told them that T.O. shot me.

MS. BANKS: That's what you told Detective…

MAURICE BOOKER: After he showed…yeah; and we was talking and he was like here go the picture, and all this.  And he was like, we going to lock your mother and them up if you don't tell us who shot you or whatever.  So he was like, tell us T.O. shot you and we going to let your mother and them go.  They said they was going to lock my mother and them up.  My mother, my sister, they was going to put my niece in a foster care and they was going to put my little sister inside a foster care, too.  And they was like, just tell us T.O. did it; so I said all right.  I lied and I told them that T.O. did it.

MS. BANKS: Okay.  Now, when you told Detective Turner and the light-skinned detective that T.O… who's T.O., first of all?

MAURICE BOOKER: Huh?

MS. BANKS: Who is T.O.?

MAURICE BOOKER:  Tony DeWitt.

MS. BANKS: Is that person present today?

MAURICE BOOKER: Yes, he is.

(TR, 11/19/2003, P-195-196).

**III.    THERE IS A MATERIAL DIFFERENCE BETWEEN WHAT NEEDS TO BE PROVEN TO BE SUCCESSFUL ON A STATE OF MARYLAND INEFFECTIVE ASSISTANCE OF COUSEL CLAIM AND A FEDERAL MALICIOUS PROSECUTION CLAIM.**

    **A.    STANDARDS OF PROOF ON A STATE OF MARYLAND INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

To establish a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) the attorney's  performance was deficient, and (2) the deficient performance prejudiced the defense. *Harris v. State,* 303 Md. 685, 697-99 (1985). Judicial review of counsel's performance "must be highly deferential." *State v. Thomas,* 325 Md. 160, 171 -72 (1992). The Supreme Court stated in *Strickland v. Washington*, 466 U.S. 668 (1984) that:

> A convicted defendant's claim that a counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that the counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced his defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from the breakdown of the adversary process that renders the result unreliable.

*Id.* at 687.

    **B.    STANDARDS OF PROOF ON A FEDERAL MALICIOUS PROSECUTION CLAIM**

"[A]llegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued"—e.g., post-indictment or arraignment—are considered a § 1983 malicious prosecution claim. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 182 (4th Cir. 1996). Such a claim "is properly understood as a

Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). To succeed, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the] plaintiff's favor." *Id.*

### 1.    *The Plaintiff's Federal Malicious Prosecution Claim*

The Plaintiff contends *inter alia* that, though he was arrested pursuant to a warrant, his arrest was unsupported by probable cause because it resulted from a materially false warrant application. "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause is "an objective standard of probability that reasonable and prudent persons apply in everyday life," *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998), and determined by a "totality- of-the-circumstances" approach, *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Gray*, 137 F.3d at 769 (internal quotation marks omitted).

A party challenging the veracity of a warrant application must show that the officer(s) deliberately or with a "reckless disregard for the truth" made material false statements in the warrant application, *Franks v. Delaware*, 438 U.S. 154, 171 (1978), or omitted from that application "material facts with the intent to make, or with reckless disregard of whether they thereby made, the [application] misleading," *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir.

1990) (citation omitted). Reckless disregard can be evidenced by an officer acting "with a high degree of awareness of [a statement's] probable falsity," meaning that "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)). Omissions are made with reckless disregard when the evidence demonstrates that a police officer "failed to inform the judicial officer of facts [he] knew would negate probable cause." *Id.* (quoting *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003)).

Moreover, a plaintiff must demonstrate that the false statement or omission is material, "that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" *Id.* at 628 (quoting *Franks*, 438 U.S. at 156). To determine materiality, the Court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Id.* (quoting *Wilson*, 212 F.3d at 789).

Here, the warrant application applied for by Detective Gregory MacGillivary included a description of wounds the shooter inflicted and further stated that:

> On 07/05/02 at approximately 0230 hours, the Baltimore City Police Department received a call to respond to the 1700 block of Montpelier Street for a shooting…On 25 September 2002 at approximately 1400 hours, Maurice Booker was interviewed at the offices of homicide. A taped statement was obtained from Master Booker indicating the events leading to the shooting. A group of six photographs were then shown to Master Booker. From this group photographs, the victim [Master Booker] identified the photograph in position #3 as the person who shot him and Sherene Moore. This photograph is a photograph of one Tony Dewitt 2526 Harford Road M/B/ 09/17/79.

The Plaintiff contends that (1) the statement that "Maurice Booker was interviewed… [and that he] identified the photograph in position #3 as the person who shot him and Sherene Moore…[and that this person was] Tony Dewitt" is false, the product of threats and coercion, and (2) a "corrected" warrant application excising the statement would not establish probable cause.

Taking this information in the light most favorable to the Plaintiff as the nonmoving party, the corrected warrant application would not have established probable cause to arrest the Plaintiff.. It is clear that the probable cause supporting the Defendants' application was based primarily, if not entirely, on the false assertion that the victim, Maurice Booker, positively identified the Plaintiff. Had the application shown that the police officers had at least partially caused Maurice Booker's response through threats and coercion, that identification—the sole basis of probable cause—would have been negated. Thus, the failure to mention these facts was at least reckless. Such a warrant would not have provided probable cause, "in light of all the evidence," to arrest the Plaintiff. *Miller*, 475 F.3d at 629 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004)). The circumstances presented in the corrected application would not "warrant a prudent person, or one of reasonable caution, in the believing, in the circumstances shown," that the Plaintiff attacked the victims. *Cahaly*, 796 F.3d at 407. No judicial officer employing the totality-of-the-circumstances approach would have issued the warrant simply because Maurice Booker identified the Plaintiff after being threatened and coerced.

IV.     **THE DEFENDANTS ARE ATTEMPTING TO RELITIGATE AN ISSUE THEY CREATED, WHICH IS CLEARLY OUTSIDE THIS HONORABLE COURT'S AUTHORITY TO ADJUDICATE.**

The Plaintiff filed a Petition for Post Conviction Relief pursuant to the Post Conviction Procedure Act, Md. Code Ann., Crim. Proc. § 7-101, *et seq.* Memo. Opinion, pg. 1. Plaintiff filed the Petition on December 5, 2013. *Id.* The State of Maryland filed a Motion to Dismiss/Response on December 9, 2013, and filed a Memorandum in Support on August 15, 2014. *Id.* The Plaintiff filed an Amended Post Conviction Petition on June 13, 2014, and filed another Amended Post Conviction Petition on July 25, 2014. *Id.* A post conviction hearing was held on July 15, 2015, and continued until August 6, 2015, for the Court to hear testimony from trial counsel. *Id.* Also, at the post conviction hearing, held on July 15, 2015, the Plaintiff orally supplemented his Petition, without objection, and asserted that trial counsel's performance was also deficient for not thoroughly investigating the statement of Tyrell Curtis on December 10, 2002, to Detective Veney.

As part of Honorable Melissa Phinn's Memorandum in Support of her grant of the Plaintiff's Petition for Post Conviction Relief, she goes to great lengths to discuss the Plaintiff's contention that he was not aware of Tyrell Curtis' statement that George Gaines was the shooter until he received it through the Public Information Act. Memo. Opinion, pgs 35-7. Where the Plaintiff's contention that a *Brady* violation is concerned, Judge Phinn concluded that the State of Maryland's arguments and "Exhibits 3a-c show that the prosecutor disclosed the December 10th interview with Curtis by Detective Veney on three different occasions." *Id.*

The Court also turned to the Plaintiff's trial counsel's testimony at the post conviction hearing regarding Tyrell Curtis. *Id.*, pg. 67. "Trial counsel testified that he was not aware of

Curtis until after he reviewed the prosecutor's file on June 17, 2003. Trial counsel acknowledged that the following day he wrote a letter to the prosecutor requesting Curtis' address. However, trial counsel could not recall specifically why he made the request for Curtis' address." *Id.* "Trial counsel testified that there must have been something else in the prosecutor's file that prompted him to request Curtis' address." *Id.* In fact, there were two documents that referenced the December 10 meeting between Tyrell Curtis and Detective Mark Veney - the document in question and the document reproduced below.



Does it not make sense that the police officers would make an official report of the December 10 questioning of Tyrell Curtis that is referenced directly above?

As well, while the Defendants' have gone to great lengths to allege that the Plaintiff manufactured the police report in question, they provide absolutely no explanation for exactly how the police report in question could have been manufactured by the Plaintiff while he was in

jail. Furthermore, whether the police report in question was manufactured is an issue that is not beyond the ken of a layperson and no experts were needed in this matter. It is crystal clear that the Defendants merely hired experts in an effort to substantiate their made up claim that the Defendant somehow manufactured the police report in question that memorializes the information in the above document while the Plaintiff was in jail for murder and obviously would not have access to any of the machinery that one would need to even begin to think about how they might go about manufacturing the police report in question.

## V.    CONCLUSION

To the extent that the Plaintiff may have been trying to secure the testimony of witnesses for their time and the trouble that providing their testimony might cause them, he was unmistakably clear that any such payments would have to be reduced to a contract and go through his lawyer, Roland Brown. This is really a red herring though, just like each and every one of the other issues that the Defendants have brought up. The material testimony required for the Plaintiff's federal malicious prosecution claim was already in the record and the police report in question only memorialized what was already in the record.

Handwriting experts can be hired to testify that any signature is suspect. What is important here; however, is that the contents of the police report in question, which was already in the prosecutor's file. There would literally be no point in providing a police report memorializing what was already in the prosecutor's file and where an argument about the Defendants' competency is concerned or one about their integrity, it benefits the Plaintiff more not to have the police report in question in the record.

For these reasons and the reasons set forth more fully throughout this Response and Opposition, the Defendants' Motion to Dismiss must be denied in its entirety.

Respectfully submitted,

/s Charles H. Edwards IV

_____

Charles H. Edwards IV, Esquire
4808 Butler Road
Glyndon, Maryland 21071

## REQUEST FOR HEARING

The Plaintiff respectfully requests a hearing on all issues raised herein his Response and

Opposition to the Defendants' Motion to Dismiss.

/s Charles H. Edwards IV

_____