IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TONY DEWITT                         :

                                    :

    v.                              :   Civil Action No. DKC 18-3202

                                    :

WILLIAM RITZ, et al.                :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights case is Defendants' motion to dismiss Plaintiff's complaint as a litigation sanction based upon witness tampering and the fabrication of evidence.  (ECF No. 48).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion to dismiss will be granted, but Defendants will be directed to supplement the record in order to make the evidentiary foundation for some of the exhibits clear.

I.  **Background**

This civil rights action arises out of the arrest and prosecution of Plaintiff, Tony DeWitt, for murder and attempted murder in the Circuit Court for Baltimore City.  On July 5, 2002, Sherene Moore and Maurice Booker were shot in Baltimore City.  Ms. Moore, only sixteen, was fatally wounded.  Maurice Booker survived.  (ECF No. 1, ¶ 18).  In November 2003, a jury sitting in the Circuit Court for Baltimore City convicted Plaintiff of the first-degree

murder of Ms. Moore, attempted first-degree murder of Mr. Booker, and use of a handgun in a crime of violence.[1]  He was sentenced to life imprisonment plus a consecutive term of twenty years.

On February 22, 2007, the Court of Special Appeals of Maryland affirmed Mr. DeWitt's conviction and, on June 8, 2007, the Court of Appeals of Maryland denied his petition for writ of certiorari. Having exhausted his options for direct appeal, Mr. DeWitt filed a petition for writ of actual innocence alleging newly discovered evidence on August 9, 2010.[2]  Shortly thereafter the Circuit Court for Baltimore City denied this petition.

Then, in December 2013, Mr. DeWitt filed a Petition for Post-Conviction Relief alleging that he had unearthed *another* exculpatory document (the "Questioned Document").  (*See* ECF No. 48-12).  The Questioned Document purported to be a police report containing a statement that a witness named Tyrell Curtis gave to

---

[1] At trial, the State theorized that the shooting was motivated by a turf war between rival drug dealers with Maurice Booker on one side, and Plaintiff and George Gaines on the other. Fifteen hours after the shooting of Moore and Booker, George Gaines was murdered in retaliation.  (*See* ECF No. 48-5, at 3-4).

[2] In that petition, Mr. DeWitt alleged that he had uncovered an exculpatory statement that a witness named Shanon Lewis had given to a Baltimore Police Department ("BPD") detective indicating that "she was present at the time of the crime and she witnessed the shooter . . . 'Mwamba Epps' commit the crime[.]" (ECF No. 48-7, at 3, 16-17).  Mr. DeWitt stated that he learned of this document for the first time as the result of a Maryland Public Information Act ("MPIA") request he made to the State's Attorneys' Office in May 2010.  He received the records on May 17, 2010.  (ECF No. 48-9, at 37).  He relied on the witness statement to advance an ineffective assistance of counsel claim, arguing that his lawyer failed to investigate Ms. Lewis thoroughly.  (ECF No. 48-7, at 7).

BPD Detective, Mark Veney, on December 10, 2002, indicating that "he witnessed George Gaines come around the corner shooting at everybody . . . [and] that Tony DeWitt had nothing to do with the shooting." (*Id.*).   The document appeared to be signed by both Detective Veney and a BPD Sergeant named Garnell Green.  Mr. DeWitt claimed that he had never seen the document before and had learned of it only as a result of his May 2010 MPIA request.[3]  He attached the Questioned Document to his petition for post-conviction relief. (*Id.*).

A post-conviction hearing was held in July 2015.  (ECF No. 48-10, at 2).   At the hearing, he was allowed to add, orally, an ineffective assistance of counsel claim on the ground that his attorney had failed to develop Tyrell Curtis as a witness at his murder trial. (*Id.*, at 73).[4]  Mr. Curtis testified at the hearing corroborating the "newly discovered" police report and stating that he did in fact give the statement attributed to him therein. (*See* ECF No. 48-13, at 19).   Maurice Booker also testified at the hearing on Plaintiff's behalf.   Trial counsel testified and said that, although he had access to the prosecutor's file, he did not recall seeing the report.  Relying on the Questioned Document, its

---

[3] Despite claiming that he learned of the document in May 2010, Mr. DeWitt made no mention of it in his August 2010 petition for writ of actual innocence. (*See generally* ECF No. 48-7).

[4] Plaintiff's petition also raised twenty-four other grounds for relief, all of which the circuit court rejected. (*See* ECF No. 48-10, at 2-7).

assumed presence in the prosecutor's file, and Mr. Curtis's testimony bolstering it, the post-conviction court determined that Mr. DeWitt's attorney must have seen the report and should have interviewed Mr. Curtis given the exculpatory information in the report.   Accordingly, the circuit court granted Plaintiff's petition for post-conviction relief and he was released from prison in October 2015.

In October 2018 Plaintiff filed the present action against seven BPD officers for malicious prosecution and conspiracy to violate the Fourth and Fourteenth Amendments.   Plaintiff alleges that Defendants "manufactured inculpatory evidence" against him and ignored "numerous exculpatory statements that [Plaintiff] was not the shooter."   (ECF No. 1, ¶¶ 1-5).   The claims against four of the named defendants and the claim for conspiracy to violate the Fourth and Fourteenth Amendments were dismissed in January 2020.   (ECF No. 39).   In the months that followed, discovery commenced on the surviving allegation of malicious prosecution against the remaining Defendants: William Ritz, Gregory MacGillivary, and Kevin Turner.

On July 22, 2020, Defendants filed the currently pending motion to dismiss Plaintiff's complaint as a litigation sanction alleging that Plaintiff had tampered with witnesses and fabricated the Questioned Document in order to deceive the state court into granting his post-conviction petition and releasing him from prison.   Defendants also contend that Mr. DeWitt intended to rely

4

on the same fabricated evidence and false testimony to support his claims in the instant proceeding.  (ECF Nos. 48, at 3; 67, at 8).

On August 5, 2020, Plaintiff simultaneously moved to strike Defendants' motion and requested more time to respond so that he could conduct discovery into the allegations.  (ECF No. 51).  On August 18, 2020, Plaintiff's attorney, Robert E. Joyce of the Law Office of Barry R. Glazer, LLC moved to withdraw himself as attorney for Plaintiff.  (ECF No. 53).  The court granted the motion on October 16, 2020, leaving Mr. Charles Edwards, IV as the sole counsel of record for Plaintiff.  (ECF No. 54).  Following a recorded telephonic conference on December 8, 2020, the court granted Plaintiff an additional 14 days to file a substantive response to the allegations.  (ECF No. 57).  After receiving yet another extension in late December, Plaintiff filed his response on January 6, 2021.  (ECF No. 64).  Defendants replied on February 3, 2021.  (ECF No. 67).

## II. Motion to Dismiss

### A. Inherent Power of the Court to Dismiss as a Sanction for Misconduct

"Federal courts have the inherent power to dismiss an action with prejudice as a sanction."  *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 158 (4th Cir. 2017).  "This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers."  *United States v. Shaffer Equipment Co.,* 11 F.3d 450, 461 (4th Cir. 1993).  "The courts'

5

inherent powers exist to preserve the integrity of the judicial process and the resources needed to resolve disputes in an orderly and expeditious manner—two indispensable assets in any nation dedicated to the rule of law." *In re Jemsek*, 850 F.3d at 157 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991)). "The courts must protect the integrity of the judicial process because, '[a]s soon as the process falters . . . the people are then justified in abandoning support for the system.'" *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *Shaffer*, 11 F.3d at 457).

"Mindful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction," a court must exercise its dismissal power with restraint and "may do so only after considering several factors[.]" *Shaffer*, 11 F.3d at 462.  In evaluating whether dismissal is an appropriate sanction, the court considers:

> (1) the degree of the wrongdoer's culpability;
> (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that [courts] seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.*, at 462-63.  Dismissal is justified where "a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the

integrity of the process[.]" *Id.*, at 462; *see also Projects Mgmt.*
*Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013). A
district court's use of its inherent power to dismiss is subject
to an abuse of discretion standard on review. *See Hartford Ins.*
*Co. v. Am. Automatic Sprinkler Sys., Inc.*, 201 F.3d 538, 543-44
(4th Cir. 2000).

Moreover, courts have considered, and imposed, sanctions when
the misconduct occurred primarily before other tribunals. For
example, in *Chambers*, the Court observed:

> Fourth, Chambers challenges the District
> Court's imposition of sanctions for conduct
> before other tribunals, including the FCC, the
> Court of Appeals, and this Court, asserting
> that a court may sanction only conduct
> occurring in its presence. Our cases are to
> the contrary, however. As long as a party
> receives an appropriate hearing, as did
> Chambers, *see* 124 F.R.D., at 141, n.11, the
> party may be sanctioned for abuses of process
> occurring beyond the courtroom, such as
> disobeying the court's orders. *See Young [v.*
> *United States ex rel. Vuitton et Fils S.A.,]*,
> 481 U.S. [787 (1987)] at 798, 107 S.Ct., at
> 2132; *Toledo Scale [v. Computing Scale Co.,*
> 261 U.S. 399 (1923)] at 426-428, 43 S.Ct., at
> 465-466. Here, for example, Chambers' attempt
> to gain the FCC's permission to build a new
> transmission tower was in direct contravention
> of the District Court's orders to maintain the
> status quo pending the outcome of the
> litigation and was therefore within the scope
> of the District Court's sanctioning power.

*Chambers,* 501 U.S. at 57. *See also Roche Diagnostics Corp. v.*
*Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB, 2020 WL 2308319,
at *6 (N.D. Ala. May 8, 2020) (discussing cases in which the
sanctioning court considered behavior in other cases that shared

7

obvious linkages to its own case, *e.g.*, the cases were consolidated or involved the same parties and issues.).

**B. Procedure**

There is no rule or required procedure for assessing a litigant's alleged misconduct, and a request for sanctions can arise in a variety of circumstances.  The bedrock fundamental principle, however, is that a litigant must have notice and an opportunity to be heard before sanctions are imposed: "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process." *Chambers*, 501 U.S. at 50.

**C. Evidentiary Basis**

At least a decade ago, courts recognized that, to impose severe sanctions for litigation abuse, they should employ the heightened standard of clear and convincing evidence, rather than a mere preponderance of the evidence:

> Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this [c]ourt's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit.
>
> However, proving misconduct occurred by "clear and convincing" evidence, as opposed to by a mere preponderance, certainly suffices. *See Lahiri v. Univ. Music and Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence." (internal citations omitted)); *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995) (citing several

> other circuits in holding that the "clear and
> convincing" standard is required to impose
> default judgment, whereas preponderance is the
> standard for imposing less dramatic
> sanctions); *Balcar v. Bell and Assoc., LLC*,
> 295 F.Supp.2d 635, [640] (N.D.W.Va. 2003)
> ("Because the court's inherent power to
> sanction should be exercised with caution and
> discretion, some circuits have held that clear
> and convincing evidence of bad faith and
> vexatious behavior is required for a court to
> exercise its inherent authority to sanction.
> Although the Fourth Circuit appears not to
> have addressed the issue, this Court believes
> it, too, would adopt the clear and convincing
> evidence standard with regard to the [c]ourt's
> inherent power to sanction." (internal
> citations omitted)).

*Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *2 (D.Md. Aug. 20, 2010). Of course, the Federal Rules of Evidence apply and govern the authentication of evidence.

## III. Analysis

### A. Plaintiff's Misconduct Falls Within the Scope of this Court's Sanctioning Power Because the Post-Conviction Proceedings and the Present Case are Immutably Linked.

Plaintiff's remaining claim is for malicious prosecution under 42 U.S.C. § 1983. As noted before, in the United States Court of Appeals for the Fourth Circuit, the term "§ 1983 malicious prosecution claim" is a conventional, but imprecise, reference to a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort [of malicious

prosecution]."[5]  The complaint is far from precise, but the overall
perspective is described in paragraphs 3 and 4:

> 3.  In this case, Sherene Moore was
> fatally gunned down on her sixteenth birthday
> and Maurice Booker was gunned down and
> survived after a gunman blindly fired multiple
> shots from around a corner at a number of
> people congregated on and around a nearby
> porch.  There was only one person that the
> Defendants identified as an eyewitness to the
> shootings, Maurice Booker.  However, prior to
> making an alleged identification of Mr. Dewitt
> in a second interview, Maurice Booker stated
> in a first interview that he did not know the
> identity of the shooter and that he had merely
> seen the shooter's arm that was extended
> around a corner.  He was then told by the
> Defendants that Mr. Dewitt shot him and in no
> uncertain terms that the adult members of his
> family would be incarcerated and that the
> children would be put in foster care if he did
> not fabricate an identification of Mr. Dewitt.
> Likewise, Maurice Booker's sister, Tasha
> Booker, was threatened that if she did not
> fabricate corroborating evidence bolstering
> Maurice Booker's phony identification of Mr.
> Dewitt, that [] she would be falsely
> prosecuted on unrelated charges.  And,
> Shamecca Bryant, Mr. Dewitt's friend that he
> had been out with till well after the shooting
> was threatened that if she did not cooperate
> with the Defendants she would go to prison for
> thirty three years.
>
> 4. Where the Defendants did not possess
> any eyewitness testimony inculpating Mr.
> Dewitt as the shooter that was not the product
> of their coercive threats, they did possess
> numerous exculpatory statements that Mr.
> Dewitt was not the shooter.  One example was

---

[5] *Lambert v. Williams*, 223 F.3d 257, 261-63 (4th Cir. 2000)
(clarifying "that there is no such thing as a '§ 1983 malicious
prosecution' claim" and explaining the term "is simply a claim
founded on a Fourth Amendment seizure"); *see also Durham v. Horner*,
690 F.3d 183, 188 (4th Cir. 2012) (describing malicious prosecution
claims as "inartfully termed").

> the statement of Shannon Lewis, who was
> present when a man by the name of Mwambe Epps
> took credit for the shooting.  Another example
> was Tyrell Curtis, an eyewitness, who
> identified George Gaines as the shooter.  As
> well, Damion Young made a statement to the
> Defendants that George Gaines was the shooter.

(ECF No. 1, at 4-5).  The evidence upon which those assertions rest include a police report and the testimony of Tyrell Curtis, Maurice Booker, and Cornell Booker.  Defendants contend that those pieces of evidence are fabricated and the result of bribery.

In response, Mr. DeWitt argues that his complaint does not rely on the Questioned Document to prove that the Defendants violated his rights secured under the United States Constitution, and that much of the evidence material to the claim in this court was already in the record of the criminal prosecution and preceded any of his phone calls.[6]  These arguments fail for two reasons. First of all, "a malefactor, caught red-handed, cannot simply walk away from a case, pay a new docket fee, and begin afresh.  History is not so glibly to be erased.  Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever

---

[6] Plaintiff also incorrectly asserts the standard.  Rather than arguing that the *Shaffer* factors do not warrant dismissal, he instead argues that the court is required to view the evidence in the light most favorable to him as the non-moving party. (*See* ECF No. 64, at 3).  This is wrong because Defendants do not seek dismissal on Fed.R.Civ.P. 12(b)(6) grounds.  Rather, Defendants move to dismiss the complaint as a sanction for litigation misconduct pursuant to Fed.R.Civ.P. 41 and this court's inherent authority. (*See* ECF No. 48, at 1).

guise it may subsequently appear." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989).

Second, in order to prove his § 1983 claim, Plaintiff will have to establish that the criminal proceeding terminated in his favor.[7]  *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254"), *accord, McDonough v. Smith*, 139 S.Ct. 2149 (2019); *Salley v. Myers*, 971 F.3d 308, 313 (4th Cir. 2020) ("a malicious prosecution plaintiff must 'establish[ ] that charges were nolle prossed for

_____

[7] The Supreme Court recently granted certiorari in *Thompson v. Clark*, No. 20-659.  One of the questions presented is:

> Whether the rule that a plaintiff must await favorable termination before bringing a Section 1983 action alleging unreasonable seizure pursuant to legal process requires the plaintiff to show that the criminal proceeding against him has "formally ended in a manner not inconsistent with his innocence," or that the proceeding "ended in a manner that affirmatively indicates his innocence," *Lanning v. City of Glen Falls*, 908 F.3d 19, 22 (2d Cir. 2018); *see also Laskar v. Hurd*, 972 F.3d 1278, 1293 (11th Cir. 2020) (acknowledging 7-1 circuit conflict).

reasons which imply or are consistent with innocence'", *citing McKenney v. Jack Eckerd Company*, 304 S.C. 21, 402 S.E.2d 887, 887 (1991)).  To do so, Plaintiff must rely on the grant of relief by the state post-conviction court and the ensuing decision of the State's Attorney for Baltimore City not to pursue a retrial.  If, as Defendants claim, dismissal of the charges was procured by fraud and bribery, Plaintiff should not be allowed to rely on it to prove his civil rights claim.

**B. Evidentiary Support for Exhibits**

Defendants filed a comprehensive motion, accompanied by attachments described as exhibits.  (*See* ECF Nos. 48-1 – 48-26). The motion, however, lacks precision in the evidentiary foundation for some of the exhibits, *i.e.,* they are not presented in the form of affidavits or declarations, or authenticated documents.  Other exhibits are sufficiently authenticated, either from their own attributes, or from admissions by Plaintiff due to his failure to deny.

As noted above, there is no specific procedure governing this type of motion.  But, to the extent it depends on evidence presented to the court, the procedure for summary judgment is helpful:

> Under Fed.R.Civ.P. 56, a party making or opposing a summary judgment motion may cite to materials in the record even if they are not in admissible form—as of 2010, the standard is whether the identified facts could be put in admissible form, not whether they are in such form when submitted.  *See Ridgell v. Astrue*,

2012 WL 707008, at *9 (D.Md. Mar. 2, 2012).
If the opposing party believes the cited
materials cannot be put in admissible form,
that party "must" file an objection. *Id.*;
*Herrera v. Ilhan*, 2013 WL 3177884, at *3
(D.Md. June 21, 2013) (same). Rule 56 thus
contemplates a "multi-step process by which a
proponent may submit evidence, subject to
objection by the opponent and an opportunity
[after an objection] for the proponent to
either authenticate the document or propose a
method to doing so at trial." *Ridgell*, 2012
WL 707008 at *9. Absent an objection, the
court may simply consider the proffered
evidence. *See Elat v. Ngoubene*, 993 F. Supp.
2d 497, 509 (D.Md. 2014) (court will consider
all evidence cited by parties absent an
objection); *Niagara Transformer Corp. v.
Baldwin Techs., Inc.*, 2013 WL 2919705, at *1
n.1 (D.Md. June 12, 2013) (unauthenticated
exhibits attached to motion for summary
judgment considered by court "as being what
they purport to be" because non-movant failed
to object); *see also Jones v. W. Tidwater
Reg'l Jail*, 187 F. Supp. 3d 648. 654 & n.5
(E.D. Va. 2016) (considering evidence where no
objection was raised and materials could be
authenticated); *Lauderdale v. Wells Fargo Home
Mortg.*, 552 Fed.Appx. 566, 572 (6th Cir. 2014)
("Usually, when a party fails to object to
evidentiary materials submitted by the
opposing party in support of summary judgment,
the objections are deemed forfeited or
waived."); 10A Charles A. Wright & Arthur R.
Miller, Fed. Prac. & Proc. § 2722 (4th ed.
2016) ("[D]ocuments inadmissible under the
evidence rules may be considered by the court
if not challenged").

*Kurland v. ACE Am. Ins. Co.*, No. CV JKB-15-2668, 2017 WL 354254,

at *3, n.2 (D.Md. Jan. 23, 2017). Mr. DeWitt has not objected

that any exhibit (or evidence) cannot be put in admissible form,

although he challenges the weight of certain evidence. Thus, the

court could consider all of the exhibits in the record. However,

14

out of an abundance of caution, Defendants will be required to make explicit what appears obvious for some of those exhibits that are not otherwise in evidentiary form.

### 1. Exhibits 1-4

Exhibits 1-4 are CDs of recorded telephone calls.  Defendants recited that the recorded prison calls were obtained through a subpoena served in this civil case on the Department of Public Safety and Correctional Services.  Because discovery material is not filed in the court file, the record does not contain that subpoena, nor do the physical exhibits on file with the court contain a copy of the subpoena, or any certification provided with the full discovery response.  Rather, Defendants have merely provided CDs of the recordings and an "Appendix A" which indexes the calls with dates and timestamps.  Mr. DeWitt, however, does not deny that it is his voice heard on those prison calls.  His lack of objection constitutes admission by his failure to deny, *see* Fed.R.Evid. 801(d)(2)(B)[8], and can provide the evidentiary

---

[8] "When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996).  "A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence. *See Marshall v. Young*, 833 F.2d 709, 716 n.3 (7th Cir. 1987).  We review the admission of evidence by the district court for abuse of discretion. *See United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir.1994)." *United States v. Robinson*, 275 F.3d 371, 382-83 (4th Cir. 2001).

support for authentication.  Fed.R.Evid. 901.  Certainly, if he was not the person on the calls, his response to this motion would have said so.

**2. Exhibits 5-17**

Many of the exhibits are documents that were filed with or by the state courts in Mr. DeWitt's criminal case:  Exhibit 5-the Court of Special Appeals opinion, Exhibit 6-the denial of certiorari by the Court of Appeals, Exhibit 7-the Petition for Writ of Actual Innocence, Exhibit 8-the order denying the petition, Exhibit 9-the Petition for Post-Conviction Relief,  Exhibit 10-the post-conviction opinion, and Exhibit 11-the order denying the motion to correct illegal sentence.  Judicial notice of state court documents is routine.  *See, e.g., Fusaro v. Cogan*, 930 F.3d 241, 245 n.1 (4th Cir. 2019) (citing *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239-40 (4th Cir. 1989)); *In re Under Armour Securities Litigation*, 409 F.Supp.3d 446, 456 (D.Md. 2019).  Plaintiff does not dispute the accuracy of the copies attached to Defendants' motion as Exhibits 5-11.

The key document – the so-called "Questioned Document" - was attached as an exhibit to Mr. DeWitt's post-conviction petition[9] and is included as Exhibit 12 to Defendants' motion.  Because the document was filed with the state court, it too is judicially noticeable.  Mr. DeWitt does not contest that it was filed in state

---

[9] The Questioned Document was attached to Plaintiff's post-conviction petition as "Exhibit 4".

court or that Exhibit 12 is an accurate copy.  He also does not challenge the conclusion that the purported police report is a forgery.  Rather, he argues that he does not rely on it in this case and that he was in no position to create the forgery because he was incarcerated.

Exhibits 13 and 14 are the transcripts of the post-conviction hearing.  They are certified by the court reporter and presumably qualify for judicial notice as court records.

Exhibits 15-17 are relied on by Defendants only to corroborate portions of the jail call discussions contained in Exhibits 1-4 and Plaintiff does not dispute the accuracy of any of these exhibits.  Exhibit 15 is the inmate locator for Tyrell Curtis printed from a website.  Exhibit 16 is the docket for Tyrell Curtis' criminal case.  Exhibit 17 is a Division of Correction Inmate Visitor Record for Mr. DeWitt, with the legend "DPSCS PRODUCED" and a Bates number on each page.  Presumably those pages were produced in discovery in this case.  Although such exhibits are relied upon only to corroborate other exhibits, Defendants should nonetheless properly authenticate them.

### 3. Exhibits 18-20

Exhibit 18 is the CV for Katherine Koppenhaver, Exhibit 19 is the CV for Diana Mears, Exhibit 20 is the report from Forensic Document Examiners, Inc.  Each of these exhibits lack an evidentiary foundation.  Mr. DeWitt questions the weight of the expert report (which is not under oath) but does not contend that

the experts would not testify as stated in the report, or that the documents upon which they rely are in any way unauthentic or are not what they purport to be.  Defendants will be required to supply appropriate declarations from the witnesses to that effect.

**4. Exhibits 21-26**

Exhibits 21, 22, and 23 are separate copies of the blank reverse side of the police report.  Exhibit 24 is both sides of the report.  Defendants' motion recites that this document is "[t]he original bubble report marked with [the] unique number [and] currently maintained by BPD's Case Management System ("CMS") Department."  (ECF No. 48, at 19 n.12).  Once again, Defendants will be required to supply appropriate declarations to verify what these documents are and where they were located.

Exhibit 25 is a typewritten account of the statement given by Tyrell Curtis on April 4, 2003.  There is no substantiation for the provenance of this document, although Mr. DeWitt does not challenge it.

Exhibit 26 is an excerpt of the testimony of Detective Sergeant Garnell Greene from the trial transcript.  It is provided only to demonstrate his rank at the time, and the transcript excerpt appears to come from a court record.  Plaintiff does not challenge its authenticity.  Thus, it is judicially noticeable.

In summary, Defendants will be required to supplement the record in order to lay a proper evidentiary foundation for Exhibits 15-25.

## C. Evidentiary Findings

The evidentiary record, once Defendants complete the foundation as outlined above, establishes that Mr. DeWitt deliberately fabricated an exculpatory police report and bribed multiple witnesses to testify in accordance with the contents of that fabricated report at his post-conviction hearing. The record also makes clear that Plaintiff intended to rely on the same fabricated report and perjured testimony in the instant case.

### 1. Evidence that the Questioned Document is Fabricated

Defendants include as an exhibit a detailed report by two certified forensic document examiners, Katherine Koppenhaver and Diana Mears. (ECF No. 48-20). The examiners reviewed the Questioned Document-purporting to contain Detective Veney and Sergeant Green's signatures-and upwards of thirty other documents containing their *known* signatures. The examiners concluded that the Questioned Document "is not authentic" but, rather, was "fabricated" by filling in the blank back page of an existing two-sided BPD report retrieved from the State's Attorneys' file. (*Id.*, at 7).

The expert report highlights multiple irregularities that expose the Questioned Document as fraudulent. First, the Questioned Document contains the exact same unique identifying

number as a known BPD report previously existing in the file.[10]
The back page of the known report, however, is entirely unfilled
in both the SAO file and the BPD's file. (*See* ECF Nos. 48-21 &
48-24). Second, the Questioned Document "contains hole punches
and 'trash marks' (imperfections, scratches, or dirt from a copy
machine which is visible on a photocopy) that line up perfectly
with the unfilled SAO copy." (ECF No. 48-20, at 11-13). This is
a clear indication that the SAO copy was used to create the forged
copy which Plaintiff alleges is "newly discovered." Third,
inspection of Sergeant Green's signature on the Questioned
Document reveals tremors, blunt endings, slower writing speed,
different initial and terminal strokes, and a lack of pressure
patterns. Each of these characteristics is indicative of a copying
process. (*See* ECF No. 48-20, at 8-10).

Aside from the experts' findings, Defendants also point out
signs of forgery readily apparent to a layperson. For example,
while the Questioned Document is purportedly authored by Detective
Veney, a homicide detective, it misspells "homicide" as
"homocide." It also mistakenly lists Sergeant Garnell Green,
Veney's boss, as a detective. This constitutes a significant
demotion of Sergeant Green's rank and thus, is an error that an
inferior officer would be unlikely to make. Finally, the "report

---

[10] Each double-sided BPD report contains its own unique
identifying number that serves for purposes of document tracking,
similar to a Bates number.

form indicates that the subject's name should be completed in the order of last name then first name" but the Questioned Document "ignores this instruction and reads 'Tyrell Curtis' – first name and then last name." (ECF No. 48, at 22) (citing ECF No. 48-12). As Defendants point out, this would be an unlikely mistake for an experienced Detective such as Veney to make because he would have been quite familiar with the format of the form.

### 2. Evidence of Witness Tampering

Defendants also submitted multiple hours of recorded prison calls which capture Plaintiff promising to pay Tyrell Curtis, Cornell Booker, and Maurice Booker in exchange for their favorable testimony at his post-conviction hearing. In addition, the calls confirm that Plaintiff asked another witness, Larry Mitchell, to provide false testimony of police misconduct. The calls span from March 2013 through October 2015.

### a. Tyrell Curtis

A series of calls throughout March 2013 show Plaintiff conspiring with his girlfriend, Yvette Gray ("Yvette"), and friend, Antonio McDougald ("Doodles"), to purchase false testimony from Tyrell Curtis. Yvette and Doodles commonly served as intermediaries, relaying messages or letters to Curtis on Plaintiff's behalf so that the two could communicate without creating a record of direct contact. Through these communications, Plaintiff provided Curtis with scripted testimony to present at his post-conviction hearing.

In March 2013, Yvette confirmed that Curtis was willing to accept Plaintiff's bribe.  During a call with Plaintiff, she stated, "I got good news . . . [Curtis] only want half up front . . . Doodles said he told [Curtis] he's gonna give him a buck fifty . . . and then give the rest when you go to court." (ECF No. 48-4, at 3/14/2013, 7:27:43 PM, 1:49-2:05).[11]  On that same call, Plaintiff instructed Yvette to "tell [Doodles] to make sure that [Curtis] know everything that this shit gonna be.  Once he put it on record it's on the record.  Ain't no switching up." (*Id.*, at 3/14/2013, 7:27:43 PM, 7:58-8:10).  The next day Yvette informed Plaintiff that "[Curtis] asked Doodles for 50.  I told Doodles . . . give him the 50 and come get it from me." (*Id.*, at 3/15/2013, 8:30:34 PM, 5:31-5:39).

In June 2013, Plaintiff urged Doodles to ensure that Curtis had read the scripted testimony he provided: "You gotta definitely make sure that uh.  You know what I mean like all the stuff that I wrote you because you know they gonna ask him questions and shit like that right? . . . make sure everything tight." (*Id.*, at 6/26/2013, 6:05:34 PM, 3:18-3:36).  Doodles replied: "Yeah, I already, I prepped him, I prepped him.  But I'm gonna, I'm gonna do it again, you know what I mean when it get closer, you feel me?" (*Id.*).

---

[11] Time stamp notations indicate the exact start and end times where the relevant quotations can be heard on the CD recordings. (*See* ECF Nos. 48-1 – 48-4).

In July 2013, Doodles spoke with Plaintiff and confirmed that he successfully "got Tyrell a deposit." (*Id.*, at 7/30/2013, 8:34:34 PM, 8:09-8:19). In response, Plaintiff chided him for using Tyrell's real name, exclaiming "Don't do that!" (*Id.*). In November 2013, one month before Plaintiff filed his petition for post-conviction relief in the circuit court, Doodles reassured Plaintiff that he had "been keeping tight contact on Tyrell." (*Id.*, at 11/24/2013, 7:14:36 PM, 20:02-20:12). In December 2013 Plaintiff filed his petition for post-conviction relief naming Tyrell Curtis as a witness who gave a statement to police that he witnessed George Gaines commit the murder.

Plaintiff also continued communicating with Curtis in the months leading up to his post-conviction hearing. In December 2014 and again in February 2015, Plaintiff mailed Yvette letters to deliver to Curtis laying out the details of his testimony. (*See* ECF No. 48-2, at 2/13/2015, 7:02 PM, 24:24-24:34) ("I wanted him to read over, so he can know. You know what I'm saying . . . so he . . . won't be getting there lookin' stupid, sounding crazy."). Despite their frequent contact, Curtis testified at the post-conviction hearing that he had not had any contact with Plaintiff since the shooting in 2002. (*See* ECF No. 48-13, at 37).

### b. Cornell and Maurice Booker

The recordings also reveal Plaintiff's attempts to coordinate the details of Cornell and Maurice Booker's testimony. Five months

before the hearing, on a February 12, 2015 call, Plaintiff told

Cornell Booker:

> So basically, what I need you to do is . . .
> say that . . . the state gave you a deal and
> shit and that's how you copped out to the time
> that you got, and your . . . brother, he . . .
> said the things that he said because of the
> simple fact that the police promised to do
> this . . . . that's basically what I need you
> to do . . . I definitely need your help . . .
> I definitely appreciate this shit . . . I get
> my lawyer and shit to uh, to send you a summons
> and shit, right . . . So if you need a ride
> down that motherfucker I can get my wife or
> . . . Doodles to come scoop you up . . . if
> you don't got no ride to go down to [the]
> courthouse and shit, she would do that . . .
> But before you all get down there to do a
> deposition I just wanna chop it up . . . first
> with you so you'll know exactly what to say
> and what, you know what I mean . . . before I
> put it in [my lawyer's] hands, I want to make
> sure that y'all were straight with it.

(ECF No. 48-2, at 2/12/2015, 12:32:37 PM, 16:26–27:57).   Later

that day, Plaintiff called Maurice Booker and stated:

> So the main thing is, basically, is you
> sticking to the whole, the whole script.  You
> just gotta be convincing.   You know what I
> mean . . . you just gotta basically be, you
> know, you know what was said and everything
> far as you being there . . . I'm gonna
> highlight you [to my lawyer] . . . 'cuz I . . .
> wrote uh, I got a letter, half of it, what I
> got one written to your brother . . . I wantin'
> to wait to talk to you first before I . . .
> put the joint together for you . . . I'm gonna
> mail that out so you should get it between
> . . . Wednesday and Thursday . . . once you
> get the letter you'll know where I'm headed
> because I don't wanna do it over the phone
> like that . . . so I'm gonna send it off to
> you and we can go from there . . . if you need

> a ride down, I can get my wife . . . or
> Doodles.

(*Id*., at 2/12/2015, 8:20:42 PM, 10:27-16:12).

One month before the hearing was scheduled to occur, Plaintiff promised Maurice Booker that he would pay him and his brother $10,000 each for their testimony:

> Me and you and my lawyer, we gonna work
> something out as far as a contract where as
> though I give you and your brother ten stacks
> a piece because that's when I can sue their
> ass for a lot of their bull-shit they did in
> my trial. And . . . if everything pan out
> right, I, I, I can definitely I wanna lace, I
> can lace your pocket and your brother pocket
> for real, right because I'm still, I'm still
> gonna need you all in my civil suit . . . I'm
> trying to bust the state for all the money I
> can  get   off   these   motherfuckers.

(ECF No. 48-1, at 6/14/2015, 8:22:39 PM, 14:05-16:48).

**c. Larry Mitchell**

The recordings confirm that Plaintiff also asked his friend, Larry Mitchell, to "come through" for him and provide false testimony of police misconduct at his post-conviction hearing. The following exchange occurred between Plaintiff and Larry Mitchell on a three-way call orchestrated by Yvette in June 2015:

> Plaintiff: I need you, basically to hit them
> up on shit like, man [the Detectives] was
> trying to force you to say that you seen me
> uh, with guns and all the other type of shit,
> and, and, and you stuck with your guns . . .
> this the thing yo, from that last trial joint
> I subpoenaed, from the prosecutor, they gonna,
> they got the transcript.  So you can't use
> . . . the plastic gloves shit.  You dig what
> I'm saying.  Because . . . all your testimony
> was that you just, all you know is that the

> motherfucker was light skinned and shit, right. In court, you gonna just. . . straight stick with the same thing. But the whole thing is, I'm, I'm just trying to pinpoint, man I'm only trying to pinpoint the corruption from the police department and shit, right . . . as far as the threats and coercion and shit like that, that they was trying to force upon you because the same detectives and shit that, that, that uh, is no longer detectives no more, they the ones that questioned you.
>
> Larry Mitchell: They never questioned me. That's what I'm saying.
>
> Plaintiff: Yeah, I know.
>
> Larry Mitchell: They never questioned me on your shit.
>
> Plaintiff: That's the, that's the point that I'm trying to make. I know that.
>
> Larry Mitchell: Oh, I get what you're saying. I get what you're saying. Oh, I get what you're saying. Aye ya, this what you gotta do, text me the uh, their names.

(ECF No. 48-1, at 6/20/2015, 7:52:47 PM, 4:09-6:38). Plaintiff's complaint in the instant case relies on Larry Mitchell as a witness to support the allegation that police ignored exculpatory statements that the shooter was light skinned when they arrested Plaintiff, who is dark-skinned. (*See* ECF No. 1, ¶ 41).

### 3. Plaintiff's Response to the Evidence

In response to the evidence proving that the Questioned Document was fabricated, Plaintiff merely contends that *he* could not possibly have fabricated it because he "obviously would not have [had] access to any of the machinery that one would need [to do so]" while in prison. (ECF No. 64, at 19). This argument is

unconvincing because, as made clear by the experts' report, the Questioned Document was fabricated using quite unsophisticated means; and as made clear by the recordings, Plaintiff was aided in his scheme by multiple third parties, any one of whom could have assisted in fabricating the document.  Plaintiff attempts to discount the expert report simply by asserting that "handwriting experts can be hired to testify that any signature is suspect." (*Id.*).  This conclusory statement does not even attempt to grapple with the merits of Defendants' substantive assertions.

Plaintiff also emphasizes the existence of an informal "while you were out memo" which he states corroborates that there was, in fact, a meeting between Tyrell Curtis and Detective Veney on December 10, 2002.  From this fact alone, he argues, it can be inferred that the Questioned Document is authentic.  Even if the court ignored that Plaintiff fails to explain where the memo comes from or the fact that it does not exist in the BPD file, the court cannot make such a giant leap.  (*See* ECF No. 64-2, at 1).

Regarding the extensive evidence of witness tampering, Plaintiff responds that "[t]o the extent that [he] may have been trying to secure the testimony of witnesses for their time and the trouble that providing their testimony might cause them, he was unmistakably clear that any such payments would have to be reduced to a contract and go through his lawyer[.]"  (ECF No. 64, at 19). This argument has not a shred of credibility for two reasons. First, it ignores the quite obvious flaw that $10,000 is an

inordinate amount of money to compensate a *lay* witness for his time.  Second, it stands in direct contradiction to Plaintiff's recorded remarks to Maurice Booker that: "Me and you and my lawyer, we gonna work something out as far as a contract where as though I give you and your brother ten stacks a piece *because that's when I can sue their ass . . . I'm trying to bust the state for all the money I can get off these motherfuckers*." (ECF No. 48-1, at 6/14/2015, 8:22:39 PM, 14:05–16:48).

In sum, Plaintiff's attempts to refute the overwhelming evidence of his misconduct fall flat.  Having carefully considered the parties' submissions, the court concludes, by clear and convincing evidence, that Plaintiff deliberately engaged in witness tampering and presented fabricated evidence to the state court in order to obtain post-conviction relief leading to the dismissal of his criminal charges.  Plaintiff intended and attempted to rely on the same false evidence to support his claims in the present suit.  First, the prison calls are essentially conceded and cannot be interpreted as innocuous.  Second, the police report is an obvious fabrication.  The existence of two copies of the original report, in the prosecutor and police files, is irrefutable, and uncontradicted, evidence that someone took the

copy from the prosecutor's office and clumsily added to the blank second page.[12]

**D. Application of the *Shaffer* Factors**

All six *Shaffer* factors weigh firmly in favor of finding involuntary dismissal an appropriate sanction here.  The first two factors include: (1) the degree of the wrongdoer's culpability and (2) the extent of the client's blameworthiness if the conduct was committed by his attorney.  In this instance, the first two factors may be analyzed simultaneously because the wrongdoing was perpetrated by Mr. DeWitt – the client.  There is clear and convincing evidence that Plaintiff fabricated the Questioned Police Report and then bribed Tyrell Curtis, Maurice Booker, and Cornell Booker to provide false testimony to bolster it.  This is irrefutable from the recorded prison calls.  (*See* ECF No. 48-1, at 6/14/2015, 8:22:39 PM, 12:33-21:06) ("We gonna work something out as far as a contract where . . . I give you and your brother ten stacks a piece because that's what I can sue [Defendants'] ass for . . . I can lace your pocket . . . because I'm still, I'm still gonna need you all in my civil suit.").  Plaintiff's actions were not the result of a temporary lapse in judgment, but rather, a deliberate scheme executed over the course of nearly two and a

---

[12]  Mr. DeWitt's trial attorney testified at the post-conviction hearing that he reviewed the prosecutor's file prior to trial and did not recall seeing the report of Tyrell Curtis' interview.  That testimony corroborates the conclusion that the so-called Curtis' interview did not take place and that the report is fabricated.

half years.  It is clear that he meticulously planned the scheme down to the last details including the careful use of pseudonyms for those involved and the coordination of their transportation to the courthouse steps.  For these reasons, Mr. Dewitt is one hundred percent personally culpable for his actions and the first two factors weigh heavily in favor of dismissal.

The third and fourth factors – prejudice to the judicial process and victim – also support dismissal.  Defendants assert that "it is difficult to conceive of a situation more prejudicial to the administration of justice than the undoing of a jury's guilty verdict in a murder case based on falsified evidence orchestrated directly by the accused and in concert with multiple co-conspirators."  (ECF No. 48, at 24).  The court agrees. Exacerbating matters even further, however, is Plaintiff's brazen attempt to profit from his scheme by pursing the current civil action and promising to pay conspirators for their lies out of the anticipated proceeds of a fraudulent civil rights case.  Such brazen actions make a mockery of the truth-seeking objectives of the judicial system and weaken its credibility as an institution deserving of public trust.  Moreover, Plaintiff's actions injure Ms. Moore's family and the community by depriving them of the closure provided by Plaintiff's conviction for her murder, as well as the Defendants in this case who have been forced to defend themselves from suit.  In one fell swoop Plaintiff's actions

30

undermined the public confidence in the integrity of law enforcement and the competence of state and federal courts.

The fifth factor is the availability of sanctions other than involuntary dismissal. Plaintiff fails to suggest any alternative sanctions that the court may impose. Regardless, the court has considered whether imposing only lesser sanctions such as requiring Plaintiff to pay costs and attorney's fees or striking the Questioned Report from the record would be adequate. Such alternatives, by themselves, would be inadequate. The gravity of Plaintiff's misconduct demands application of the strongest penalty available. *See Green v. Mayor & City Council of Baltimore*, 198 F.R.D. 645, 647 (D.Md. 2001) ("[N]o lesser sanction than dismissal could conceivably uphold the integrity of this Court as a place where the submission of false documents or testimony is not tolerated."). Indeed, courts have imposed dismissal as a sanction in cases involving less egregious misconduct. *See Mindek v. Rigatti*, 964 F.2d 1369 (3d Cir. 1992) *(*Upholding dismissal as a sanction where plaintiffs repeatedly refused to comply with court orders*)*; *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, (1st Cir.1989) (Affirming district court's ruling that dismissal was warranted where the complaint was based upon bogus purchase agreement); *Eppes v. H.E. Snowden*, 656 F.Supp. 1267 (E.D.Ky.1986) (dismissing counterclaim where backdated letters were produced in support of counterclaim).

The sixth and final factor, the public interest, also supports dismissal.  There is a strong public interest in preserving the public confidence in the courts' ability to adjudicate disputes fairly on the basis of facts and legitimate evidence, not on perjured testimony and forged evidence.  Our entire American judicial system is premised on such values.  Dismissal is also in the public interest because it deters others from engaging in similar misconduct by sending the clear message to potential offenders that attempts to game the system will not be tolerated.

Thus, despite "the strong policy favoring the disposition of cases on the merits," the court finds Mr. Dewitt's abuse of the judicial process in this case so extreme as to "forfeit [his] right to use the process."  *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir.), cert. denied, 139 S. Ct. 2762, 204 L. Ed. 2d 1137 (2019).

### E. Attorneys' Fees

Defendants also seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988, as prevailing parties.  This is precisely the situation in which fees are appropriate:

> In enacting § 1988, we stated, Congress sought "to protect defendants from burdensome litigation having no legal or factual basis." *Id.* [*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)], at 420, 98 S.Ct. 694. Accordingly, § 1988 authorizes a district court to award attorney's fees to a defendant "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Id.*, at 421, 98 S.Ct. 694; *see also Kentucky v. Graham*, 473 U.S. 159,

32

165, n.9, 105 S.Ct. 3099, 87 L.Ed.2d 114
(1985).

*Fox v. Vice*, 563 U.S. 826, 833 (2011).  The findings above more than meet that standard and Defendants are entitled to recover their attorneys' fees.

## IV.  Conclusion

For the foregoing reasons, the court will dismiss this case, with prejudice.  Defendants will have fourteen days to complete the evidentiary foundation for the specified exhibits. Thereafter, a final judgment will be entered and Defendants will have fourteen days from the entry of that judgment to file a motion requesting the award of attorneys' fees in accordance with Local Rule 109.2.c.  A separate order will follow.

                                    /s/
                          _____
                          DEBORAH K. CHASANOW
                          United States District Judge

33